Brian R. Nester (*pro hac vice*)
bnester@sidley.com
Anna M. Weinberg (*pro hac vice*)
aweinberg@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C.  20005
Telephone:  (202) 736-8000
Facsimile:  (202) 736-8711

Richard A. Cederoth (*pro hac vice*)
rcederoth@sidley.com
David C. Giardina (*pro hac vice*)
dgiardina@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

M. Patricia Thayer (SBN 90818)
pthayer@sidley.com
Ezekiel L. Rauscher (SBN 269141)
erauscher@sidley.com
SIDLEY AUSTIN LLP
555 California Street
Suite 2000
San Francisco, California  94104
Telephone:  (415) 772-1200
Facsimile:  (415) 772-7400

Attorneys for Plaintiffs
ASUS COMPUTER INTERNATIONAL,
ASUSTEK COMPUTER INCORPORATED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ASUS COMPUTER INTERNATIONAL; and ASUSTEK COMPUTER INCORPORATED<br><br>Plaintiffs,<br><br>vs.<br><br>INTERDIGITAL, INC.; INTERDIGITAL COMMUNICATIONS, INC; INTERDIGITAL TECHNOLOGY CORPORATION; IPR LICENSING, INC., and INTERDIGITAL PATENT HOLDINGS, INC.,<br><br>Defendants. | Case No. 15-CV-1716 (BLF)<br><br>**FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**PUBLIC**

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED.**

Plaintiffs ASUS Computer International and ASUSTeK Computer Inc. ("ASUSTeK") (collectively "ASUS" or "Plaintiffs") allege as follows for their First Amended Complaint against InterDigital, Inc., InterDigital Communications, Inc., InterDigital Technology Corporation, IPR Licensing, Inc. and InterDigital Patent Holdings, Inc. (collectively "IDC" or "Defendants").

## NATURE OF THE ACTION

1.     This action arises from (1) IDC's unlawful monopolization of the Cellular and Wireless Markets defined below (*see* ¶¶ 67-70, *infra*) through empty, misleading commitments to standard setting organizations ("SSOs"), including the European Telecommunications Standardization Institute ("ETSI") and the Institute of Electrical and Electronics Engineers Standards Association ("IEEE"), that it would license its Standard Essential Patents ("SEPs") on fair, reasonable, and non-discriminatory terms ("FRAND"); and (2) IDC's demand for royalties, and other terms, from ASUS that violate IDC's irrevocable commitment to license its SEPs on FRAND terms.

2.     SSOs specify technical standards for phones and other devices to provide interoperability.  SSOs are comprised of private corporations and other interested parties that select which technology (among alternative, competing technologies) must be used by consumers and equipment manufacturers.  ETSI sets standards for cellular telecommunications, and IEEE standardizes wireless local area networks or "Wi-Fi" and other communication technology.  These functionalities are contained in off-the-shelf chips (or chip-sets) purchased by mobile device manufacturers.

3.     Smartphones have revolutionized the mobile phone industry.  Previously, mobile phones were simple products that made and received phone calls and basic data messages.  Today, however, smartphones are complex computers.  Innovators, such as ASUS, merged countless functionalities into smartphones, beyond the baseline functionality provided by compliance with the ETSI and IEEE wireless standards.

4.     Eager to exploit the success of smartphone innovators, certain SSO members that own cellular or wireless SEPs, such as IDC, have engaged in "hold up" of smartphone innovators, to the detriment of the industry, consumers, and SSOs.  Patents declared essential to a cellular or

2

FIRST AMENDED COMPLAINT

wireless standard present opportunity for anticompetitive conduct. Once a patent becomes essential to a standard, the patentee's bargaining power surges because the prospective licensee has no alternative to licensing the patent.

5. SSOs present an acute risk for anticompetitive conduct because their members select which technology is to be implemented. Collective standard-setting involves both horizontal and vertical agreements to limit the technology available to consumers that would violate the antitrust laws if unconstrained. To counter-balance what otherwise would be illegal agreements, those participating in SSO standard-setting operate pursuant to the judge-made antitrust exemption that is rooted in meaningful safeguards against abuse, including the FRAND licensing commitment. IDC declared that it would license its essential patents on FRAND terms to ETSI, IEEE and other SSOs, but it has not honored these commitments.

6. Courts and regulators have criticized attempts by companies such as IDC to assert patents that are allegedly essential to cellular or wireless standards to demand supra-competitive royalties (and other licensing terms), particularly when it results in taxing value from unpatented functionality in wireless devices. For example, the High Court of China (affirming the lower trial court) ruled that IDC is a monopolist that illegally demanded supra-competitive royalties, illegally bundled essential and non-essential patents, illegally demanded unfair cross license terms, and illegally sought injunctive relief. Similarly, the Northern District of California held that LSI violated its FRAND commitment to IEEE 802.11 standard by seeking to have the U.S. International Trade Commission ("ITC") bar import of products implementing the standard, a litigation tactic that IDC has employed in at least four (4) ITC investigations to date.

7. IDC leverages the hold-up power of its SEPs against ASUS. ASUS and IDC currently are parties to a Patent License Agreement ("2008 PLA") dated April 2008. Ex. 1. Under the 2008 PLA, IDC licensed ASUS under certain patents relating to cellular and wireless communications standards—specifically ETSI's cellular 2G and 3G standards and IEEE's 802 wireless standard—for certain products. ██████████████████████████████ ███████████████████████████████████████████████████. As detailed below, recent publications have revealed that, among other things, ████████████████

████████████████████████████████████. However, IDC steadfastly demands █████

██████████████████████████████████████████████████████

████████████████████████████. IDC has violated its FRAND commitment during its negotiations leading to the 2008 PLA, by entering the 2008 PLA, by seeking to enforce the 2008 PLA, and by seeking to license other SEPs on terms that are unfair, unreasonable, and discriminatory.

8.   As described more fully in this Complaint, IDC has engaged in monopolization, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, § 17200 of the California Business & Professional Conduct Code and § 2512 of the Delaware Consumer Fraud Act, by unlawfully acquiring and exploiting the monopoly power in the Cellular Markets for 2G, 3G and 4G cellular technology and the Wireless Markets for IEEE 802 wireless technology.  IDC's monopolistic behavior consists of, among other anticompetitive acts and practices, (a) deceptively acquiring monopoly power through incorporation, or declaring incorporation, of technology in standards over which it asserts it has patents; (b) demanding supra-competitive royalty rates and other unreasonable licensing terms for its purported SEPs; (c) discriminating in its licensing practices in favor of certain large manufacturers to the detriment of others; and (d) using the threat of injunctive relief, such as filing a series of actions with the ITC, to force licensees to accept non-FRAND terms.

9.   Further, IDC's FRAND commitments to ETSI and IEEE constitute binding obligations that extend to all implementers, including ASUS.  By failing to offer to license on FRAND terms and actually licensing SEPs on FRAND terms, IDC has breached its contracts with ETSI and IEEE.  ASUS is a member of both ETSI and IEEE, and is a third party beneficiary of IDC's commitments.

10.   Accordingly, ASUS, a willing licensee, files the present action.

**PARTIES**

11.   Plaintiff ASUS Computer International is a wholly-owned United States subsidiary of ASUSTeK organized under the laws of California, with its principal place of business located at 800 Corporate Way, Fremont, California 94539.

12. Plaintiff ASUSTeK Computer, Inc. is a Taiwanese corporation with its principal place of business located at No. 15, Li-Te Road, Peitou, Taipei, Taiwan.

13. ASUS is a leading technology company that employs over 11,000 people around the world.  Innovation is key to ASUS's success.  Through extensive research, design, and development, ASUS now produces two lines of smartphones, the ZenFone and PadFone.  In addition to smartphones, ASUS designs and develops a broad array of information technology products, including PC components and peripherals, notebooks, tablets, and servers.  ASUS sells hundreds of thousands of mobile devices to U.S. consumers annually.

