Brian Nester (*pro hac vice*)
bnester@sidley.com
Michael R. Franzinger (SBN 222155)
mfranzinger@sidley.com
Anna M. Weinberg (*pro hac vice*)
aweinberg@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711

Richard A. Cederoth (*pro hac vice*)
rcederoth@sidley.com
David C. Giardina (*pro hac vice*)
dgiardina@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone (312) 853-7000
Facsimile: (312) 853-7036

Mike Bettinger (SBN 122196)
mbettinger@sidley.com
SIDLEY AUSTIN LLP
555 California Street
Suite 2000
San Francisco, CA 94104
Telephone: (415) 772-1200
Facsimile: (415) 772-7400

Attorneys for Plaintiffs
ASUS COMPUTER INTERNATIONAL,
ASUSTEK COMPUTER INCORPORATED

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| ASUS COMPUTER INTERNATIONAL; and ASUSTEK COMPUTER INCORPORATED, <br><br> Plaintiffs, <br><br> vs. <br><br> INTERDIGITAL, INC.; INTERDIGITAL COMMUNICATIONS, INC.; INTERDIGITAL TECHNOLOGY CORPORATION; IPR LICENSING, INC. and INTERDIGITAL PATENT HOLDING, INC., <br><br> Defendants. | Case No. 15-cv-01716-BLF <br><br> **ASUS'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT** <br><br> Hearing Date: October 11, 2018 <br> Time: 9:00 a.m. <br> Location: Courtroom 3, 5th Floor <br> Judge: Hon. Beth Labson Freeman <br><br> **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on October 11, 2018 at 9:00 a.m., or as soon thereafter as counsel may be heard, Plaintiffs ASUS Computer International and ASUSTeK Computer Inc. (collectively "ASUS") through their attorneys, will move before the Honorable Beth Labson Freeman, United States District Judge, in Courtroom 3, 5th Floor, San Jose Courthouse, Courtroom 3 - 5th Floor, 280 South 1st Street, San Jose, CA 95113, for summary judgment, pursuant to Federal Rule of Civil Procedure 56. This Motion is based upon this Notice of Motion and the accompanying Memorandum of Points and Authorities, the declarations of Michael R. Franzinger and Prof. Philippe Stoffel-Munck in support of the Motion, the accompanying exhibits, the pleadings and papers on file in this action, and such other matters as the Court may deem appropriate in deciding this Motion.

## RELIEF REQUESTED

ASUS seeks an order granting summary judgment that Defendants Interdigital, Inc.; InterDigital Communications, Inc.; InterDigital Technology Corporation; IPR Licensing, Inc.; and InterDigital Patent Holding, Inc. (collectively "IDC") have breached their contractual obligation to license their declared standard-essential patents on fair, reasonable, and non-discriminatory terms and conditions by engaging in discriminatory licensing practices.

DATED: August 16, 2018

By: /s/ Michael R. Franzinger
Brian Nester (*pro hac vice*)
Michael R. Franzinger
Anna M. Weinberg (*pro hac vice*)
Mike Bettinger
Richard A. Cederoth (*pro hac vice*)
David C. Giardina (*pro hac vice*)

*Attorneys for Plaintiffs*
ASUS COMPUTER INTERNATIONAL, and
ASUSTEK COMPUTER INCORPORATED

## TABLE OF CONTENTS

I.      INTRODUCTION. .................................................................................................. 1

II.     STATEMENT OF ISSUE TO BE DECIDED.......................................................... 1

III.    THE LEGAL STANDARD. ................................................................................... 1

IV.     FACTUAL BACKGROUND. ................................................................................ 2

        A.      The Parties to This Case. ............................................................................ 2

        B.      IDC Committed to ETSI to License Its 3G and 4G Patents to ASUS on Fair,
                Reasonable, and Non-Discriminatory Terms and Conditions. ...................... 3

        C.      IDC Applies Different ███████████████████████████████████
                ████████████████████████ ......................................................... 4

        D.      IDC's 4G Offers to ASUS ........................................................................... 6

V.      ARGUMENT. ........................................................................................................ 7

        A.      IDC's FRAND Commitment Obligates It to License Its Standard Essential
                Patents on Similar Terms and Conditions to Competitors in the Global Cellular
                Market. ...................................................................................................... 8

                1.      IDC's FRAND Commitment Is a Binding Contractual Promise That
                        ASUS Can Enforce. ........................................................................ 8

                2.      IDC's Obligation Not to Discriminate among "Similarly Situated"
                        Firms Requires IDC to Treat Well-Established Competitors in the Global
                        Cellular Market Similarly. ............................................................. 10

        B.      IDC's Licensing Practices Discriminate against ASUS by Denying It the
                Rates Similarly Situated Companies Obtain through ████████████ ......... 15

                1.      IDC's Offers to ASUS Did Not Treat ASUS Similarly to Its Global
                        Cellular Device Competitors, ████████████████████ ......... 15

                2.      IDC Admits That ████████████ Are Responsible for Its Royalty
                        Disparities. ................................................................................. 18

                3.      ████████████ Discriminate among Competitors in the Global
                        Cellular Device Market, Including ASUS. ...................................... 19

        C.      The ████████ IDC Purports to Offer Lack Economic Basis and Quantitative
                Justification. .............................................................................................. 22

VI.     CONCLUSION. ................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..............................................................................................1

*Apple, Inc. v. Motorola Mobility, Inc.*,
    886 F. Supp. 2d 1061 (W.D. Wis. 2012) ...........................................................8, 9

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..............................................................................................1

*Certain Wireless Devices with 3G Capabilities & Components Thereof*,
    U.S.I.T.C. Inv. 337-TA-800, 2013 WL 3961230 (June 28, 2013) .......................14

*Certain Wireless Devices with 3G Capabilities & Components Thereof*,
    U.S.I.T.C. Inv. 337-TA-800, Comm'n Op. (Feb. 19, 2014).................................14

*Ericsson, Inc. v. D-Link Sys., Inc.*,
    773 F.3d 1201 (Fed. Cir. 2014)...........................................................................11

*In re Innovatio IP Ventures, LLC Pat. Litig.*,
    Case No. 11 C 9308, 2013 WL 5593609 (N.D. Ill. Oct. 3, 2013) ...................11, 20

*Microsoft Corp. v. Motorola, Inc.*,
    No. C10-1823JLR, 2013 WL 2111217 (W.D. Wash. Apr. 25, 2013) ...................11

*TCL Commc'n Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*,
    CV 15-2370 JVS (DFMx), 2017 WL 6611635 (C.D. Cal. Dec. 21, 2017) ....................*passim*

Tex. Instruments Inc. v. Cypress Semiconductor Corp.,
    90 F.3d 1558, 1569 (Fed. Cir. 1996)....................................................................14

*Unwired Planet Int'l Ltd. v. Huawei Technologies Co.*,
    EWHC 711 (Pat) ¶ 175 (2017) ....................................................................10, 15, 20

**Rules and Statutes**

Fed. R. Civ. P. 56(e) ......................................................................................................2

MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION.