14. Defendant InterDigital, Inc. is organized under the laws of Pennsylvania.  Upon information and belief, its principal place of business is at 200 Bellevue Parkway, Suite 300, Wilmington, DE 19809.  InterDigital, Inc, maintains a facility in San Diego, California for technology and administrative functions.

15. Defendant InterDigital Communications, Inc. ("InterDigital Communications") is a Delaware corporation.  Upon information and belief, its principal place of business is at 781 Third Avenue, King of Prussia, Pennsylvania 19406.  Upon information and belief, InterDigital Communications, Inc. acquired Tantivy Communications, Inc, a Delaware corporation.  Upon information and belief, InterDigital Communications has an agent for service of process in Los Angeles, California.

16. Defendant InterDigital Technology Corporation ("InterDigital Technology") is a Delaware corporation.  Upon information and belief, its principal place of business is at 200 Bellevue Parkway, Suite 3000, Wilmington, DE 19809.  Upon information and belief, InterDigital Technology is a wholly-owned subsidiary of InterDigital Communications.

17. Defendant InterDigital Patent Holdings, Inc. ("InterDigital Holdings") is a Delaware corporation.  Upon information and belief, its principal place of business is at 200 Bellevue Parkway, Suite 300, Wilmington, DE  19809.

18. IPR Licensing, Inc. ("IPR Licensing") is a Delaware corporation, having its principal place of business at 200 Bellevue Parkway, Suite 300, Wilmington, DE 19809.

19.     Upon information and belief, InterDigital Communications, InterDigital Technology, InterDigital Holdings, and IPR Licensing are wholly-owned direct or indirect subsidiaries of InterDigital, Inc.  InterDigital, Inc., InterDigital Communications, InterDigital Technology, IPR Licensing and InterDigital Holdings act as a common, unified enterprise to the benefit of InterDigital, Inc.  Upon information and belief, InterDigital, Inc. has dictated and controlled the actions of InterDigital Communications, InterDigital Technology, IPR Licensing and InterDigital Holdings as described herein.

20.     IDC does not manufacture mobile devices.  In 2014 alone, InterDigital, Inc., on behalf of itself and its subsidiaries, reported generating $415.8 million in revenue—none of which is attributable to its own manufacturing efforts and all of which was acquired from licenses with innovators.  *See* Ex. 2, IDC Annual 10-K 2014 (Feb. 19, 2015) at 3 (reporting income generated from its subsidiaries' licenses).  Indeed, IDC's business strategy centers on acquiring and growing its portfolio of patents to generate licensing revenue for itself.  *Id.*  IDC promotes its patented technologies at SSOs, seeking to expand its revenue.  *Id.*

## JURISDICTION

21.     This Court has jurisdiction over this action pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.  It has supplemental jurisdiction over the state law claims asserted in this action pursuant to 28 U.S.C. § 1367.

22.     This Court also has jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C. § 1332 because this is an action between the citizens of different states and because the value of the injunctive relief, the value of ASUS' rights that this action will protect and enforce, and the extent of injury to be prevented exceed $75,000, exclusive of interest and costs.

23.     This Court also has jurisdiction over this dispute pursuant to 15 U.S.C. § 15 and 28 U.S.C § 1337 for injuries ASUS has sustained as a result of IDC's unfair restraint of trade through its action in SSOs and regarding standard essential patents.

24.     Defendants are also subject to this Court's personal jurisdiction because they have consented to personal jurisdiction in the Northern District of California, maintain facilities and employ residents in the state of California, maintain an agent for process in the state of California,

and/or regularly solicit and conduct business in the Northern District of California and have minimum contacts with this District. *See supra* ¶¶ 14-19.  For example, upon information and belief, InterDigital, Inc.'s various subsidiaries have availed themselves of the Northern District of California by requiring and consenting to the San Jose Division of the United States District Court for the Northern District of California as the exclusive jurisdiction and venue in several of its license agreements and by filing suit to enforce arbitrations of such licensing agreements in this district.

25.     Because of Defendants' contacts with this District, the exercise of jurisdiction over them would not offend traditional notions of fair play and substantial justice.

26.     Defendants are also subject to this Court's personal jurisdiction pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22.

## INTRADISTRICT ASSIGNMENT

27.     Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391(b)-(d).

28.     The parties have both irrevocably consented to exclusive jurisdiction and venue of the state and federal courts in the San Jose Division of the United States District Court for the Northern District of California.  Ex. 1, § 6.10.  Furthermore, events giving rise to the claim occurred in this District, all defendants are subject to personal jurisdiction in California and in this District, and ASUS International's principal place of business is in this District.  The parties had ███████████████ ███████████████████████████████████████████████████████████████████████████████ ████████████████████████████████.

## BACKGROUND

**A.     Standard Setting Organizations, Interoperability Of Mobile Devices, And Elimination Of Competition—"Lock-In"**

29.     At issue in this action are cellular and wireless standards—standards that define how one mobile device communicates with another device.  These cellular and wireless standards are promulgated by different standard setting organizations.  Standard setting organizations, commonly referred to as SSOs, are typically comprised of members from the private technology sector, such as ASUS, Apple, Nokia, Samsung, and IDC, to name just a few.

7

30.     SSOs effectively determine what technologies a standard product, such as a mobile device, must implement. By deciding which technologies will become the standard, a SSO eliminates and renders obsolete other technologies that the standard could have, but did not, implement.  SSOs thus impede innovation in the standardized technology space once a standard is accepted into the marketplace.  The tradeoff is that standards facilitate interoperability among product.  Such interoperability allows a mobile phone to communicate with other mobile phones as well as with the networking equipment involved in mobile communications.

31.     At least two SSOs are relevant to this action: ETSI, which promulgates cellular telecommunications standards, and IEEE, which promulgates wireless communication technology standards, including the IEEE 802 standards.

32.     ETSI, under the auspices of the Third Generation Partnership Project ("3GPP"), has promulgated several cellular telecommunications standards, including the standards for second-generation ("2G"), third-generation ("3G"), and fourth-generation ("4G") cellular network technologies, including but not limited to the Universal Mobile Telecommunications System ("UMTS") and Long-Term Evolution ("LTE") standards.  Prior to the adoption of each of these standards, ETSI had a choice among competing cellular technologies and the option to not specify any particular technology in any given technology space.

33.     The 802 wireless standards promulgated by the IEEE are the basis for wireless network products, such as Wi-Fi.  The original 802.11 Wi-Fi standard was released in 1997, with several subsequent revisions (denoted alphanumerically as 802.11a, 802.11b, 802.11c, etc.).

34.     Mobile devices, including those manufactured by ASUS, must comply with the technical standards promulgated by, *inter alia*, ETSI and IEEE, to be commercially viable.  By creating these standards, SSOs and their members effectively choose the technology that will be available to consumers.  Mobile devices (as well as the related components and network infrastructure) that do not conform to the adopted standards may not function with other standard-compliant components, devices, and network infrastructure equipment.

35.     The industry thus becomes "locked-in" to the technology specified by the standard. SSO members that adopt one technology render others obsolete.

**B.    SSO Collective Action, Standard Essential Patents, And Risk Of Monopolistic Behavior**

36.    Patent rights covering technologies that SSOs adopt as the standard create the potential for anticompetitive behavior in the standard-setting process.  Patents containing, or declared to contain, claims that must be practiced in order to implement any portion of a standard are referred to as standard essential patents, or SEPs.

37.    Standards are the product of collective action among competitors that endow standard essential patents holders with market power unrelated to the merit of their actual patented inventions. These collective horizontal and vertical agreements to limit the technology available to consumers would, if SEP owners are unconstrained and absent meaningful safeguards, violate the antitrust laws.