Plaintiffs ASUS Computer International and ASUSTeK Computer Inc. (collectively "ASUS") hereby move for summary judgment of breach of contract, Count III of the First Amended Complaint (ECF No. 107), by Defendants Interdigital, Inc.; InterDigital Communications, Inc.; InterDigital Technology Corporation; IPR Licensing, Inc.; and InterDigital Patent Holding, Inc. (collectively "IDC").

This case concerns IDC's failure to meet its fair, reasonable, and non-discriminatory ("FRAND") licensing obligations to ASUS under the policies of the European Telecommunications Standardization Institute ("ETSI") and IDC's binding promises to ETSI. ECF No. 107 ¶ 1. A key component of that issue is whether IDC discriminated against ASUS relative to its other licensees, and whether its royalty demands are reasonable. The undisputed facts establish that IDC provides certain licensees with ███████████████████████████████████ ██████████████████. ASUS is entitled to judgment as a matter of law because no reasonable jury could conclude, on these facts, that IDC complied with its non-discrimination obligation owed to ASUS by virtue of its FRAND licensing obligations.

## II.   STATEMENT OF ISSUE TO BE DECIDED.

Whether IDC has breached its contractual obligation to license its declared standard-essential patents on fair, reasonable, and non-discriminatory terms and conditions by engaging in discriminatory licensing practices.

## III.   THE LEGAL STANDARD.

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party must show the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing that there is a genuine issue for trial." *Id.*;

1    Fed. R. Civ. P. 56(e). The non-movant's bare assertions, standing alone, are insufficient to create a

2    material issue of fact and defeat a motion for summary judgment. *Anderson*, 477 U.S. at 247-48. An

3    issue of fact is material if, under the substantive law of the case, resolution of the factual dispute

4    might affect the case's outcome. *Id.* at 248. Factual disputes are genuine if they "properly can be

5    resolved in favor of either party." *Id.* at 258. However, "[i]f the [non-movant's] evidence is merely

6    colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50

7    (internal citations omitted).

8    **IV.    FACTUAL BACKGROUND.**

9         **A.    The Parties to This Case.**

10        ASUS is a multinational company headquartered in Taiwan, employing over 12,500 people

11   around the world. Ex. 1.[1] It makes a wide range of products in the electronics and information

12   technology markets, including 3G and 4G cellular products that it sells on the global market. *Id.* It

13   sells cellular devices in over forty countries in every global region, covering North America, Asia

14   Pacific, Central & Eastern Europe, Central & Latin America, the Middle East & Africa, and Western

15   Europe. (*See* Ex. 2 at Analysis Tab p. 1; Ex. 3 (ASUS 2017Q3 Royalty Report to IDC reflecting

16   sales of covered cellular devices in 42 countries)).

17        IDC is based in Delaware and Pennsylvania. ECF No. 112. IDC is involved in

18   telecommunications technologies but it does not manufacture any mobile devices. *Id.* It owns a

19   patent portfolio of approximately 19,000 patents and applications related to wireless

20   communications, including "a number of patents and patent applications that [IDC] believe[s] are or

21   may be essential or may become essential to cellular and other wireless standards, including 3G, 4G

22   and the IEEE 802 suite of standards." Ex. 4 at 3. IDC derives its revenues primarily from patent

23   licensing. *Id.* To monetize its technology solutions, IDC strategically participates in worldwide

24   standards bodies, including ETSI. *Id.*

25

26

27

28

---

[1] All "Ex." citations herein refer to the exhibits attached to the Declaration of Michael R. Franzinger in Support of ASUS's Motion for Summary Judgment.

ASUS'S MPA ISO MOTION FOR SUMMARY JUDGMENT,
CASE NO. 5:15-cv-01716-BLF

**B.    IDC Committed to ETSI to License Its 3G and 4G Patents to ASUS on Fair, Reasonable, and Non-Discriminatory Terms and Conditions.**

ETSI is a standard setting organization ("SSO") responsible for promulgating technical cellular phone standards, including the "generations" of standards known as 2G, 3G, and 4G. It is governed by the ETSI Directives, which contain, *inter alia*, an Intellectual Property Rights Policy ("ETSI IPR Policy"). This policy provides, in Section 6.1, that

> When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an irrevocable undertaking in writing that it is prepared to **grant irrevocable licenses on fair, reasonable, and non-discriminatory ("FRAND") terms and conditions** under such IPR…

Ex. 5, pp. 37-38 § 6.1 (emphasis added). The capitalized terms are all defined in the ETSI IPR Policy's Definitions section. *Id.* pp. 42-43, § 15. The above-quoted provision of the ETSI IPR Policy has not changed in substance since its adoption in the early 1990s. Ex. 6, Huber Dep. 22:20-23:9 (June 22, 2018). Owners of essential IPRs voluntarily submit declarations (using the Forms in Annex A of the ETSI IPR Policy) as part of the standardization process to ensure that implementers have access to the relevant technology, even if it is patented.

IDC has voluntarily submitted over a dozen declarations to ETSI stating that "[t]o the extent that the IPR(s) disclosed in the attached IPR Information Statement Annex are or become, and remain, ESSENTIAL…[it is] prepared to grant irrevocable licenses under this/these IPR(s)" on terms and conditions set forth in Section 6.1 of the ETSI IPR Policy. Ex. 7, IDC Resp. to 1st Set of Req. for Admis. ("RFAs") p. 14 (No. 11) (Jan. 25, 2018); *see, e.g.*, Am. Compl. Exhibits 6-21 (ECF Nos. 107-1 - 107-9). IDC has represented to licensees and the SEC that it owns essential 2G, 3G, and 4G patents, which it is willing to license on FRAND terms and conditions. Ex. 8, IDC Resp. to 2nd Set of RFAs, pp. 6-8 (Nos. 35-37) (Mar. 16, 2018); Ex. 9, Merritt Dep. 99:6-23 (Mar. 14, 2018) (████████████████████████████████████████); Ex. 10 at ASUS_0000197-99 ("████████████████████████████████████████"), ASUS_0000218 (█████████████████████████████████████████), ASUS_0000225; Ex. 4, at 3; Ex. 11, at 1, 6-7 (admitting owning essential 2G, 3G patents requiring licenses from implementers and agreeing

3

to license on FRAND terms).