38.    Specifically, a company that purports to own one or more SEPs and that is free of an effective constraint on its licensing has the potential to exercise and abuse monopoly power in the markets for the technologies covered by its patents.  If another company wants to manufacture a standard-compliant product, holders of each patent that is essential to the standard can demand that it take a license.  Once a patent becomes essential to a standard, the patentee's bargaining power surges because the prospective licensee has no alternative to licensing the patent; he is at the patentee's mercy.  A SEP owner can demand exorbitant prices far in excess of any actual, incremental contribution of its patented technology to the licensed patent.  It can do so because the manufacturer faces the risk of being shut out of implementing the entire standard—including the substantial amounts of unpatented and public domain technology incorporated therein—and thus foreclosed from selling any standard-compliant product if it can be denied access to even one SEP. Moreover, an SEP owner can create, as IDC attempts, a large pool of potential licensees—namely, every company that wants to manufacture a standard-compliant product—by supporting adoption of its patented technology into the standard.  *See* Ex. 2 at 3, 6.

39.    In sum, absent an effective constraint on supra-competitive pricing, a SEP holder can demand and receive compensation far in excess of the value of its own contribution to the standard.

### C.    SEP Owners' FRAND Declaration Was Intended To Ameliorate Risk Of Monopolistic Behavior

40.    Attempting to safeguard against opportunistic behavior, SSOs typically request that members declare that they are prepared to license their SEPs on FRAND terms.  The FRAND commitment is intended to prevent monopolistic behavior, sometimes referred to as "hold-up."  In fact, the most common mechanism used by SSOs to attempt to prevent patent hold-up is the FRAND commitment, which is an antitrust exemption under which SSO standard-setting operates.

41.    IEEE and ETSI both provide voluntary FRAND obligations for SEP owners.  The IEEE requests letters of assurance containing, in pertinent part:

> b)    A statement that the Submitter without conditions will make available a license for Essential Patent Claims to an unrestricted number of Applicants … under *Reasonable Rates*, with other *reasonable terms* and conditions that are *demonstrably free of any unfair discrimination* to make … any Compliant Implementation that practices the Essential Patent Claims for use in conforming with the IEEE Standard…

Ex. 3, IEEE Standards Board Bylaws, § 6.1 (defining "licensing assurance").  Similarly, ETSI requests that a holder of a declared-essential patent make a binding and irrevocable commitment that the patent holder is prepared to grant a license to its declared-essential patent on "fair, reasonable and nondiscriminatory," or FRAND, terms.  Ex. 4, ETSI IPR Policy, § 6.1.  Both standards thus require that the SEP holder provide implementers with reasonable licensing terms and conditions that are also non-discriminatory.

42.    Despite the FRAND commitment, however, some SEP owners engage in anticompetitive practices, including hold-up.  Hold-up enables a SEP owner to, *inter alia*, demand unreasonable rates, rates that exceed (1) the actual incremental contribution of its patents to the standard,(2) the amount that could have been obtained if potential alternative technologies had not been eliminated through the standard selection process and (3) what implementers would be willing to pay if they were not already irreversibly locked into and invested in the standard.  *See* Ex. 3, IEEE Standards Board Bylaws, § 6.1 (defining "Reasonable Rate").  The purpose of the FRAND requirement is to confine the patentee's royalty demand to, at most, the value conferred by the patent itself as distinct from the additional value—the hold-up value—conferred by the designation of a patent as a SEP.

43.    IEEE defines what constitutes a Reasonable Royalty as excluding all value derived from inclusion of the standard:

> "Reasonable Rate" shall mean appropriate compensation to the patent holder for the practice of an Essential Patent Claim excluding the value, if any, resulting from the inclusion of the Essential Patent Claim's technology in the IEEE Standard.  In addition, determination of such Reasonable Rates should include, but need not be limited to, the consideration of such:
>
> - The value that the functionality of the claimed invention or inventive feature within the Essential Patent Claim contribute to the value of the relevant functionality of the smallest saleable Compliant Implementation that practices the Essential Patent Claim.
>
> - The value that the Essential Patent Claim contributes to the smallest saleable Compliant Implementation that practices that claim, in light of the value contributed by all Essential Patent Claims for the same IEEE Standard practiced in that Compliant Implementation.
>
> - Existing licenses covering use of the Essential Patent Claim, where such licenses are not obtained under the explicit or implicit threat of a Prohibitive Order, and where the circumstances and resulting licenses are otherwise  sufficiently comparable to the circumstances of the contemplated license.

Ex. 3, IEEE Standards Board Bylaws, § 6.1 (defining "Reasonable Rate").  As the definition further provides, Reasonable Rates should also consider: (1) the value the patented feature contributes to the smallest saleable implementation, (2) royalty burden of other SEPs to that saleable unit, and (3) any existing licenses if not obtained under the threat of injunction and otherwise comparable.  IEEE explains that a Reasonable Rate should exclude the value arising from the cost or inability of implementers to switch from technologies included in a standard.  *See* IEEE Standards Board Bylaws, FAQ, at 12.  As the Department of Justice observes, "This provision aligns with generally accepted goals of RAND commitments, namely, providing the patent owner with appropriate compensation, while assuring implementers that they will not have to pay any hold-up value connected with the standardization process."  Ex. 5, U.S. D.O.J, Bus. Rev. Letter to IEEE (Feb. 2, 2015).

44.    Even if a SEP declarant provides what otherwise might be considered a Reasonable Rate, it violates its FRAND obligation if it demands licensing terms and conditions that are not demonstrably non-discriminatory.  Both IEEE and ETSI obligations require that licensing terms and conditions be non-discriminatory. Ex. 3, IEEE Standards Board Bylaws, § 6.1; Ex. 4, ETSI IPR

Policy, § 6.1.  Although recently updated, the IEEE Bylaws clarify the FRAND commitment of the IEEE's previous Bylaws.  Even under the prior Bylaws, a participant was required to submit a Letter of Assurance that, *inter alia*, "a license for the compliant implementation of the standard will be available to an unrestricted number of applicants on a worldwide basis without compensation or under reasonable rates, with reasonable rates and conditions that are demonstrably free of any unfair discrimination."

45.    In and of itself, the FRAND commitment is a binding contract.  A patentee agreeing to permit use of the declared-essential patent on FRAND terms creates legally enforceable contractual rights and obligations between it and the SSO.  Specifically, by submitting its declarations, IDC became (i) contractually bound to SSOs, including IEEE and ETSI; (ii) for the benefit of third party beneficiaries; (iii) to license its declared-essential patents on FRAND terms in accordance with, *inter alia*, Article 6.1 of the ETSI IPR Policy and Clause 6 of the IEEE Standard Board Bylaws.

**D.    IDC's Participation In Technology Selection For Standardization And Empty Promise To License That Technology On FRAND Terms**

46.    IDC is in the business of participating in standard-setting, having the SSO adopt technology over which IDC claims to have patents, and then seeking exorbitant rates to license its SEPs for that technology.  *See* Ex. 2 at 3, 6.  IDC is a member of ETSI and IEEE, and has actively participated in their technical working groups.  The working groups specify which technology the SSO will adopt.  IDC claims to have had  a "leadership" role in each of these SSOs.  For example, ███████████████████████████████████████████ including making hundreds of alleged contributions to the 3GPP standards.  Indeed, IDC representatives hold positions in committees for these standards, including as Vice Chair of the 3GPP RAN Working Group 3, editor of the 3GPP RAN WG1 Physical Layer Procedures, and editor for the 3GPP RAN WG4 TDD Base Station Classification standard.  Similarly, IDC states on its website that it "is among the leading contributors to the standardization process for . . . various IEEE 802 groups such as 802.11, . . ."