    **C.**    **IDC Applies Different** ████████████████████████████████████
████████████████████████████████████.

    In licensing its FRAND-committed 2G, 3G, and 4G patents, IDC gives ████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████ Ex. 7, p. 23 (No. 27); Ex. 8, pp. 10-12 (Nos 41, 43);
Exs. 12-13; Ex. 14, Putnam Corrected Rebuttal Report ("CRR") at Exhibits 23, 14.1. IDC applies
████████████████████████████████████████████████████████████████████
████████████. Ex. 15, McElvaine Dep. 19:11-20, 21:9-24, 32:22-33:8 (Mar. 5, 2018) (30(b)(6)
witness on types of discounts offered by IDC).

    IDC applies its royalty rates ████████████████████████ of the licensed devices. *See,
e.g.*, Ex. 16 at IDC-ASUS-1716-0112738. The floors and caps operate to set upper and lower bounds
on a licensee's per-unit royalty. If applying the royalty rate to the NSP results in amount below the
floor, the licensee must pay the floor. If applying the royalty rate to the NSP results in an amount
above the cap, than the licensee pays the cap. Thus, higher floors and caps can result in higher
overall payments, even if two licensees have the same royalty rate and sell products at the same price
points. These floors and caps can influence the actual royalty rate paid by a licensee (referred to here
as the "effective rate") by either raising it if the licensee must pay the floor amount on lower priced
products or lowering it if a licensee's per unit payment is capped at the cap amount. Where the
license charges a royalty at a fixed dollar-per-unit amount, that dollar amount effectively sets the cap
and floor.

    These ████████████████████ to the royalty rates, floors, and caps ████████████
████████████████████████████████████████████████████████████████████
████. Ex. 9, Merritt Dep. 252:20-253:20. Since ██████ IDC's licensing program has ██████
████████████████████████████████████████████████████████████████████████
████████████████████████ Ex. 17, IDC Responses to 2nd Set of Interrogatories pp. 11-13 (No.
19) (Mar. 14, 2018); Ex. 18, Grewe Dep. 138:4-9 (Mar. 6, 2018); Merritt Dep. 252:20-253:20. The
████████████████████████████

4

1

2

3

4

5

6

7

8

9

10

11

12   Ex. 17 pp. 11-13 (No. 19). Thus, according to this table,

13

14        IDC creates

15                                                                Ex. 15,

16   McElvaine Dep. 89:6-13; Ex. 18, Grewe Dep. 96:22-97:7. IDC's

17

18

19

20   Ex. 12 p.2; *see also* Ex. 17 pp. 11-13 (No. 19); Ex. 14, Putnam CRR Exhibit 23. Similarly,

21

22                                        *Id.*; Ex. 13 p.2

23

24                                    . Ex. 17 pp. 11-13 (No. 19); Ex. 14, Putnam CRR Exhibit 23.

25

26

27

28

| | | |
|---|---|---|
| ███ | ██████ | █████ ██ |
| ████████ | ██ | █████ |
| ███████ | ██ | ██ |
| ███████ | ██ | ██ |

Ex. 14, Putnam CRR Exhibit 23 (citing *inter alia* Exs. 12-13).

While certain of IDC's licensees—especially the larger ones—████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ Ex. 15,

McElvaine Dep. 24:10-12; *see also id.* 25:13-20; Ex. 8, p. 12 (No. 42); Ex. 18, Grewe Dep. 139:1-

11, 22:6-24:3; Ex. 9, Merritt Dep. 243:3-8.

These ████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████ *E.g.*, Ex.

19 ███████████████████████████████████████████

███████████████████████████████████████████████

Ex. 20, p. 2; Ex. 18, Grewe Dep. 30:11-18 ████████████████████████

████████████████████████████████████████████████████

███████████████████████ Ex. 9, Merritt Dep. 136:24-137:25.

**D.     IDC's 4G Offers to ASUS**

IDC and ASUS are parties to an existing patent license agreement ("PLA") that covers 2G

and 3G technology. *See* Am. Compl. Ex. 1 (ECF No. 107-1). In late ███████████████

███████████████████████████. Ex. 16. In ████████████████

████████████████████████████████ *Id.* at IDC-ASUS-1716-

1    112738. ████████████████████████████████████████████████

2    ████████████████████████████████████████████████████████

3    ██████████████████████████████████. Ex. 21. In January ██████████

4    ████████████████████████████████████████████████████████

5    ██████████████████ Ex. 22 at IDC-ASUS-1716-0109311. ████████████

6    ████████████████████████████████████████████████████████

7    ██████████████████ Ex. 23 at IDC-ASUS-1716-0114029-31. ██████████

8    ████████████████████████████████████ *Id.* at IDC-ASUS-1716-0114019-21;

9    Ex. 24.

10       In █████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████

12   ████████████████████████████████████████████████

13   ████████ Ex. 25 at ASUS_0001502. ████████████████████████████

14   ████████████████████████████████████████████████████████ Ex.

15   26. ██████████████████████████████████████████████████

16   ████████████████████████████████████████████████

17   ████████████████████████████████████████████ Ex. 19 at

18   ASUS_0001491. ████████████████████████████████████

19   ████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████ *Id*.

21       On April 15, 2015, ASUS filed the instant case. ████████████████████

22   ████████████████████████████████████████████████████████

23   ████████████████████████████ Ex. 27. ████████████████████

24   ████████████████████████████████████ (*infra*, n.3).

25   **V.    ARGUMENT.**

26       IDC's contractual FRAND commitment includes a non-discrimination requirement. IDC's

27   ████████████████ practice, the material facts of which are undisputed, discriminates among

28   participants in the global cellular market in breach of IDC's FRAND commitment. The disparate

7

1   treatment of these implementers of the 4G standard operates to the detriment of entities like ASUS

2   who are not the industry's largest. The non-discrimination prong of the FRAND commitment stands

3   as a restriction against favoritism of entrenched leaders, ████████████████████████████

**A.   IDC's FRAND Commitment Obligates It to License Its Standard Essential
Patents on Similar Terms and Conditions to Competitors in the Global Cellular
Market.**

6   The existence and enforceability of IDC's FRAND contract is not disputed. Nor is the fact

7   that it bars IDC from discriminating among "similarly situated" firms. To the extent ██████████

8   ████████████████████████████████████████████████████, IDC

9   misinterprets "similarly situated." As other courts have recognized, the term applies across a product

10   market implementing a particular technology (such as 4G). It does not permit stratification of the

11   market into tiers with different rights.

**1.   IDC's FRAND Commitment Is a Binding Contractual Promise That ASUS
Can Enforce.**

14   It is undisputed that IDC's FRAND commitment to ETSI is contractually binding. It is also

15   undisputed that ASUS, as an implementer of ETSI standards, is entitled to enforce that contract.