47.    As a result of IDC's concerted efforts within SSOs, including ETSI and IEEE, IDC allegedly owns thousands of SEPs.  For example, in its 2003 10-K submission to the SEC, IDC

admitted that "[a] number of our TDMA inventions are being used in a broad range of 2G and 2.5G wireless networks and mobile and fixed terminal-end devices and we believe such inventions are essential to those standards…. Similar to our TDMA inventions, we believe that a number of our inventions are essential to the implementation of 2G and 2.5G and 3G CDMA systems in use today." Ex. 41 at 5. IDC also stated that "[f]or 3G we have submitted over 1,000 contributions to standards bodies worldwide and over 60% of those contributions have been adopted." *Id.* at 6. As of 2012, IDC purported to have a portfolio of more than 9,500 patents and applications that it has declared to be essential to ETSI, of which at least 1,000 were U.S. patents and applications declared essential to the 3G UMTS standard. In 2014, IDC boasted of owning more than 1,400 U.S. patents and patent applications that it has declared to be essential to the 4G LTE standard. *See* Ex. 2. And, in 2015, IDC stated, in its public SEC filings, that "[w]e believe that licenses under a number of our patents are required to manufacture and sell 3G, 4G, and other wireless products." Ex. 42 at 10. Many of these patents, according to IDC, read on portions of standards for which IDC played an active role in forming.

48. Along with its participation in standard setting, IDC has declared to SSO members that it will license its declared patents on FRAND terms. For instance, IDC provided the following non-exhaustive list of declarations to ETSI:

| Date | InterDigital Entity | Project(s) or Standard(s) | Exhibit |
|---|---|---|---|
| 10/4/01 | InterDigital Technology | UMTS | 6 |
| 10/4/01 | InterDigital Technology | GSM | 7 |
| 4/8/04 | InterDigital Technology | UMTS (TS41.101 Rel. 5) | 8 |
| 4/8/04 | InterDigital Technology | GSM (TS41.101 Rel. 4) | 9 |
| 3/21/07 | InterDigital Technology | UMTS; E-UMTS | 10 |
| 9/19/08 | InterDigital Holdings | UMTS; E-UMTS; GERAN | 11 |
| 9/19/08 | InterDigital Technology | GSM; UMTS; E-UMTS; GERAN | 12 |
| 9/14/09 | InterDigital Holdings | UMTS; E-UMTS; GERAN | 13 |
| 9/14/09 | InterDigital Technology | GSM; UMTS; E-UMTS; GERAN | 14 |

| 9/16/10 | InterDigital Holdings | UMTS; LTE; GERAN | 15 |
| 10/31/11 | InterDigital Holdings | UMTS; LTE; RRS; M2M | 16 |
| 10/31/11 | InterDigital Technology | UMTS; LTE | 17 |
| 11/30/12 | InterDigital Holdings | UMTS; LTE; RRS; M2M | 18 |
| 11/30/12 | InterDigital Technology | UMTS; LTE | 19 |
| 11/26/13 | InterDigital Holdings | UMTS; LTE; RRS; M2M | 20 |
| 11/16/13 | InterDigital Technology | GSM; UMTS; LTE | 21 |

It did the same with IEEE:

| Date | InterDigital Entity | Project(s) or Standard(s) | Exhibit |
|---|---|---|---|
| 5/31/05 | IPR Licensing, Inc | 802.11k | 22 |
| 5/31/05 | InterDigital Technology | 802.11k | 23 |
| 2/8/08 | InterDigital Technology | 802.11n | 24 |
| 2/8/08 | InterDigital Technology | 802.11s | 25 |
| 2/8/08 | InterDigital Technology | 802.11u | 26 |
| 2/8/08 | InterDigital Technology | 802.11v | 27 |
| 9/9/11 | InterDigital Holdings | 802.11z | 28 |
| 9/9/11 | InterDigital Technology | 802.11z | 29 |
| 9/9/11 | InterDigital Holdings | 802.11ac | 30 |
| 9/9/11 | InterDigital Technology | 802.11ac | 31 |
| 9/9/11 | InterDigital Holdings | 802.11ad | 32 |
| 9/9/11 | InterDigital Technology | 802.11ad | 33 |
| 10/29/13 | InterDigital Holdings | 802.11af | 34 |
| 10/29/13 | InterDigital Holdings | 802.11ah | 35 |
| 10/29/13 | InterDigital Holdings | 802.11ai | 36 |

49.     In reliance on the integrity of the SSO process and its participants, and on the commitments made by IDC and others regarding essential patents they owned and declared "essential," ASUS has been developing and selling compatible products and implementing off-the-shelf chips that incorporate the standards at issue here.  ASUS decided to develop and sell these products in reliance on, and under the assumption that, it and/or any third-party suppliers could obtain a license to SEPs on FRAND terms.

50.     However, on information and belief, IDC embedded itself within IEEE, ETSI, and other SSOs, and concealed its intent to engage in hold-up and to charge supra-competitive royalty rates and other licensing conditions for its declared essential patents.  Indeed, IDC provided what have proved to be hollow FRAND declarations so that the SSO would adopt technology over which IDC claimed patent rights rather than alternative technology that would have been available for use, fairly.

**E.     IDC's Effort To Exploit Market Power By Refusing To Provide FRAND License**

51.     IDC has exploited its market power obtained through the standards setting process in negotiations with ASUS.  IDC refuses to honor its FRAND commitment by failing to license under fair and reasonable terms and conditions.  Further, IDC's licensing demands of ASUS are discriminatory.  Still further, ███████████████████████████████████████████ ███████████████████████████████████████ this representation was false.

52.     IDC began exploring licensing possibilities for its █████████████████ ████████████████████.  At the outset, ███████████████████████████, IDC refused ████████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████.  Of significance, IDC stated that ██████ IDC offered ASUS was ████████████████████████████████ ████████████████████████████████████████.  For example, ████████████████████████████████████████ ████████████████████████████████████████

1

2

3  . And,

4

5

6  IDC made these representations in response to

7  ASUS' stated concerns about

8  .

9        53.    IDC ensures its ability to engage in discrimination by conducting licensing

10  negotiations in secret, and by keeping secret the terms of the licenses it enters.  *See*, *e.g.*, Ex. 1 § 6.6.

11  IDC requires that potential licensees enter non-disclosure agreements for all negotiations and

12  licenses.  IDC does this to ensure that only IDC knows the terms and rates obtained by its licensees.

13  *See*, *e.g.*, Exs. 37, 38, 39.  Armed with this one-sided knowledge, IDC attempts to extract supra-

14  competitive terms and obtain discriminatory terms from each licensee.  IDC's representations that

15  ASUS was

16       secretive, anticompetitive environment IDC imposes.

17        54.    Nevertheless, recent events—namely IDC's litigation efforts against others—exposed

18  that IDC's licensing conduct with, and representations to, ASUS were false, and knowingly

19  misleading.  IDC has and continues to abuse its market power, gained through the standard setting

20  process, to extract unfair and unreasonable licensing terms.  IDC also uses that market power to

21  discriminate against ASUS vis-à-vis other licensees.

22        **1.  IDC Demands Anticompetitive Royalty Rates**

23        55.    On information and belief, multiple, recent disclosures indicate that the rates IDC

24  demands are not fair or reasonable and are discriminatory.  At least one forum has confirmed that

25  IDC's similar licensing conduct toward another mobile device producer (Huawei) is monopolistic

26  and violates IDC's FRAND obligation.  Based on information and belief, other IDC licensees are

27  also

28       .

56.     Specifically, on October 16, 2013, the Guangdong High Court of China (affirming the lower trial court) ruled that IDC is a monopolist ("High Court decision").  The High Court issued this decision for multiple counts of conduct that violate IDC's FRAND commitments.  It found that IDC (1) illegally demanded supra-competitive royalties, (2) illegally bundled essential and non-essential patents, (3) illegally demanded a royalty-free cross license, and (4) illegally threatened injunctive relief.  IDC has imposed the ████████████████████████████.  Although IDC dismisses the decision as "nationalistic," the decision is consistent with United States appellate and district court opinions, as well as the obligations imposed by the same SSOs in which IDC participates and infiltrates with its standard essential patents.