16   These points are a matter of French law and have been recognized by U.S. courts. They are outlined

17   for background below.

18   ETSI is an "association" under French law. Declaration of Philippe Stoffel-Munck in Support

19   of ASUS's Mot. for Summ. J. ("Stoffel-Munck Decl.") ¶ 8. French law treats an "association" as a

20   contract. *Id.* ETSI members are governed by the ETSI Directives, which include the ETSI

21   Intellectual Property Rights ("IPR") Policy. The ETSI Directives, including the IPR Policy, are

22   governed by the laws of France. *Id.* ¶ 9; Ex. 5 pp. 37-38 § 6, & pp. 44-47 (Annex A). Thus, the

23   FRAND commitment must be interpreted, and its performance evaluated, pursuant to French law.

24   *TCL Commc'n Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*, CV 15-2370 JVS (DFMx),

25   2017 WL 6611635, at *5 (C.D. Cal. Dec. 21, 2017); *Apple, Inc. v. Motorola Mobility, Inc.*, 886 F.

26   Supp. 2d 1061, 1081-82 (W.D. Wis. 2012).

27   Under French law and consistent with the ETSI Directives, ETSI's IPR Declarations form a

28   binding contract between ETSI and the IPR owner. *See TCL*, 2017 WL 6611635, at *5; *Apple,* 886

F. Supp. 2d at 1083-85 (citing courts reaching similar conclusions). ETSI is the promisee, the owner of a declared standard-essential patent ("SEP") who submits the IPR Declaration is the promisor, and the third-party beneficiaries are prospective licensees who benefit from the stipulation. *Id.* at 1083-85. Specifically, the FRAND commitments in ETSI's IPR Declarations provide the implementers of ETSI standards with enforceable rights. Stoffel-Munck Decl. ¶¶ 11-13; Ex. 5 pp. 55-56 § 1.4. IDC's FRAND commitment regarding its declared essential patents applies to confer rights on ASUS. Ex. 7, pp. 14-15 (Req. No. 12).

Under French law, a contract must be interpreted unless its terms are "clear and precise." Stoffel-Munck Decl. ¶ 4. Although the French Civil Code sets forth rules for contract interpretation, none are mandatory. *Id.* ¶¶ 4-5. The primary objective is to determine the common intent of the parties. *Id.* ¶ 4. If common intent cannot be discerned (e.g., because it does not exist), the inquiry focuses on the understanding of a reasonable person of the same kind under the same circumstances as the parties. *Id.* It is common to use extrinsic materials, including negotiation documents and other relevant documents surrounding the conclusion of the contract, in following these rules. *Id.* ¶ 5. Contracts should also be interpreted such that they are internally consistent and give full effect to each clause, and in a manner that complies with the law. *Id.* ¶¶ 6-7.

Here, the relevant contractual language appears in IDC's declarations to ETSI and Clause 6.1 of the ETSI IPR Policy. IDC's declarations provide, in substance:

> In accordance with Clause 6.1 of the ETSI IPR Policy the Declarant and/or its AFFILIATES hereby irrevocably declares the following…
>
> ☒ To the extent that the IPR(s) disclosed in the attached IPR Information Statement Annex are or become, and remain ESSENTIAL…the Declarant and/or its AFFILIATES are prepared to grant irrevocable licenses under this/these IPR(s on the terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy.
>
> ☒ This irrevocable undertaking is made subject to the condition that those who seeks licenses agree to reciprocate.

*E.g.*, Am. Compl. Exhibits 6-21 (IDC IPR Declarations to ETSI). Clause 6.1, in turn, provides for "an irrevocable undertaking in writing that it is prepared to ***grant irrevocable licenses on fair, reasonable, and non-discriminatory ('FRAND') terms and conditions*** under such IPR…" Ex. 5,

9

pp. 37-38 (emphasis added). This commitment must be interpreted in view of the surrounding

agreements and documents, such as the ETSI Directives (which includes the ETSI IPR Policy), and

consistent with EU competition law. Stoffel-Munck Decl. ¶ 14.

## 2. IDC's Obligation Not to Discriminate among "Similarly Situated" Firms Requires IDC to Treat Well-Established Competitors in the Global Cellular Market Similarly.

IDC's expert witnesses admit that the term "non-discriminatory" as used in IDC's IPR

Declarations requires IDC to provide similarly situated companies with similar licensing terms and

conditions. Ex. 28, Huber RR ¶ 58 (agreeing with ASUS's expert Dr. Bekkers ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Ex. 29, Layne-Farrar RR ¶ 84 (agreeing

with ASUS's expert Dr. Scott Morton that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *see*

*also TCL*, 2017 WL 6611635, *29 (parties agreed "that like, or close to, like rates must be offered to

firms which are similarly situated."); Ex. 39 at p. 7 (EC 2017 Communication). The parties' dispute

instead focuses on how narrowly or broadly "similarly situated" should be interpreted.

As detailed below, in the context of ETSI's FRAND commitment, companies are "similarly

situated" when they participate and use the same standard technology (*e.g.*, 2G, 3G, 4G) in the same

product market. Companies like Apple, Samsung, Huawei, LG, ASUS, and others are established

and competing in the same market—selling 4G-compatible cellular devices globally. They require

licenses that are similar in technical and geographic scope, and therefore the ETSI FRAND

commitment requires IDC to make licenses available to them on substantially the same terms and

conditions. *See TCL*, 2017 WL 6611635, at *29 ("The Court concludes that for purposes of license

comparison the analysis should include all firms reasonably well-established in the world market.

This implies a necessarily wide spectrum…"); Ex. 30, *Unwired Planet Int'l Ltd. v. Huawei*

*Technologies Co.*, EWHC 711 (Pat) ¶ 175 (2017) ("In my judgment the FRAND rate ought to be

generally non-discriminatory in that it is determined primarily by reference to the value of the

patents being licensed and has the result that all licensees who need the same kind of licence [sic]

will be charged the same kind of rate."). "Similarly situated" is not, ▮▮▮▮▮▮▮▮▮▮▮▮

10

1  ███████████████, a term that permits the licensor to balkanize the market into "similarly

2  situated" strata based on sales volumes, product mixes, brand recognition or type of relationship with

3  the licensor. *See, e.g.*, Ex. 9, Merritt Dep. 129:1-131:11; Ex. 18, Grewe Dep. 117:21-118:10, Ex. 31

4  p. 4. As courts have recognized, non-discrimination requires more consistent treatment than that. *See*

5  *In re Innovatio IP Ventures, LLC Pat. Litig.*, Case No. 11 C 9308, 2013 WL 5593609, at *38 (N.D.