57.     The High Court decision provides a FRAND rate for IDC's SEPs ████████████ ███████████████████████.  Specifically, the High Court held that the FRAND rate for IDC's Chinese SEPs is 0.019%, which is ███████████████████████████ ███████████████████████.

58.     As to U.S. patents, recently released public information reveals that IDC granted Apple a license (prior to the 2008 PLA) that ██████████████████████████████ ██████.  Specifically, the High Court decision indicates that Apple's license with IDC includes royalties ████████████████████████████████████ ████████████████.

59.     Further, in June 2014, IDC entered a licensing agreement with Samsung for, *inter alia*, IDC's 3G and 4G portfolios.  Attempting to promote its stock to shareholders, IDC disclosed certain terms of the 2014 Samsung license.  Based on sales figures for Samsung's devices, IDC's public disclosures indicate that Samsung pays ████████████████████████████ ██████.  And, IDC obtained its license from Samsung under threat of injunction, which violates IDC's FRAND obligation.  Thus, despite IDC's best-effort to maintain a shroud of secrecy over its licensing terms with others, it has become clear to ASUS that IDC's licensing terms in the 2008 PLA and those IDC demands by amendment improperly exploit IDC's declarations that the patents are essential to the respective standards.

60.     Despite these public disclosures regarding IDC's licensing rates and terms, IDC not

███████████████████████████████████████████████████████████████████████,

but it also demands ██████████████████████████████████████████████████████

█████. For example, ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████ Nonetheless, ASUS has,

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████ And,

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████

**2.   IDC Demands Application Of Royalty Rate To The Wrong Base**

61.   ███████████████████████████████████████████████████████████

████████████████████████████████████████████ For example,

██████████████████████████████████████████████████████████████

█████████████████ that implements the relevant standards.  This too, either alone or in

combination with IDC's other demands, reflects IDC's attempt to use the hold-up power of its SEPs

in order to capture value that is unrelated to them.  Although at the █████████████████

███████████████████████████████████████████████████████████████

██████████████████████

62.   ████████████████████████████████████████████████████

███████████████████████████████. Any FRAND royalty should be based on the

patented feature, as opposed to all features of a complex licensed product that integrates many

functions and features wholly unrelated to any IDC-patented technology.

### 3. Improper Injunction Threats

63.     IDC's hold-up also includes its threat to enjoin ASUS from manufacturing its mobile devices.  .  Furthermore, IDC has

64.     IDC continues to use the threat of injunction to exploit its market power.  In March 2007, IDC filed a complaint against Samsung with the U.S. International Trade Commission ("ITC") to ban import of 3G handsets and components that allegedly infringed IDC's SEPs and simultaneously filed an infringement action in the U.S. District Court for the District of Delaware. In August 2007, IDC filed a complaint against Nokia with the ITC, similarly seeking to ban Nokia's 3G or 4G allegedly implementing IDC's SEPs.  Since 2006, and to exclude use of its SEPs, IDC has filed at least four  ITC investigations asserting over thirteen (13) declared essential patents against many mobile phone manufactures, including Samsung, Microsoft Mobile Oy, Nokia Inc., Nokia Corp., ZTE, LGE and Huawei.  *See* Ex. 2.

### 4. Other Improper Licensing Terms: Grant-Back License And Term

65.     IDC requires unreasonable

.  Ex. 1, §§         .  Similarly,

66.

Further, ███████████████████████████████████████████████, and the unreasonableness of such a provision is exacerbated by IDC's refusal to ████████████ ██████████.

### F.  Relevant Markets Impacted By IDC's Monopolistic Behavior

#### 1.  The Cellular Markets

67.   The relevant markets within which IDC exercises market power are the markets or submarkets for technologies covered by IDC patents incorporated into the 2G, 3G, and 4G cellular network by SSOs—such as ETSI—together with all other technologies that SSOs could have used in alternative 2G, 3G and 4G cellular network standards to provide the same or reasonably interchangeable functionalities (hereinafter, "Cellular Markets").

68.   Examples of markets and submarkets encompassed within the Cellular Markets can be found by reference to the specific patents (and patent applications) that IDC claims are essential to the 2G, 3G, or 4G cellular network standards that were identified in its licensing declarations to ETSI and other SSOs.  *See supra* ¶ 48 & Exs. 6-21 (exemplary IDC declarations to ETSI, which list IDC's declared essential patents).  After the adoption of these standards, IDC became the only commercially viable seller in each of the relevant Cellular Markets.  Furthermore, because of the lock-in effect described in paragraphs ¶¶ 30-36, device manufacturers can no longer replace the elements of the widely-adopted standards with different technology.  As IDC itself has stated, "companies making, importing, using or selling products compliant with the standards covered by our patent portfolio, including all manufacturers of mobile handsets, tablets and other devices,

require a license under our patents and will require licenses under patents that may issue from our pending applications." Ex. 2 at 6.

### 2.  The Wireless Markets

69.     The second set of relevant markets within which IDC exercises market power are the markets or submarkets for technologies covered by IDC patents incorporated into the IEEE 802 wireless standards by IEEE, together with all other technologies that IEEE could have used in alternative IEEE 802 wireless standards to perform the same or reasonably interchangeable functionalities (hereinafter, "Wireless Markets").

70.     Examples of markets and submarkets encompassed within the Wireless Markets can be found by reference to the specific patents (and patent applications) that IDC claims are essential to the IEEE 802 wireless standards that were identified in its licensing declarations to IEEE.  *See supra* ¶ 48 & Exs. 22-36 (exemplary IDC declarations to IEEE, which list IDC's declared essential patents).  After the adoption of these standards, IDC became the only commercially viable seller in each of the relevant Wireless Markets.  Furthermore, because of the lock-in effect described in paragraphs ¶¶ 30-36, device manufacturers can no longer replace the elements of the widely-adopted standards with different technology.  As IDC itself has stated, "companies making, importing, using or selling products compliant with the standards covered by our patent portfolio, including all manufacturers of mobile handsets, tablets and other devices, require a license under our patents and will require licenses under patents that may issue from our pending applications."  Ex. 2 at 6.

### <u>COUNT I</u>
### (Violation Of Section Two Of The Sherman Act)

71.     ASUS realleges and incorporates by reference the allegations set forth paragraphs 1–70 above.

72.     In the context of the consensus-oriented private standard-setting environment of SSOs, IDC's intentionally false promise to license essential technology on FRAND terms, coupled with SSOs' and its members' reliance on that promise when including the technology in the

standard, and IDC's blatant breach of its promise is actionable anticompetitive behavior in violation of § 2 of the Sherman Act.

73.     IDC has monopoly power in the Cellular Markets and Wireless Markets by virtue of ETSI's and IEEE's adoption of IDC's technology into their standards.  As a result, manufacturers, such as ASUS, have become locked-in to the adopted technology.  *See supra* ¶¶ 29-39.  The monopoly power that IDC enjoys over the Cellular Markets and Wireless Markets is not a result of its superior business acumen, simple good fortune, or technical superiority.  Rather, it is the result of IDC's deliberate and continuous abuse of the standard setting process by making false and disingenuous representations to SSOs, including ETSI and IEEE, and their members to induce adoption of standards reading on its patents, and then leveraging these patents resulting in anti-competitive conduct.

74.     On information and belief, IDC concealed its true intent to assert its declared patents to obtain supra-competitive royalties and other licensing terms when it submitted declarations to ETSI  and IEEE, *see supra* ¶ 48, because it knew if it revealed its true intent, ETSI, IEEE, and their members would have adopted alternative technologies for the standard.  In that circumstance, IDC would not enjoy its current monopoly power.