6  Ill. Oct. 3, 2013) (refusing to use profit margins of manufacturer-licensees in FRAND evaluation "is

7  appropriate because a RAND licensor…cannot discriminate between licensees on the basis of their

8  position in the market."); *see also Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1230-31 (Fed.

9  Cir. 2014) (citing *Microsoft Corp. v. Motorola, Inc*., No. C10-1823JLR, 2013 WL 2111217, at *18

10  (W.D. Wash. Apr. 25, 2013)) ("'[T]he commercial relationship between the licensor and licensee'—

11  is irrelevant because [patent holder] must offer licenses at a *non-discriminatory* rate.").

12      Contract interpretation begins with the contract itself and the plain language of the FRAND

13  commitment in the relevant ETSI documents is broad. Neither IDC's IPR Declarations nor the

14  corresponding language in the ETSI IPR Policy condition or cabin the scope of "non-

15  discriminatory." *See, e.g.*, Am. Compl. Exhibits. 6-21; Ex. 5 pp. 37-38 § 6.1; Ex. 6, Huber Dep.

16  122:2-10; Ex. 32, Bekkers Dep. 138:20-24 (June 27, 2018).

17      The surrounding documents and agreements, whether taken as evidence of common intent of

18  the contracting parties or of the understanding of a reasonable person, further demonstrate that the

19  "non-discrimination" requirement is not confined to actions within narrow market segments. The

20  history and purpose of the ETSI IPR policy demonstrate that non-discrimination—and thus

21  "similarly situated"—should be interpreted to ensure a level playing field for all implementers in a

22  market that makes use of its standards. In addition to ensuring that the FRAND commitment

23  prevents discrimination based on nationality or ETSI membership, ETSI aimed to protect, *inter alia*,

24  market entrants and small or medium sized firms from discrimination. *See TCL*, 2017 WL 6611635,

25  at *7 ("ETSI was also concerned with price discrimination among potential licensees…The ETSI

26  IPR Policy forbids discrimination based on nationality or ETSI membership, but the policy is not so

27  limited…ETSI organic documents specifically note the concern with protecting small and medium-

28  sized enterprises."). In so doing, ETSI explicitly sought to avoid license practices that favored the

ASUS'S MPA ISO MOTION FOR SUMMARY JUDGMENT,
CASE NO. 5:15-cv-01716-BLF

1    biggest businesses.

2         This aim is engrained in the development of the policy. As early as 1988, ETSI's predecessor

3    CEPT expressed concerns that, without an effective IPR Policy, price discrimination would cause

4    "serious risk of distortion of market forces against [small and medium-sized enterprises] and in favor

5    of large multinationals." Ex. 34 at ASUS_0068637 (cited in *TCL*, 2017 WL 6611635, at *6-7). ETSI

6    echoed these concerns in 1991 in aiming to develop policy provisions that provide smaller

7    companies with "real protection from unfair treatment" and avoid violating competition law. Ex. 33,

8    ASUS_0069337. That same year, ETSI agreed to pursue an IPR policy barring discrimination

9    because implementation of its standards "***free of discrimination is essential*** for the development of

10   global telecommunications and removal of barriers to trade." Ex. 35 at ASUS_0069339 (1991

11   Agreement between Standards Institute of Israel and ETSI "to pursue [IPR] policies in respect to

12   telecommunication standards that support this objective.") (emphasis added).

13        In 1992, ETSI reiterated the need for the ETSI IPR Policy to prevent price discrimination that

14   harms smaller enterprises' ability to compete:

15             "inter operability" is the crucial commodity in telecommunications
                that creates the huge service market. This in turn demand exacting
16             technical standards for essential interfaces. Thus in
                telecommunications it is not feasible for an enterprise to find an
17             alternative non infringing solution without destroying inter operability.
                This tilts the negotiating balance in favor of the IPR owner. Legal
18             enforcement of some of ETSI's standards by the European Community
                considerably exaggerates this imbalance. ***Thus the term 'fair and***
19             ***reasonable' for royalty becomes whatever anyone cares to demand.***
                ***Large enterprises trade IPR so that the absolute level of royalty is***
20             ***irrelevant. Small enterprises get pushed out of the market.***

21   Ex. 36 at ASUS_0067138 (ETSI Chairman's 1992 Explanatory Note on ETSI's Intellectual Property

22   Rights Policy and Undertaking) (emphasis added) (quoted in *TCL*, 2017 WL 6611635, at *7). ETSI

23   highlighted that the "non-discriminatory" aspect of ETSI's FRAND undertaking was considered an

24   improvement over the policies of other standard-setting organizations like ISO, and in alignment

25   with European Commission ("EC") competition policy:

26             ETSI believes that in terms of competition law the policy is
                considerab[ly] better than the ISO type approach. In particular
27             members and non members within the Community are treated the
                same. The term "non discriminatory" does not appear in the ISO
28             policy.

Ex. 36 at ASUS_0067141. Thus, the key documents concerning the development of the ETSI IPR Policy demonstrate that the FRAND commitment—specifically, the non-discrimination prong—should be interpreted to ensure there is not price discrimination and competitive harm to smaller competitors relative to larger entities competing in the same market.

European competition law further informs this interpretation of non-discrimination and hence "similarly situated." The interpretation of "non-discrimination" as used in the IPR Declarations and section 6.1 must conform with European competition law based on French canons of contract interpretation and because ETSI explicitly requires it. Under French law, an integral aspect of understanding a contractual term is to construe it consistently with the prevailing law. Stoffel-Munck Decl. ¶¶ 7, 14. Moreover, ETSI explicitly intended for its IPR Policy to conform with European competition law by stating that its IPR Policy is to be implemented "to avoid anti-competitive actions," acknowledging that "competition law rules apply to…the activities of members within ETSI," and providing EC representatives with special "counsellor" status at ETSI. Ex. 5 pp. 15, 53, 76-77; *see* Stoffel-Munck Decl. ¶ 14.

The EC itself has directly opined on the FRAND concept and non-discrimination. As early as 1992, the EC indicated that non-discrimination under FRAND meant that IPR owners must not impose differing financial or other burdens on implementers of the same standard based on factors unrelated to use of the technology. Ex. 37 pp. 19, 32; *TCL*, 2017 WL 6611635, at *6-7. In 2011, the EC issued Horizontal Guidelines warning that IPR licensing agreements that "discriminate or foreclose or segment markets according to their geographic scope of application" likely violate competition law. Ex. 38 at ASUS_0067836, Clause 294. And in a 2017 Communication, the EC stated that "[t]he non-discrimination element of FRAND indicates that rightholders cannot discriminate between implementers that are 'similarly situated.'" Ex. 39 p. 7. Similarly, in other contexts, the EC has articulated "non-discrimination" as applying across an entire market, rather than to arbitrary market segments. Ex. 50, EC 2014 Guidelines at ¶ 269 (explaining, in context of non-discrimination for patent pools: "It is in general not considered restrictive of competition to apply different royalty rates to different product markets, whereas there should be ***no discrimination within product markets***." (emphasis added)).