75.     After the adoption of these standards, IDC has repeatedly reneged on its promises in willful disregard of its public commitments to comply with the ETSI and IEEE IPR policies.  For example, IDC has taken the position that its FRAND declarations made pursuant to that policy: (a) do not create an enforceable contractual obligation to grant licenses on FRAND terms; and (b) do not bar IDC from using the threat of injunctive or other exclusionary remedies to extract supra-competitive prices and terms for its proposed SEPs.  These disingenuous positions decimate the language, spirit, and intent of the ETSI and IEEE IPR policies and leaves hollow IDC's declarations. Through its deceptive conduct, IDC has not only harmed individual competitors whose alternative technologies may have been selected absent IDC's false representations, but IDC has harmed competition as a whole in the Cellular Markets and Wireless Markets by undermining the standard selection process.

76.     IDC has not made a good faith effort to license its SEPs to licensees based on FRAND terms reflecting the value of its contributions, if any.  Instead, it has used its ownership of SEPs for the 2G, 3G, and 4G cellular network, and IEEE 802 wireless standards to force implementers into one-sided, non-FRAND licenses.

77.     IDC has also abused its monopoly power in pricing its SEPs in a manner that unfairly discriminates against ASUS.  As detailed above, IDC has discriminated against ASUS by providing other device manufacturers, such as Samsung, licensing ████████████████████ ████████████.  These actions, ████████████████████████████████████, are contrary to IDC's commitment to license its essential patents to users of the cellular technology on non-discriminatory terms.  They also effectively hinder competition in the downstream markets for mobile devices, by imposing higher costs on smaller players in the field.

78.     On information and belief, IDC, ████████████████████ ████████████████████████████████████████████████████ ████████████, engages in price discrimination.  Thus, by its acts, practices, and conduct, IDC has unlawfully used its monopoly power within the Cellular Markets and Wireless Markets to impair competition and harm consumers by favoring larger companies.  Similarly, upon information and belief, other licensees of IDC's 2G, 3G, and IEEE 802 portfolios included in the 2008 PLA were offered and obtained ████████████████████.

79.     Thus, IDC has abused its unlawfully acquired monopoly power by failing to meet its FRAND commitments by (1) entering into the 2008 PLA and continuously charging ASUS royalty rates inconsistent with its FRAND commitments; (2) inducing ASUS to enter the 2008 PLA based on false statements that other licensees ████████████████████████ offered to ASUS; and (3) refusing to offer license terms compliant with FRAND commitments with respect to 2G, 3G, 4G, and IEEE 802 declared essential patents, despite publicly available evidence that other licensees are obtaining ████████████████████████████.

80.     IDC's ability to engage in patent hold-up and discriminate exists, in part, because of the secrecy through which IDC licenses its technology.  The monopoly power acquired by IDC through the standard-setting process might be subject to greater constraint if its pricing information

1   and intentions were readily and publicly apparent to manufacturers and other implementers of the

2   technology prior to voting and other decision-making on the selection of technologies for inclusion

3   in the cellular and wireless standards at issue.  But instead, IDC insists that negotiations and

4   resulting or intended terms remain secret until after implementers are locked into reliance on the

5   essential patents.

6       81.   IDC's success in demanding and receiving from other implementers supra-

7   competitive and discriminatory rates for access to its allegedly SEPs for cellular and wireless

8   standards has adversely affected consumers of mobile devices and is directly related to IDC's efforts

9   to leverage its market power through patent hold-up.  IDC's conduct has raised prices for consumers

10  and limited consumer choices in ancillary and complementary technology by impeding new entry

11  into the mobile device marketplace and by diverting resources and monies that otherwise would have

12  fueled additional innovation in mobile devices.

13      82.   The on-going threat of harm to manufacturers of mobile devices, including ASUS, is

14  compounded by IDC's participation in efforts to prevent the adoption within ETSI, IEEE, and other

15  SSOs of meaningful constraints on the charging of supra-competitive royalties or other abuses of

16  monopoly power.  In particular, it has acted to thwart the reform by the SSOs of their IPR Policy.

17  For example, as recently as December 2013, IDC actively opposed the adoption of new rules and

18  policies that would limit the ability of members of ETSI who have made licensing commitments for

19  their SEPs to seek injunctive relief or exclusion orders from the ITC.  And, even though IEEE

20  further explained its IPR policy, on March 25, 2015, InterDigital states that it "will not make

21  licensing assurances under the new policy."  Ex. 40, Letter from InterDigital to IEEE Standards

22  Board (Mar. 25, 2015).

23      83.   By its acts, practices, and conduct, IDC has unlawfully monopolized Cellular Markets

24  Wireless Markets.  It has, among other things, made facial commitments to license its patents

25  essential to the 2G, 3G, and 4G cellular network, and IEEE 802 wireless standards on FRAND terms

26  when its true intent was to exploit the hold-up power of its purported SEPs to obtain supra-

27  competitive terms.

28

---

FIRST AMENDED COMPLAINT

84.     As a direct and proximate result of IDC's monopolization, ASUS has suffered injury to its business and property and is threatened by the imminent loss of profits, loss of customers and potential customers, and loss of goodwill.  ASUS suffers antitrust injury as a purchaser in the Cellular Markets and Wireless Markets because reasonable substitutes have been excluded and it has been deprived of the benefit of competition between those substitutes.  Because IDC has abused its wrongfully-acquired monopoly power, ASUS has been forced to expend significant resources defending against IDC's unreasonable negotiation tactics and incurring one-sided licensing terms that violate IDC's FRAND obligations.  If IDC's conduct remains unchecked, ASUS faces the imminent threat of further loss or injury and of further antitrust injury because IDC intends to use the on-going threat of exclusion to obtain supra-competitive prices not just on its U.S. patents, but on its entire worldwide patent portfolio.   The seriousness of this threat is demonstrated by the fact that IDC has, on information and belief, succeeded in compelling other implementers to enter such worldwide licenses on supra-competitive terms in the past.

85.     In addition to the harm to ASUS, consumers are injured and threatened with further injury from IDC's unlawful and unreasonable restraint of trade because it has the effect of raising the cost of access to all products that implement the 2G, 3G, and 4G cellular standards, and IEEE 802 wireless standards.  This unlawful tax on standard-compliant products reduces output and stifles innovation.

## COUNT II
### (Violation Of Section 17200 Of California Business & Professional Conduct Code)

86.     ASUS realleges and incorporates by reference the allegations set forth paragraphs 1–85 above.

87.     By the acts alleged, IDC has engaged in unfair competition within the meaning of Cal. Bus. & Prof. Code § 17200, et seq.  IDC's conduct, as set forth above, constitutes unfair and deceptive business acts or practices, significantly threatening and harming competition in California and elsewhere.  IDC's unfair and fraudulent business acts and practices are a direct and proximate cause of injury to the public and to ASUS.

88.     IDC engaged in unfair conduct by obtaining monopolistic power in the Cellular Markets and Wireless Markets through disingenuous commitments to ETSI and IEEE to license its SEPs on FRAND terms, and, subsequent to the adoption of standards embodying its patents, ignoring its commitments and using its acquired power to obtain supra-competitive royalty rates from implementers, including ASUS.  ASUS incorporates by reference the allegations set forth in paragraphs 74-87 alleging a violation of § 2 of the Sherman Act as further evidence of IDC's unfair conduct.

89.     IDC engaged in fraudulent and deceptive conduct by (1) negotiating to obtain and entering into the 2008 PLA and continuously charging ASUS royalty rates and other licensing terms inconsistent with IDC's FRAND commitments; (2) inducing ASUS to enter the 2008 PLA based on false statements that licensees ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ that offered to ASUS; and (3) refusing to offer licenses complaint with FRAND commitments with respect to declared essential patents.