Prior court decisions have reached similar conclusions. To date, two cases (one in the Central District of California) have interpreted the meaning of non-discrimination and similarly situated in the context of the ETSI IPR Policy to apply broadly to competitors in a market, consistent with the IPR Declaration, ETSI Directives, surrounding ETSI documents, and European competition law.[2]

In *TCL v. Ericsson*, the U.S. District Court for the Central District of California construed the non-discrimination prong of the ETSI FRAND commitment. The court considered the context in which the FRAND commitment emerged. Based on this context, the court determined that *all* competitors "reasonably well-established in the world market" were entitled to non-discriminatory licenses:

> The Court concludes that for purposes of license comparisons the analysis should include ***all firms reasonably well-established in the world market***. This implies a necessarily wide spectrum, and correctly so for several reasons. First, ETSI contemplates facilitating competition in the market, ***particularly from emerging firms***. Second, excluding from the analysis the largest firms in the market would have the effect of insulating them, and further contributing to their dominant positions, by imposing a barrier in the form of higher rates for those at the top end of the market…. Third, permitting [the patent owner] to define similarly situated very narrowly by picking and choosing criteria with no relation to its SEPs or the FRAND commitment would effectively allow [it] to read the non-discrimination prong out of the FRAND commitment.

*TCL*, 2017 WL 661153, at *30 (emphasis added). Thus, *TCL* confirms a licensor must offer level treatment to all well-established players in the global cellular device market and is not permitted to dilute its non-discrimination commitment and entrench market leaders by segmenting the market into several tiers. *Id.*

*Unwired Planet v. Huawei*, a case in the United Kingdom, draws similar conclusions regarding the meaning of non-discrimination in the context of the ETSI IPR Policy. When comparing licenses to determine FRAND terms and conditions, Justice Birss explained that non-

---

[2] An Administrative Law Judge (ALJ) of the U.S. International Trade Commission (ITC) also addressed non-discrimination in *dicta*. *Certain Wireless Devices with 3G Capabilities & Components Thereof* ("*Wireless Devices*"), Initial Determination, U.S.I.T.C. Inv. 337-TA-800, 2013 WL 3961230, at *235 (June 28, 2013). The ITC is a quasi-judicial agency whose decisions as to patent issues are not binding on district courts. *Tex. Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1569 (Fed. Cir. 1996). The Commission reviewed the ALJ's determination in its entirety, thereby vacating it, and did not rule on the FRAND issue. Ex. 40, *Wireless Devices*, Comm'n Op. (Feb. 19, 2014).

discrimination means charging "the same kind of rate" for the same kind of license, independent of licensee size and bargaining power:

> FRAND is supposed to eliminate hold up as well as hold out. Different licensees will have differing levels of bargaining power. That is another way of saying their ability to resist hold up and their ability to hold out will vary. It would be unfair (and discriminatory) to assess what is and what is not FRAND by reference to this and other characteristics of specific licensees. In my view, it would not be FRAND, for example, for a small new entrant to the market to have to pay a higher royalty rate than an established large entity. Limiting comparable licences to those where Huawei or a similar company like Samsung is the licensee is therefore unjustified. In my judgment the FRAND rate ought to be generally non-discriminatory in that it is determined primarily by reference to the value of the patents being licensed and has the result that ***all licensees who need the same kind of licence will be charged the same kind of rate.***

Ex. 30, *Unwired Planet*, ¶ 175 (emphasis added). He characterized a rate as non-discriminatory if it is based on intrinsic value and does not depend on the licensee. *Id.* ¶ 177 ("This rate is non-discriminatory because it is a measure of the intrinsic value of the portfolio being licensed but it does not depend on the licensee.").

These sources demonstrate that "similarly situated" should not be interpreted in a way that would allow SEP licensors to introduce dependency on the identity of the licensee and to give better deals to larger players in the industry. Doing so would harm competition by increasing the costs for small firms relative to those of the largest firms, insulating the larger firms from competition and imposing barriers in the form of increased royalty rates.

**B.     IDC's Licensing Practices Discriminate against ASUS by Denying It the Rates Similarly Situated Companies Obtain through** ███████████████

Instead of licensing its SEPs in a nondiscriminatory fashion, IDC has subjected the global cellular device market, including ASUS, to ████████████████████████████ ████████████████████████████ This is contrary to IDC's FRAND commitment and lacks any redeeming justification.

**1.     IDC's Offers to ASUS Did Not Treat ASUS Similarly to Its Global Cellular Device Competitors,** ████████████████████

IDC's 4G offers to ASUS discriminate against ASUS vis-à-vis several of its competitors in

15

1  the global cellular device market. The mechanics of the royalty rate calculations are specific to each

2  offer and license, but as detailed below the upshot in each instance ███████████ between what

3  IDC has demanded of ASUS and what IDC charges several of its competitors.

4       IDC's ████████████████████████████████████████████████████

5  ███████████████████████████████████████

| Offer Date | Tech | Royalty Rate | Floor | Cap | Ex. |
|---|---|---|---|---|---|
| ████ | ██ | ██ | █ | ██ | Ex. 16, at IDC-ASUS-1716-0112738. |
| █████ | ███ | ██ | ██ | ██ | Ex. 21. |
|  | ███ | ██ | ██ | ██ |  |
| ████ | ███ | ██ | ██ | ██ | Ex. 22 at IDC-ASUS-1716-0109311. |
|  | ███ - | ██ | ██ | ██ |  |
| ██████ | ███ | ██ | ██ | ██ | Ex. 23 at IDC-ASUS-1716-0114019-21, 029-31; Ex. 24. |
| ████ | ███ | ██ | ██ | ██ | Ex. 27. |

17       These ██████████████████████████████████████████████████████████

18  ████████████████████████████. Ex. 18, Grewe Dep. 20:23-21:4, 22:12-16, 22:24-23:2; Ex. 42,

19  Putnam Dep. 121:7-122:1 (July 18, 2018). (At least one court has found that, in the FRAND context,

20  "use of floors use of floors in its rates is itself discriminatory." *TCL*, 2017 WL 6611653, at *57.)

21  While █████████████████████████████████████████████████████████████████████████████████

22  ███████████████████████████████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████

24  _____

25  [3] As of the filing of this motion, a motion is pending before the Court with respect to IDC's use of its
████████████ in this case because ██████████ was made after fact discovery closed. For purposes of

26  completeness, ████████████████████████████████████████████████████████████████████████████
██████████████████████████████████, respectively. *See* Ex. 4, p. 2. According to IDC's late-

27  produced ████████████████████████████████████████████████. *Id.* As
discussed below, even if the ████████████ offer is considered, IDC still has not offered ASUS terms on

28  par with those made available to other established companies in the global market for cellular
devices.