90.     IDC committed unfair business acts or practices by failing to meet its FRAND commitments by (1) negotiating to obtain and entering into the 2008 PLA and continuously charging ASUS royalty rates inconsistent with IDC's FRAND commitments; (2) inducing ASUS to enter the 2008 PLA based on false statements that other licensees ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ that offered to ASUS; and (3) refusing to offer licenses complaint with FRAND commitments with respect to 2G, 3G, 4G, and IEEE 802 declared essential patents, despite publicly available evidence that other licensees are obtaining ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

91.     As a direct, proximate, and foreseeable result of IDC's wrongful conduct, as alleged above, competition has been injured in Wireless Markets and Cellular Markets.  IDC's wrongful conduct also brings a significant threat of injury for downstream price, quality and innovation competition for these products, thereby causing injury to consumers in California (where ASUS products are service and sold) and elsewhere.  These injuries include the inevitable passing of improperly high royalties demanded by IDC to consumers and decreases in innovation and quality of competition for end products compliant with these standards.  Among other things, IDC's abusive conduct threatens to dampen innovation for products complying with cellular and wireless standards,

including compliant tablets, phones, and computers, by eliminating manufacturers' ability to invest in and bring to market innovative products with confidence that holders of declared essential patents will not abuse their position by demanding exorbitant non-FRAND licensing terms.  These injuries are substantial and cannot reasonably be avoided by the consumer or ASUS unless this court enjoins IDC's conduct.

92.     As a direct, proximate and foreseeable result of IDC's wrongful conduct, as alleged above, ASUS has suffered harm in California and elsewhere as a supplier of devices that are compliant with the 2G, 3G, and 4G cellular network, and IEEE 802 wireless standards.  ASUS has suffered or faces the threat of, *inter alia*, increased costs, lower quality or innovation of standard-compliant products in the Cellular Markets and Wireless Markets, including tablets, phones, and computers, loss of profits, loss of customers and potential customers, loss of goodwill and product image, uncertainty in business planning, and uncertainty among customers and potential customers.

## COUNT III
### (Breach Of Contract Resulting From Ongoing Negotiations)

93.     ASUS realleges and incorporates by reference the allegations set forth in paragraphs 1–92 above.

94.     IDC's irrevocable undertaking to SSOs, including ETSI and IEEE, and manufacturers of standard-compliant products, to permit license of its declared SEPs in its wireless technology portfolios by manufacturers like ASUS on FRAND terms creates contractual agreements.

95.     IDC's undertakings to SSOs, including ETSI and IEEE, are binding and enforceable agreements between IDC and SSOs in favor of SSO members, including ASUS.  ASUS, as an implementer of 2G, 3G, and 4G cellular network, and IEEE 802 wireless standards, is entitled to enforce these agreements as a direct party or a third party beneficiary.

96.     Under the terms of these contracts, IDC irrevocably agreed and is obligated to offer a license to its declared essential patents on FRAND terms.

97.     IDC breached its contracts with ASUS by refusing to offer licenses to its identified patents under reasonable rates, with reasonable terms, and on an non-discriminatory basis. For

example, IDC's imposition of supra-competitive royalties that collect on unpatented portions of products; insistence ███████████████████████████████ some of its other licensees enjoy; ██████████████████████████████████████████████████████████████████████████████. *See* ¶¶ 55-70, *supra*.  These breaches are ongoing.

98.    As a result of these ongoing contractual breaches, ASUS has been and continues to be injured in its business or property, has suffered losses in profits and, is threatened by imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image.  IDC's licenses █████████████████████████████████████████ these injuries.

99.    ASUS will suffer irreparable injury by reason of the acts, practices and conduct of IDC alleged above until and unless the Court enjoins such acts, practices and conduct.

## COUNT IV
### (Breach Of Contract Leading To And Resulting From 2008 PLA)

100.    ASUS realleges and incorporates by reference the allegations set forth in paragraphs 1–99 above.

101.    IDC's irrevocable undertaking to standard setting organizations, including ETSI and IEEE, and manufacturers of standard-compliant products, to permit use of its declared-essential patents in its wireless technology portfolios by manufacturers like ASUS on FRAND terms creates contractual agreements.

102.    IDC's undertakings to SSOs, including ETSI and IEEE, create binding and enforceable agreements between IDC and SSOs in favor of their members, including ASUS. ASUS, as an implementer of such standards, is entitled to enforce these agreements either as a direct party or a third party beneficiary.

103.    Under the terms of these contracts, IDC irrevocably agreed and is obligated to offer a license to its declared essential patents to on FRAND terms consistent with the applicable SSO patent policies.

104.    IDC breached these contracts by offering and demanding the terms and conditions that were unreasonable, unfair and discriminatory, and entering into the 2008 PLA that is also unreasonable, unfair, and discriminatory.

105.    IDC breached its contracts during ongoing negotiations with ASUS by refusing to license its identified patents under reasonable rates, with reasonable terms, and on a non-discriminatory basis.  For example, IDC imposes supra-competitive royalties that collect on unpatented portions of products;  insists on arbitrary ███████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ *See* ¶¶ 55-70, *supra*.

106.    Each and every time IDC offers a term, and charges and receives a royalty or enforces a term that is inconsistent with its FRAND obligations, IDC breaches its commitments to the SSOs.

107.    As a result of these ongoing contractual breaches, ASUS has been and continues to be injured in its business or property, has suffered losses in profits, loss of customers and potential customers, and loss of goodwill and product image.  IDC's licenses with other licensees ███████ ██████████████████████████████████████████████████████

108.    ASUS will suffer irreparable injury by reason of the acts, practices and conduct of IDC alleged above until and unless the Court enjoins such acts, practices and conduct.

### COUNT V
**(Promissory Estoppel)**

109.    ASUS realleges and incorporates by reference the allegations set forth in paragraphs 1–108 above.

110.    IDC made clear and definite promises to potential licensees through its commitments to ETSI and IEEE that it would license declared essential patents under reasonable rates, with reasonable terms, and on a non-discriminatory basis.

111.    The intended purpose of IDC's promises was to induce reliance.  IDC knew or should have reasonably expected that this promise would induce companies producing products in wireless networking technologies, such as ASUS, to develop products compliant with the relevant standards.

112.    ASUS developed and marketed its products in reliance on IDC's promises, as described above, including making its products compliant with 2G, 3G, and 4G cellular network, and IEEE 802 wireless standards in various ASUS product offerings. *See* ¶ 49, *supra*.

113.    IDC is estopped from reneging on these promises to SSOs, including  ETSI and IEEE, under the doctrine of promissory estoppel.

114.    ASUS has been harmed as a result of its reasonable reliance on IDC's promises and is threatened by the imminent loss of profits, loss of customers and potential customers, and loss of good will and product image.

115.    ASUS will suffer irreparable injury resulting from the acts and conduct of IDC alleged above until and unless the court enjoys such acts, practices, and conduct.

## COUNT VI
### (Waiver)

116.    ASUS realleges and incorporates by reference the allegations set forth paragraphs 1–115 above.

117.    IDC expressly stated in its declarations and letters to SSOs that it would license declared essential patents under reasonable rates and non-discriminatory terms.  *See* ¶¶ 47-48, *supra*.

118.    Through this express statement, IDC voluntarily and intentionally waived its rights to obtain compensation for its declared essential patents for the 2G, 3G, and 4G cellular network, and IEEE 802 wireless standards other than at reasonable rates and on non-discriminatory terms.

119.    ASUS has and will continue to suffer irreparable injury by reason of the acts and conduct of IDC alleged above until and unless the court enjoins such acts, practices and conduct.