█████████████████████████████████████████████████████████████

█████████████████████ :

| License | Tech | ██ | █ | █ | ██ | ██ | Ex. |
|---------|------|-----|---|---|-----|-----|-----|
| ██ | ██ | ██ | █ | █ | ██ | ██ | Ex. 12, pp. 2, 14, Ex. 14, Putnam CRR Exhibits 11.1, 23; Ex. 42, Putnam Dep. 95:22-96:4, 107:24-110:3. |
| | ██ | █ | █ | █ | ██ | ██ | *Id.*; Ex. 43 pp. 2, 14. |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | Ex. 13 p. 2; Ex. 14, Putnam CRR Ex. 23. |
| ██ | █ | ██ | █ | ██ | ██ | ██ | Ex. 44, p. 2; Ex. 14, Putnam CRR Ex. 14.1. |

████████████████████████

In each of these licenses, ████████████████████████████████████
████████████████████████████████ *See* Ex. 42, Putnam Dep. 135:11-137:20. ████████████████████████████

████████████████████████████████████████
████████████████ *See, e.g.*, Ex. 12 p.2, Ex. 13 p.2, Ex. 43 p.2, Ex. 44 p.2,; Ex. 15, McElvaine, Dep. 19:11-20, 21:9-24, 32:22-33:8; Ex. 42 Putnam Dep. 138:2-25.

As a result, each of these licensees obtained a royalty rate, floor, and cap lower than that offered to ASUS.[4] For example, ████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████

--------

[4] ████████████████████████████████████████████

1

2

3

4

5

6      In sum,

7

8

9

**2. IDC Admits That ▮▮▮▮▮▮ Are Responsible for Its Royalty Disparities.**

IDC defends its differential pricing with the claim that ASUS is not "similarly situated" to IDC's other licensees ▮▮▮▮▮▮▮▮▮▮▮▮. For example, ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ Ex. 19, p. 1. ▮▮▮▮▮▮▮

▮▮▮▮▮▮ *Id*. Again, ▮▮▮▮▮▮▮

▮▮▮▮▮▮ Ex. 20, p. 2. When deposed ▮▮▮▮▮▮▮

▮▮▮▮▮▮ Ex. 18, Grewe Dep. 30:11-18.

IDC's CEO Bill Merritt—IDC's Rule 30(b)(6) witness on IDC's FRAND obligations, the compliance of its discounts with the FRAND obligation, and the compliance of IDC's offers to ASUS with its FRAND obligation—echoed the same sentiments. When asked, ▮▮▮▮▮▮

18

1 ██████████████████████████████████████████████████

2 █████████████████████████████████████████████

3 ████████████████████████████████████████

4 ███████████████████████████████████  ███

5 ███████████████████████████████████████

6 ████████████████████████████████████████

7 ████████████████████████████████████████

8 ████████████████████████████████████████

9 ████████████████████████████████

10 Ex. 9, Merritt Dep. 136:24-137:25. Time and again, ████████████████████████

11 ████████████████████████████████████ *See, e.g., id.* 121:5-123:2. When he

12 was asked █████████████████████████████████████

13 ████████████████████████████████████████████████

14 ██████████████████████████ *Id.* 123:18-124:14.

15     IDC's correspondence with ASUS and its Rule 30(b)(6) witnesses' testimony show ████

16 ████████████████████████████████████████████████████

17 ████████████████████████████████████████████

18 ███████████████████████████████████████████

19 █████████████████████████████

20     **3.**   ████████████  **Discriminate among Competitors in the Global Cellular**

21 **Device Market, Including ASUS.**

22     IDC's use of █████████████████████████████████████████

23 ████████████████████████████████████████████████

24 ████████████████████████████, is indefensible discrimination. There is no viable

25 justification for such ████████████ in the presence of a FRAND commitment.

26     ETSI repeatedly indicated its desire to form an IPR policy that prevents discrimination of

27 smaller companies in favor of larger companies when licensing SEPs. *E.g.*, Ex. 36 at

28 ASUS_0067138 (expressing need for effective IPR policy otherwise "the term 'fair and reasonable'

1   for royalty becomes whatever anyone cares to demand. Large enterprises trade IPR so that the

2   absolute level of royalty is irrelevant. Small enterprises get pushed out of the market."),

3   ASUS_0067141 (IPR policy improves over prior policies by including "non-discrimination" prong

4   and providing mechanisms to protect "small and medium size concerns"); Ex. 34 at ASUS_0068637

5   (concerns that price discrimination would cause "serious distortion of market forces against [small

6   and medium-sized enterprises] and in favor of large multinationals."). But, volume discounts do

7   exactly that: they force smaller companies to pay many times more than large companies for access

8   to the same technology.

9          As the *TCL* court held, there is no legitimate basis under the ETSI IPR Declaration or ETSI

10  Directives for using volume to discriminate among established, global firms. The court explained

11  that treating the largest firms such as Apple and Samsung as a "category unto themselves" (as IDC

12  does) would unacceptably undermine the non-discrimination requirement:

13             Apple and Samsung do sell many more devices than TCL, but the
               Court views sales volume only as a filter to separate out niche and
14             small firms from the reasonably well-established global firms . . . .
               Ericsson identifies many other criteria in its attempt to show Apple
15             and Samsung are not similarly situated, but exclusive applications,
               retail stores, brand recognition, and a proprietary operating system are
16             irrelevant to determining a non-discriminatory rate for Ericsson's
               SEPs. Ericsson would clearly prefer that Apple and Samsung be
17             considered *sui generis*, but the prohibition on discrimination would
               mean very little if the largest, most profitable firms could always be a
18             category unto themselves simply because they were the largest and
               most profitable firms.
19

20  *TCL*, 2017 WL 6611635, at *33. In *Unwired Planet*, Judge Birss similarly held, in the context of

21  ETSI's FRAND obligation, that "it would not be FRAND, for example, for a small new entrant to

22  the market to have to pay a higher royalty rate than an established large entity." Ex. 30, *Unwired*

23  *Planet*, at ¶ 175 ("Limiting comparable licences to those where Huawei or a similar company like

24  Samsung is the licencee is therefore unjustified."); *see also Innovatio*, 2013 WL 5593609, at *38 ("a

25  RAND licensor…cannot discriminate between licensees on the basis of their position in the

26  market").

27         Moreover, using sales volume as a metric for determining who is similarly situated for

28  purposes of FRAND provides an impractical and unstable metric for evaluating discrimination. The

1   global cellular device market is highly dynamic and companies' market shares change constantly.

2   *See, e.g.*, Exs. 45-48 (showing different companies with top market share in global cellphone in

3   2006, 2010, 2014, and 2015). Two companies with similar sales volumes in one, two or three years

4   may be in very different positions five or ten years later. ██████████████████████████

5   ████████████████████████████████████████████████

6   ████████████████████████████████████████████████

7   ███████████████████████████████████████ Ex. 14, Putnam

8   CRR ¶ 48. ████████████████████████████████████

9   ████████████████████████████████████████████████

10   ████████████████████████ *Id.* at ¶ 50. But when IDC's CEO was asked ████████

11   ████████████████████████████████████████████████

12   ████████████████████████████████████████████████

13   ████████████████████████████████████████████████

14   ██████████████ Ex. 9, Merritt Dep. 226:16-228:10, 229:12-13; *see also id.* 271:1-272:1.

15          The *TCL* court recognized that the fluctuation of relative sales volumes over time makes this

16   criterion unstable and unreliable for determining which entities are similarly situated:

17                The Court also believes that similarly situated should be broadly
              interpreted because the mobile phone market has been extremely
18            dynamic over the last decade. In 2007, the six largest companies
              ranked by U.S. market share were, in order, Motorola, Samsung, LG,
19            Nokia, Blackberry, and Apple…. Within a decade, Motorola, Nokia,
              Blackberry, and even Ericsson's own handset division would be
20            shuttered or divested, events which… no industry observer would have
              ever predicted….The volatility of the handset market over [the] last
21            decade requires the Court to exercise a broad view of who will be
              similarly situated to [the licensee] over the course of the [term of the
22            license] which the Court adopts.

23   *TCL*, 2017 WL 6611635, at *31. Accordingly, the court rejected a narrow interpretation of "similarly

24   situated" based on relative market share. In this case, ██████████████████████████

25   ████████████████████████████ Ex. 17, pp. 11-13 (No. 19). Thus, █████████████

26   ████████████████████████████████████████████████

27   ████████████████████████████████████████████████

28   ████████████████████████████████████████ IDC creates

---

21

1    mismatched groups of "similarly situated" licensees that get ███████████████████████

2    ██████████████████████████████

3         **C.     The** ███████ **IDC Purports to Offer Lack Economic Basis and Quantitative**

4         **Justification.**

5         Even assuming that some degree of volume discounting could be tolerated in the FRAND

6    context, ████████████████████████████████████████████████████████

7    ██████████████████████████████████████████████████████████████████

8    ██████████████████████████████████ Ex. 17 pp. 11-13 (No. 19). ████████████

9    █████████████████████████████████ Ex. 43.

10   ████████████████████████████████████████████████████████████████

11   ██ ██████████████████████████████████████████████████████████████

12   ███████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████████

16   ███████████████████████. Ex. 18, Grewe Dep. 139:15-140:6. ████████████████

17   ████████████████████████████████████████████████████████████████

18   █████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████████

20   ███████████████████████████████████████ Ex. 15, McElvaine Dep. 25:21-

21   26:2. ████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████. *See* Ex. 9,

25   Merritt Dep. 138:1-139:24.

26        Similarly, none of IDC's experts provided ████████████████████████████████

27   ████████████████████████████████ Dr. Putnam opined in his report that t███

28   ███████████████████████████████████████. *Compare* Ex. 14, Putnam CRR ¶¶ 47-

1  50, *with* Ex. 17 pp. 11-13 (No. 19). ████████████████████████████████████

2  ████████████████████████████████████████████████████████

3  ███████████████████████████ *Id.* D████████████████████████████

4  ████████████████████████. *See* Ex. 14, Putnam CRR ¶ 47, Exhibit 23; Ex. 31 (████████

5  █████████████████████████████████████████████████

6  ████████████████████████████████████████; Ex. 9, Merritt Dep. 129:1-11. Dr.

7  Putnam did not provide ████████████████████████████████████

8  █████████████████████████████████████████████

9  ███████████████████████████████. *Id.* When asked about ███████████████

10  █████████████████████████████████████████████████

11  █████████████████████████████████████████████

12  ████████ Ex. 42, Putnam Dep. 42:25-43:11, 44:16-45:1. He repeatedly admitted he could not

13  ████████████████████████████████████████████████

14  █████████████ *See* Ex. 14, Putnam CRR ¶¶ 47-50; Ex. 42, Putnam Dep. 43:12-45:19. IDC's

15  other economic expert, Dr. Layne-Farrar, proposed ███████████████████████████

16  ████████████████████████████████████████

17  ████████████████████████████████████████

18  ██████████████████████████████████ Ex. 49, Layne-Farrar Dep. 135:5-14,

19  136:22-138:12, 140:11-142:3, 144:21-145:14, 152:17-25, 155:5-157:8 (████████████████

20  █████████████████████████████████████████

21  █████████████████████████████████████████

22  ██████████████████████████████████████████████

23  ███████████████████████████████████████████████

24  █████████████████████████████████████████

25  ███████████████████████████████████████

26  ██████

27  IDC cannot justify why ████████████████████████████████████

28  ███████████████ complies with IDC's obligation to provide ASUS with "fair, reasonable, and

1    non-discriminatory" terms and conditions.

2    **VI.    CONCLUSION**

3          Pursuant to IDC's FRAND commitment, IDC must treat all well-established global cellular

4    device manufacturers similarly, providing each with terms and conditions that are fair, reasonable,

5    and non-discriminatory vis-à-vis its competitors. For years, IDC has failed to provide such terms and

6    conditions to ASUS. ███████████████████████████

7    █████████████████████████████████████████

8    ███████████████████████████████. Regardless, ████████

9    █████████████████████████████████████████

10   ████████████████████ Thus, at their core, █████████████ embody

11   and facilitate IDC's discriminatory licensing behavior. Based on these ████████, IDC has

12   breached its FRAND commitment as a matter of law. ASUS respectfully requests that this Court find

13   IDC liable for breach of its contractual ETSI IPR Declarations.

14

15   DATED: August 16, 2018

16                                        By: */s/ Michael R. Franzinger*
                                              Brian Nester (*pro hac vice*)
17                                            Michael R. Franzinger
                                              Anna M. Weinberg (*pro hac vice*)
18                                            Mike Bettinger
                                              Richard A. Cederoth (*pro hac vice*)
19                                            David C. Giardina (*pro hac vice*)

20

21                                        *Attorneys for Plaintiffs*
                                              ASUS COMPUTER INTERNATIONAL, and
22                                            ASUSTEK COMPUTER INCORPORATED

23

24

25

26

27

28