## COUNT VII
### (Fraudulent Inducement to Contract)

120.    Pursuant to the Court's Order (1) Granting In Part And Denying In Part Defendants' Motion To Compel Arbitration For Lack Of Subject Matter Jurisdiction Or In The Alternative, Stay Proceedings Pending Resolution Of The Arbitration dated August 25, 2015, and pursuant to the

Arbitral Tribunal's Interim Award On Jurisdiction in *InterDigital Tech. Corp. et al v. ASUSTeK Comp. Inc*. dated June 17, 2016, Count VII will be resolved in arbitration.

## COUNT VIII
### (Violation of Delaware Consumer Fraud Act)

121.   ASUS realleges and incorporates by reference the allegations set forth in paragraphs 1-119 above.

122.   By the acts alleged, Defendants, which are incorporated and headquartered in Delaware, have engaged and continue to engage in fraud, false promises and misrepresentations, and concealed, suppressed, and omitted material facts within the meaning of 6 Del. C. § 2512.  IDC's conduct, as set forth above in paragraphs 1-70, is consumer fraud with the "sale…of merchandise," which broadly includes "intangibles" such as Defendants' declared SEPs.  6 Del. C. § 2511(6).

123.   IDC, by and through its employees located in Delaware, engaged in fraud, false promises and misrepresentations by obtaining monopolistic power in the Cellular and Wireless Markets through disingenuous commitments to SSOs, including ETSI and IEEE, to license its SEPs on FRAND terms, and, subsequent to the adoption of standards embodying its patents, ignoring its commitments and using its acquired power to obtain supra-competitive royalty rates from implementers, including ASUS.  ASUS incorporates by reference the allegations set forth in paragraphs 71-92 alleging a violation of Section 2 of the Sherman Act and alleging a violation of Section 17200 of California's Business & Professional Code as further evidence of IDC's unfair conduct.

124.   IDC, by and through its employees located in Delaware, engaged in fraudulent and deceptive conduct and concealed, suppressed and omitted material facts by (1) negotiating to obtain and entering into the 2008 PLA and continuously charging ASUS royalty rates and imposing other licensing terms inconsistent with IDC's FRAND commitments; (2) inducing ASUS to enter the 2008 PLA based on false statements that other licensees would not enjoy a royalty rate lower than that offered to ASUS; and (3) refusing to offer licenses compliant with FRAND commitments with respect to declared essential patents.  These acts were conducted by IDC's employees, most of whom were located in Delaware, and to the benefit of Defendants, who are Delaware corporations.

125.    IDC, by and through its employees located in Delaware, further misled ASUS, engaged in fraudulent conduct, made misrepresentations, omissions, and concealments by failing to meet its FRAND commitments by (1) negotiating to obtain and entering into the 2008 PLA and continuously charging ASUS royalty rates inconsistent with IDC's FRAND commitments; (2) inducing ASUS to enter the 2008 PLA based on false statements that other licensees would not enjoy a royalty rate lower than that offered to ASUS; and (3) refusing to offer licenses compliant with FRAND commitments with respect to 2G, 3G, and 4G,  and IEEE 802 declared essential patents licensed to ASUS, despite publicly available evidence that other licensees are obtaining ██████ ████████████████████████████.

126.    As a direct, proximate, and foreseeable result of IDC's wrongful conduct, which stemmed from Delaware, as alleged above, competition has been injured in Wireless Markets and Cellular Markets.  IDC's wrongful conduct also brings a significant threat of injury for downstream price, quality and innovative competition for these products, thereby causing injury to consumers in Delaware (where ASUS's products are sold) and elsewhere.  These injuries include the inevitable passing of improperly high royalties demanded by IDC to consumers and decreased innovation and quality of competition for end products compliant with these standards.  Among other things, IDC's abusive conduct threatens to dampen innovation for products complying with cellular and wireless standards, including compliant tablets, phones, and computers, by eliminating manufacturers' ability to invest in and bring to market innovative products with confidence that holders of declared essential patents will not abuse their position by demanding exorbitant non-FRAND licensing terms. These injuries are substantial and cannot reasonably be avoided by consumers or ASUS unless this Court enjoins IDC's conduct.

127.    As a direct, proximate and foreseeable result of IDC's wrongful conduct, as alleged above, ASUS has suffered harm in Delaware and elsewhere as a supplier of devices that are compliant with the 2G, 3G, and 4G cellular networks, and IEEE 802 wireless standards.  ASUS has suffered or faces the threat of, *inter alia*, increased costs, lower quality or innovation of standard-compliant products in the Cellular Markets and Wireless Markets, including tablets, phones, and

computers, loss of profits, loss of customers and potential customers, loss of goodwill and product image, uncertainty in business planning, and uncertainty among customers and potential customers.

**PRAYER FOR RELIEF**

WHEREFORE, ASUS respectfully requests that this Court enter the following relief against IDC:

A.   Judgment in favor of ASUS and against IDC;

B.   Judgment that IDC is liable for breach of contract;

C.   Judgment that IDC is liable for violation of Section 2 of the Sherman Act;

D.   Judgment that IDC is liable for violation of Section 17200 of California Business & Professional Conduct Code;

E.   Judgment that IDC is liable for waiver;

F.   Judgment that IDC is liable for promissory estoppel;

G.   Judgment that IDC is liable for violations of Delaware Consumer Fraud Act;

H.   Judgment that ASUS is entitled to a fair, reasonable and non-discriminatory license from IDC;

I.   Judgment that IDC specifically perform its contractual obligation to grant a license on fair, reasonable and non-discriminatory terms;

J.   Judgment setting the proper fair, reasonable and non-discriminatory terms for IDC's cellular and wireless patent portfolio;

K.   Judgment that the 2008 PLA and the offers IDC made to ASUS are not fair, reasonable and non-discriminatory;

L.   Finding IDC is precluded by promissory estoppel from obtaining license terms that are not fair, reasonable and non-discriminatory;

M.   Judgment that IDC is liable for promissory estoppel based on the declarations it submitted to SSOs, including ETSI and IEEE, and ASUS committing to license its patents on fair, reasonable and non-discriminatory terms;

N.   Judgment that each of IDC's patents declared to be essential or potentially essential to standard setting bodies is unenforceable;

O.  Judgment that any and all contracts or agreements that IDC has entered into in furtherance of its unlawful conduct are void;

P.  Judgment against IDC for damages in the amount of excess royalties ASUS has paid IDC under the 2008 PLA;

Q.  Judgment against IDC for interest for the amount of excess royalties ASUS has paid IDC;

R.  Judgment that IDC has monopolized the Cellular Markets and Wireless Markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

S.  Judgment that IDC has monopolized the Cellular Markets and Wireless Markets in violation of Section 17200 of California Business & Professional Conduct Code;

T.  Judgment against IDC for disgorgement of profits and restitution stemming from IDC's violation of Section 17200;

U.  Judgment finding IDC liable for punitive damages for IDC's violation of Section 17200;

V.  Treble damages pursuant to Section 4 of the Clayton Act;

W.  Judgment against IDC for the amount of damages ASUS proves;

X.  Such further equitable relief as necessary or appropriate, including full restitution to ASUS and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by IDC from ASUS, its customers, and its potential customers as a result of such unfair business acts and practices;

Y.  Judgment granting ASUS its expenses, costs and attorneys fees; and

Z.  Any other and further relief as the Court deems just and proper.

FIRST AMENDED COMPLAINT

1

**JURY DEMAND**

2

ASUS demands a jury trial on all issues and claims so triable.

3

4

Dated:  August 18, 2016

SIDLEY AUSTIN LLP

5

6

7

By:   /s/ Brian R. Nester
        Brian R. Nester

8

9

Attorneys for Plaintiffs
ASUS COMPUTER INTERNATIONAL, and
ASUSTEK COMPUTER INCORPORATED

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT