1  DAVID S. STEUER, State Bar No. 127059
   dsteuer@wsgr.com
2  MICHAEL B. LEVIN, State Bar No. 172329
   mlevin@wsgr.com
3  MAURA L. REES, State Bar No. 191698
   mrees@wsgr.com
4  MATTHEW R. REED, State Bar No. 196305
   mreed@wsgr.com
5  WILSON SONSINI GOODRICH & ROSATI
   Professional Corporation
6  650 Page Mill Road
   Palo Alto, CA 94304-1050
7  Telephone:  (650) 493-9300
   Facsimile:   (650) 565-5100
8
   LUCY YEN, State Bar No. 224559
9  lyen@wsgr.com
   WILSON SONSINI GOODRICH & ROSATI
10 Professional Corporation
   1301 Avenue of the Americas, 40th Floor
11 New York, NY 10019-6022
   Telephone:  (212) 999-5800
12 Facsimile:   (212) 999-5899

13 Attorneys for Defendants
   *InterDigital, Inc.; InterDigital Communications,*
14 *Inc.; InterDigital Technology Corporation; IPR*
   *Licensing, Inc.; and InterDigital Patent*
15 *Holdings, Inc.*

16                    UNITED STATES DISTRICT COURT

17                  NORTHERN DISTRICT OF CALIFORNIA

18                        SAN JOSE DIVISION

19

20 ASUS COMPUTER INTERNATIONAL; and        )   Case No.: 15-cv-1716 (BLF)
   ASUSTEK COMPUTER INCORPORATED,          )
21                                         )   **DEFENDANTS' OPPOSITION TO**
                                           )   **PLAINTIFFS' MOTION FOR**
                Plaintiffs,                )   **SUMMARY JUDGMENT**
22                                         )
           v.                              )
23                                         )   **JURY TRIAL DEMANDED**
   INTERDIGITAL, INC.; INTERDIGITAL        )
24 COMMUNICATIONS, INC.; INTERDIGITAL      )   Hearing Date:  October 11, 2018
   TECHNOLOGY CORPORATION ; IPR            )   Time:  9:00 a.m.
25 LICENSING, INC. ; and INTERDIGITAL      )   Judge:  Hon. Beth Labson Freeman
   PATENT HOLDINGS, INC.,                  )
26                                         )
                Defendants.                )
27 _____)

28                         **PUBLIC**

       **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................ 1

II.  STATEMENT OF FACTS ................................................................................. 1

   A.  FRAND Commitments Under the ETSI IPR Policy ............................ 2

   B.  History of Enactment of ETSI IPR Policy ......................................... 3

   C.  Industry Practice in Licensing Pursuant to ETSI IPR Policy ............ 4

   D.  InterDigital's Good Faith Licensing Practices ................................. 5

   E.  ███████████████████████████████ ............................................ 6

III.  ARGUMENT ...................................................................................................... 9

   A.  There Is No Precedent For Finding a Breach of FRAND Obligations On Summary Judgment ....................................................... 9

   B.  The Parties Dispute the Interpretation of the ETSI FRAND Obligation ............. 12

   C.  The Factual Disputes Regarding the Meaning of "Fair, Reasonable, and Non-Discriminatory" ........................................... 15

      ██ ████████████████████████████████████████

      ██ █████████████████████████████ .............................................. 17

      3.  ASUS's Reliance on the *Unwired Planet* Decision Raises Further Issues of Fact ........................................................ 18

      4.  The Parties' Dispute as to When Licensees are "Similarly Situated" Cannot Be Decided on Summary Judgment ............ 19

      ██ ██████████████████████████ ............................................ 22

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

### CASES

4

*Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242 (1986) ..................................................11

5

*Certain 3G Mobile Handsets*, Inv. No. 337-TA-613,
    2015 WL 6561709 (Apr. 27, 2015)..................................................................11, 23

6

*Certain Wireless Devices With 3G and/or 4G Capabilities*, Inv. No. 337-TA-868,
    2014 WL 2965327 (June 13, 2014)..................................................................11, 23

7

8

*Certain Wireless Devices With 3G Capabilities*, Inv. No. 337-TA-800,
    2013 WL 3961230 (June 28, 2013)..............................................11, 12, 13, 15, 23

9

*Crowley v. Epicept Corp.*, 547 Fed. App'x 844 (9th Cir. 2013) ....................................10

10

*Dugan v. Lloyds TSB Bank, PLC*, No. C 12-02549 WHA,
    2014 U.S. Dist. LEXIS 57530 (N.D. Cal. Apr. 24, 2014)...................................10

11

12

*In re Innovatio IP Ventures, LLC Pat. Litig.*, Case No. 11 C 9308,
    2013 WL 5593609 (N.D. Ill. Oct. 3, 2013) ........................................................11

13

*In re Innovatio Patent Litig.*, 956 F. Supp. 2d 925 (N.D. Ill. 2013) ...............................12

14

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009) ..........................17

15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ......................10

16

*Microsoft Corp. v. Motorola, Inc.*, No. C10-1823JLR,
    2013 WL 2111217 (W.D. Wash. Apr. 25, 2013) ..............................11, 13, 21, 24

17

18

*Music Grp. Macao Commer. Offshore, Ltd. v. Foote*, 14-cv-03078-JSC,
    2015 U.S. Dist. LEXIS 81415 (N.D. Cal. June 22, 2015) ...................................10

19

*Network-1 Techs., Inc. v. Alcatel-Lucent USA, Inc.*, 11-cv-492-RWS-KNM,
    2017 WL 4641073 (E.D. Tex. Sept. 11, 2017),
    adopted by district court at 2017 WL 4620692 (E.D. Tex. Oct. 6, 2017)...........12

20

21

*Optis Wireless Tech., LLC v. Huawei Techs. Co. Ltd.*, 17-cv-00123-JRG-RSP,
    2018 WL 3375192 (E. D. Tex. Jul. 11, 2018)................................................11, 12

22

*Pardi v. Kaiser Permanente Hosp., Inc.*, 389 F.3d 840 (9th Cir. 2004) .........................10

23

*Res-Care Inc. v. Roto-Rooter Servs. Co.*, 753 F. Supp. 2d 970 (N.D. Cal. 2010) .........10

24

*Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174 (7th Cir. 1991)............11

25

*Shaw v. Lindheim*, 919 F. 2d 1353 (9th Cir. 1990) ........................................................11

26

*TCL Commc'n Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*,
    CV 15-2370 JVS, 2017 WL 6611635 (C.D. Cal. Dec. 21, 2017)............................. *passim*

27

28

*Unwired Planet Int'l Ltd. v. Huawei Techs. Co.*, EWHC 711 (Pat) (2017).........................11, 13, 18

*Worldwide Equip. of TN, Inc. v. United States*, No. CV 14-108-ART,
    2016 WL 3574395 (E.D. Ky. June 23, 2016) .................................................................11

**STATUTES**

Cal. Bus. & Prof. Code § 17200....................................................................................................8

Delaware Consumer Fraud Act ......................................................................................................8

Sherman Act ....................................................................................................................................8

**RULES**

Fed. R. Civ. P. 56(a)........................................................................................................................9

Table of Abbreviations

| | |
|---|---|
| InterDigital | Defendants InterDigital, Inc., InterDigital Communications, Inc., InterDigital Technology Corporation, IPR Licensing, Inc., and InterDigital Patent Holdings, Inc. |
| ASUS | Plaintiffs ASUS Computer International and Asustek Computer Incorporated |
| IPRs | Intellectual Property Rights |
| ETSI | European Telecommunications Standards Institute, a standards development organization |
| SDO | Standards Development Organization (used interchangeably with SSO) |
| SSO | Standards Setting Organization (used interchangeably with SDO) |
| 2G | Second Generation (of cellular technology) |
| 3G | Third Generation (of cellular technology) |
| 4G | Fourth Generation (of cellular technology) |
| LTE | A 4G cellular standard (Long Term Evolution) |
| USITC | United States International Trade Commission |
| ALJ | Administrative Law Judge |
| FRAND | Fair, Reasonable and Non-Discriminatory |
| PLA | Patent License Agreement |
| FAC | First Amended Complaint, Dkt. 108-6 |
| MFL | Most-Favored Licensee |
| SEP | Standards-Essential Patent |
| IDC | InterDigital |
| EC | European Commission |
| ECJ | European Court of Justice |
| EU | European Union |
| Ex. RM# | Exhibit to Declaration of Ranae McElvaine |
| Ex. WM# | Exhibit to Declaration of William Merritt |
| Ex. P# | Exhibit to Declaration of Dr. Jonathan D. Putnam |
| Ex. L# | Exhibit to Declaration of Prof. Yves-Marie Laithier |
| Ex. H# | Exhibit to Declaration of Dr. Bertram Huber |
| Ex. J# | Exhibit to Declaration of Dr. Jorge Padilla |
| Ex. F# | Exhibit to Declaration of Dr. Anne Layne Farrar |
| Opp. Ex. # | Exhibit to Declaration of Lena Wong in Support of Opposition to ASUS's Motion for Summary Judgment |

**Note**: all emphasis in quotations is added unless otherwise stated.

1    I.    **INTRODUCTION**

2          ASUS seeks summary judgment on a claim that is highly fact intensive and heavily

3    disputed: whether InterDigital breached an obligation to be prepared to grant licenses for SEPs

4    on "fair, reasonable, and non-discriminatory" terms pursuant to a standards-setting

5    organization's IPR Policy.  The cases cited by ASUS addressing claims of breach of a FRAND

6    obligation have required lengthy trials, leading to hundreds of pages of findings of fact and

7    conclusions of law.  Courts routinely deny motions for summary judgment on breach of FRAND

8    claims; indeed, ASUS's motion cites no decision in which such a claim has *ever* been decided on

9    summary judgment.  This case is no different. ASUS's oversimplified and erroneous

10   interpretation of the FRAND commitment at issue should be rejected, but even if it were

11   accepted, the need to resolve numerous disputed factual issues raised by ASUS's claim would

12   preclude summary judgment.  Those issues include:

13   • The proper interpretation of the ETSI FRAND commitment in light of conflicting
14   extrinsic evidence;

15   • Whether a breach of contract occurred;

16   • Whether the parties negotiated in good faith toward a license on fair, reasonable, and
17   non-discriminatory license in light of all the facts and circumstances;

18   • Whether ASUS is similarly situated to other licensees like Samsung, and whether terms
19   offered to ASUS can be considered similar to other licensees;

20   • Whether ASUS's license comparison methodology is economically justifiable;

21   • ██████████████████████████████

22   The evidence demonstrates that InterDigital has not breached any FRAND commitment by

23   supposedly "discriminating" against ASUS via license offers, and further that ASUS has acted as

24   an unwilling licensee who has refused to negotiate in good faith for a license.  ASUS's motion

25   for summary judgment should be denied.

26   II.   **STATEMENT OF FACTS**

27         Plaintiff ASUS is a multinational corporation based in Taiwan that sells a wide range of

28   various electronics products in dozens of countries worldwide.  Mot. at 2.  ASUS has over

1    12,500 employees, and over US$14 billion in yearly sales across all products as of 2017.  *Id*.;

2    Dkt. 234-3 at Ex. 3.  With respect to cellular handsets specifically, however, ASUS has a

3    relatively small presence: its worldwide market share of cellular handset sales is currently under

4    one percent (0.82% as of 2017).  Putnam Decl. ¶ 11.

5           InterDigital is an American technology company that is a pioneer in developing wireless

6    telecommunications technologies.  Founded in 1972, InterDigital is publicly traded and listed on

7    NASDAQ.  Merritt Decl.¶ 6.  As of December 31, 2017, InterDigital had approximately 350

8    employees, the majority of whom are engineers.  *Id*. ¶ 7.  Over its history, InterDigital has

9    invested over $1 billion in research and development.  *Id*.  InterDigital's reported yearly

10   revenues are far smaller than ASUS's; it reported revenue of $533 million for 2017.  *Id*. ¶ 9.

11          **A.      FRAND Commitments Under the ETSI IPR Policy**

12          The FRAND commitments at issue are reflected in the written declaration forms

13   InterDigital submitted to ETSI.  The forms are included as annexes to ETSI's IPR Policy.  Dkt.

14   234-4 at Ex. 20.  They have two parts: (1) the IPR Information Statement, which includes a list

15   of patents as to which it is the patent owner's "present belief" that the patents "may be or may

16   become ESSENTIAL" to a standard; and (2) the Licensing Declaration, which states:  "***To the***

17   ***extent*** that the IPR(s) disclosed in the attached IPR Information Statement Annex ***are or become,***

18   ***and remain ESSENTIAL*** . . .  the Declarant and/or its AFFILIATES are (1) ***prepared to grant***

19   irrevocable licences under this/these IPR(s) on terms and conditions which are in accordance

20   with Clause 6.1 of the ETSI IPR Policy. . . ."  *Id*.  Clause 6.1 provides for an "undertaking in

21   writing that [the declarant] is ***prepared to grant*** irrevocable licences on fair, reasonable and non-

22   discriminatory ("FRAND") terms and conditions."  *Id*.  The licensing declaration and the ETSI

23   IPR Policy are governed by French law.  *Id*. § 12 & Decl. Form.

24          The ETSI IPR Policy expressly sets forth the Policy's goals. Section 3.1 of the ETSI IPR

25   Policy states that its objective is to adopt "solutions which best meet the technical objectives" of

26   the telecommunications sector, and that:

27          In achieving this objective, the ETSI IPR POLICY ***seeks a balance between the***
             ***needs of standardization for public use*** in the field of telecommunications and ***the***
28          ***rights of the owners of IPRs***.

*Id*. § 3.1. The next section expressly provides that:

> ***IPR holders*** whether members of ETSI and their AFFILIATES or third parties, ***should be adequately and fairly rewarded for the use of their IPRs*** in the implementation of STANDARDS and TECHNICAL SPECIFICATIONS.

*Id*. § 3.2. Thus, contrary to ASUS's suggestion that the ETSI IPR Policy is concerned only with making IPRs available to manufacturers to ensure widespread dissemination of standards and a "level playing field" for implementers, the Policy actually provides that the interests of patent owners are equally to be protected.  The express language of the Policy requires an interpretation of the licensing commitment that will "adequately and fairly" compensate the patent owner.

### B.    History of Enactment of ETSI IPR Policy

The history of the ETSI IPR Policy provides evidence of the intent of the parties (*i.e.*, the members of ETSI) who adopted it.  In 1993, ETSI enacted an initial IPR Policy and Undertaking that generated significant controversy among members.  Huber Decl. ¶¶ 30-38.  Consequently, the 1993 Policy was not put into practice, and instead was replaced with the 1994 Policy that is operative today.  *Id*. ¶¶ 39-45.  As set forth in the declaration of Dr. Huber, who participated in the deliberations concerning the adoption of the Policy, the initial 1993 version included a far more detailed undertaking that would have placed significant limitations on patent licenses for SEPs. *Id*. & Ex. H7 (1993 policy including 21-page licensing undertaking specifying detailed requirements of licenses). Many participants criticized this proposed undertaking in the 1993 version as placing too many restrictions on licensing parties and departing from accepted industry licensing practice. *Id*. ¶¶ 30-38.  The requirements for FRAND licensing under the 1993 version of the policy would have significantly interfered with the contractual freedom that industry participants valued and wanted to maintain.  Ex. H14 (Apple: an "open licensing policy" based on FRAND "has worked successfully for many years"); *id*. (Motorola "will not be able to sign" the proposed undertaking in light of "unprecedented restrictions" it would impose); Ex. H9 (IBM: "[a] market forces mechanism is the only practical means to weigh the various interests involved in IPRs and standardization and to determine a fair and adequate royalty." ).

For example, the 1993 version included a "Most Favored Licensee" (MFL) provision, which would have required the licensor to notify a licensee of a subsequent license to a third

party on "clearly more favourable" terms and to allow the licensee to elect such terms.   Ex. H7.

However, this provision was deleted from the ultimately enacted 1994 ETSI IPR Policy, which

instead includes a commitment to be "prepared to grant" licenses on FRAND terms and

conditions.   Huber Decl. ¶ 46.   The 1994 ETSI IPR Policy does not prescribe any specific terms,

provisions, or criteria that must be present in order to qualify as "FRAND."  *Id*. ¶ 52-65.   Rather,

it provides industry participants with freedom to negotiate "fair, reasonable, and non-

discriminatory" terms and conditions through bilateral negotiations that are appropriate for the

circumstances of the licensor and licensee.  *Id*.

The 1994 Policy thus contemplates that FRAND terms and conditions are subject to

individual commercial negotiations between the licensor and licensee.  *Id*.   During the 21st ETSI

General Assembly, when the 1994 ETSI IPR Policy was adopted, two ETSI members noted that

"licenses must be negotiated on a case by case basis between the IPR owner and the entity which

requires them.   The fees, duration, and territorial extension must therefore be negotiated for each

single license by each individual party."  *Id*. ¶ 54 & Ex. H20.   Other ETSI documents likewise

made this clear. For example, the ETSI IPR FAQ stated that:

> It is necessary to obtain permission to use patents declared as essential to ETSI's
> STANDARDS.  To this end, ***each STANDARD user should seek directly a license
> from a patent holder***.
> . . . .
> Any firm interested in obtaining patents declared essential to ETSI STANDARDS
> shall not pay any consideration to ETSI but to the patents holders.  To this end, the
> ***concerned firm has to enter into negotiation with the companies holding patents
> in order to obtain licenses*** . . . .

Huber Decl. ¶ 56 & Ex. H21.  The Policy thus encourages case-specific agreements between the

parties that balance the standard essential patent holder's entitlement to adequate and fair

compensation and the prospective licensee's interests.  *Id*.

### C.      Industry Practice in Licensing Pursuant to ETSI IPR Policy

For the past twenty-four years, licensors and licensees in the cellular industry have

engaged in and practice that illuminates how the parties to the ETSI IPR Policy (ETSI's

members) understood the ETSI FRAND commitment and how they intended it to operate.  In

2012, a document of the ETSI IPR Special Committee reviewing the Policy's application and

positions taken by various parties concluded that "[t]he FRAND concept has been a cornerstone of the ETSI IPR policy and has been applied on a case-by-case basis depending on the individual circumstances of each case." Huber Decl. ¶ 73 & Ex. H19.  Licenses in the cellular industry are reached through arm's length, bilateral negotiations between sophisticated entities and take into account the individual circumstances of each situation.  Merritt Decl. ¶ 12.  Because of the flexible nature of the FRAND commitment, there is no "one size fits all" set of terms that will be applicable to all licensees, and licensors do not enter into identical licenses with every licensee. *Id*. ¶¶ 10-30; Huber Decl. ¶ 77; Layne Farrar Decl. ¶¶ 5-12.  Rather, license agreements may vary across a number of dimensions.  *Id*. ██████████████████████████████████████ ██████████████████████████████████    Merritt Decl. ¶¶ 43-51; Huber Decl. ¶¶ 84-89; Layne Farrar Decl. ¶ 32; Putnam Decl. ¶¶ 39-48.

### D.    InterDigital's Good Faith Licensing Practices

ASUS incorrectly claims that InterDigital "gives" royalty terms to licensees, or unilaterally "sets" royalty provisions.  Mot. at 4.  In fact, license agreements between InterDigital and its licensees are reached through a process of good faith negotiation, in which the contracting parties make proposals and counterproposals until reaching mutually agreed terms.  Merritt Decl. ¶¶ 10-27.  InterDigital's potential licensees are often sizeable corporations that engage in large-scale manufacturing of high tech wireless devices. The license negotiations thus involve arm's-length commercial dealings between sophisticated companies.  *Id*. ¶¶ 12, 20, 26.  ████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████

License agreements may have different structures, which include:  (i) running royalty licenses and (ii) lump sum (or fixed payment) licenses.  *Id*. ¶¶ 31-36.  In a running royalty agreement, the licensee agrees to pay a certain royalty for each device it sells during the term of the license.  *Id*.  In a fixed payment license, the licensee makes one or more fixed payments for a license over a defined period of time, regardless of how many units it sells.  *Id*.  Larger, high-

volume licensees tend to seek fixed royalty payments because they value certainty, so they prefer to agree to a defined payment amount that is not variable based on actual sales.  *Id*. ¶ 34.  A lump sum agreement represents risk to both InterDigital and the licensee.  *Id*. ¶ 35.  If the licensee sells more units than forecasted, the fixed royalty structure may become a better deal for the licensee than it would have had with a running royalty, because it would have sold more licensed units than expected for the same fixed royalty.  *Id*.  The converse is also true: if the licensee sells fewer units than forecasted, InterDigital may be better off under a fixed fee than it would have been under a running royalty agreement.  *Id*.  Lump sum licenses are qualitatively different from running royalty license due to their very different risk profiles.  *Id*. ¶¶ 35-36.

**E.**





Shortly thereafter, in April 2015, ASUS filed this lawsuit.  ASUS

ASUS's lawsuit goes far beyond simply attempting to resolve a dispute about 4G royalty rates.[1]  ASUS asserted numerous tort claims including unfair competition under Cal. Bus. & Prof. Code § 17200, violation of the Delaware Consumer Fraud Act, and a treble-damages Sherman Act claim.  Compl., Dkt. 1.  ASUS even included the utterly unwarranted accusation that InterDigital "fraudulently induced" ASUS into signing the 2008 PLA, and sought a refund of all royalties paid under the PLA.  *Id.*  The fraudulent inducement claim was found to be arbitrable, and following a four-day evidentiary hearing, the Tribunal unanimously rejected ASUS's claim as meritless.  Dkt. 135-4.

Notwithstanding ASUS's initiation of litigation,

---

[1]



III.    **ARGUMENT**

ASUS's breach of contract claim raises a host of disputed issues for trial.  The most glaring factual issues are addressed below, any one of which provides a more than sufficient basis to deny the motion.

    **A.      There Is No Precedent For Finding a Breach of FRAND Obligations On Summary Judgment**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). The court must view the facts in the light most favorable to the non-moving party and give

1   it the benefit of all reasonable inferences to be drawn from those facts.  *Res-Care Inc. v. Roto-*

2   *Rooter Servs. Co*., 753 F. Supp. 2d 970, 973 (N.D. Cal. 2010), citing *Matsushita Elec. Indus. Co.*

3   *v. Zenith Radio Corp*., 475 U.S. 574 (1986).

4          ASUS's motion seeks summary judgment on its Count III for breach of contract alleging

5   breach of the ETSI FRAND undertaking, which is governed by the law of France.  Mot. at 1.

6   Under French law, contract interpretation is a question of fact.  Laithier Decl. ¶ 8.  The primary

7   goal of contract interpretation under French law is to determine the common intent of the parties.

8   *Id*. ¶ 9.  Factual disputes about interpretation of a contract preclude summary judgment.  "Where

9   contractual language is susceptible to more than one reasonable interpretation, summary

10  judgment is ordinarily improper because differing views of the intent of parties will raise genuine

11  issues of material fact." *Pardi v. Kaiser Permanente Hosp., Inc*., 389 F.3d 840, 848 (9th Cir.

12  2004).  ASUS also acknowledges that under French law, courts use extrinsic evidence to

13  interpret contracts, including (i) materials reflecting the negotiation of the contract, and (ii)

14  evidence of conduct of the parties after the conclusion of the contract.  Stoffel-Munck Decl. ¶ 5.

15  Summary judgment should be denied where there are disputes of fact concerning such extrinsic

16  evidence.  *Dugan v. Lloyds TSB Bank, PLC*, No. C 12-02549 WHA, 2014 U.S. Dist. LEXIS

17  57530, at *11 (N.D. Cal. Apr. 24, 2014) (denying summary judgment due to disputed factual

18  issues on breach of contract claim governed by Hong Kong law, under which extrinsic evidence

19  may be admitted for contract interpretation).

20         In addition, whether a contract has been breached is a question of fact for the jury.

21  *Crowley v. Epicept Corp*., 547 Fed. App'x 844, 846 (9th Cir. 2013); *Music Grp. Macao*

22  *Commer. Offshore, Ltd. v. Foote*, 14-cv-03078-JSC, 2015 U.S. Dist. LEXIS 81415, at *37–38

23  (N.D. Cal. June 22, 2015) (finding "triable issue on the question of breach").  Summary

24  judgment is especially inappropriate when resolution of the claim involves contract language or

25  legal standards incorporating subjective, imprecise criteria like "fair, reasonable, and non-

26  discriminatory" or "similarly situated."  For example, the Ninth Circuit has held that it is

27  improper to find "substantial similarity" as a matter of law for a copyright claim:

28

1

> [I]t is improper for a court to find . . . that there is no substantial similarity as a matter of law after a writer has satisfied the extrinsic test. To conclude otherwise would allow a court to base a grant of summary judgment on a purely subjective determination of similarity. This result would conflict with the Court's instruction in *Anderson*, that "at the summary judgment stage, the judge's function is not [herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."

2

3

4

5   *Shaw v. Lindheim*, 919 F. 2d 1353, 1359 (9th Cir. 1990), citing *Anderson v. Liberty Lobby, Inc.*,

6   447 U.S. 242, 249 (1986); *see also Worldwide Equip. of TN, Inc. v. United States*, No. CV 14-

7   108-ART, 2016 WL 3574395, at *1 (E.D. Ky. June 23, 2016) ("It's difficult to win summary

8   judgment when the legal question presented uses nebulous adjectives like 'specially' and

9   'substantially.'"); *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174 (7th Cir. 1991)

10  (summary judgment not appropriate on whether efforts were "reasonable" because answer "will

11  vary from case to case" and requires estimations by persons knowledgeable in field).

12      In light of the many complicated factual issues implicated by a claim of breach of a

13  FRAND licensing commitment, it is unsurprising that the cases relied on by ASUS were not

14  decided on summary judgment, but instead required full trials resulting in lengthy findings of

15  fact and conclusions of law, often running well over one hundred pages. *See Microsoft Corp. v.*

16  *Motorola, Inc.*, No. C10-1823JLR, 2013 WL 2111217 (W.D. Wash. Apr. 25, 2013) (207-page

17  decision following trial); *TCL Commc'n Tech. Holdings, Ltd. v. Telefonaktiebolaget LM*

18  *Ericsson*, CV 15-2370 JVS, 2017 WL 6611635 (C.D. Cal. Dec. 21, 2017) ("*TCL*") (115-page

19  decision following trial); *In re Innovatio IP Ventures, LLC Pat. Litig.*, Case No. 11 C 9308, 2013

20  WL 5593609 (N.D. Ill. Oct. 3, 2013) (89-page decision following trial); *Unwired Planet Int'l*

21  *Ltd. v. Huawei Techs. Co.*, EWHC 711 (Pat) ¶ 175 (2017) (166-page decision following trial).

22  Likewise, all of the USITC cases in which administrative law judges found that InterDigital did

23  not breach FRAND commitments were decided after full trials. *Certain Wireless Devices With*

24  *3G Capabilities*, Inv. No. 337-TA-800, 2013 WL 3961230 (June 28, 2013); *Certain Wireless*

25  *Devices With 3G and/or 4G Capabilities*, Inv. No. 337-TA-868, 2014 WL 2965327 (June 13,

26  2014); *Certain 3G Mobile Handsets*, Inv. No. 337-TA-613, 2015 WL 6561709 (Apr. 27, 2015).

27      Courts routinely deny motions seeking summary judgment as to breach of a FRAND

28  commitment. *See, e.g., Optis Wireless Tech., LLC v. Huawei Techs. Co. Ltd.*, 17-cv-00123-JRG-

1   RSP, 2018 WL 3375192, at *6 (E. D. Tex. Jul. 11, 2018) ("Trial needs to occur to resolve a

2   number of factual questions" including whether "offers made during negotiations . . . are

3   consistent with the FRAND obligation"); *Network-1 Techs., Inc. v. Alcatel-Lucent USA, Inc*., 11-

4   cv-492-RWS-KNM, 2017 WL 4641073, at *2 (E.D. Tex. Sept. 11, 2017) (denying summary

5   judgment where disputes regarding "definition of 'FRAND'" and "the amount of the rates, are

6   for the jury");[2] *see also Certain Wireless Devices With 3G Capabilities*, Inv. No. 337-TA-800,

7   2013 WL 3961230 (Jan. 24. 2013) (denying motion for summary determination brought by

8   Huawei against InterDigital regarding alleged failure to offer license on FRAND terms due to

9   genuine issues of fact).  Indeed, ASUS's motion does not cite a single case where a claim for

10  breach of a FRAND commitment has *ever* been determined on summary judgment.

11           **B.       The Parties Dispute the Interpretation of the ETSI FRAND Obligation**

12          The parties dispute the interpretation of the ETSI licensing declaration that sets forth the

13  FRAND commitments at issue, which is a question of fact under French law, *see* Laithier Decl. ¶

14  8, and which ASUS also admits should be assessed with reference to extrinsic evidence.  Mot. at

15  9; Stoffel-Munck Decl. ¶ 5.  The interpretation of the ETSI FRAND commitment thus raises

16  disputed factual issues that preclude summary judgment.[3]

17          ASUS argues that InterDigital breached the ETSI FRAND obligation because

18  "InterDigital's 4G offers to ASUS discriminate against ASUS."  Mot. at 15.  But the express

19  language of the ETSI IPR Declaration makes no mention of "offers," and instead refers to a

20  "license" on FRAND terms and conditions.  Accordingly, breach of the FRAND commitment

21  does not turn on whether or not a particular offer is "FRAND."  Laithier Decl. ¶ 21; Huber Decl.

22

23  _____

24          [2] Adopted by district court at 2017 WL 4620692 (E.D. Tex. Oct. 6, 2017).

25          [3] ASUS also must prove that InterDigital patents are essential (*i.e.*, necessarily infringed by
    practicing a standard) in order for a FRAND commitment to apply, yet ASUS's motion includes
    no such proof. *In re Innovatio Patent Litig.*, 956 F. Supp. 2d 925, 939 (N.D. Ill. 2013) ("[t]o
26  prove that a patent claim is standard-essential, an accused infringer must establish" essentiality
    "by a preponderance of the evidence").

27

28

¶¶ 63-64.  Rather, the FRAND commitment obligates a declarant to negotiate in good faith with licensees to reach a license agreement on FRAND terms and conditions.  Laithier Decl. ¶¶ 17-18.

Under French law, the "prepared to grant" language in the IPR Declaration is properly construed to create an obligation to negotiate seriously and in good faith toward a FRAND license.  *Id*.  Further, the license-seeking company also has a duty to negotiate seriously and in good faith.  *Id*. ¶¶ 15-16; *see also Certain 3G Wireless Devices*, 2013 WL 3961230 at *232 (ETSI IPR Policy "imposes on both negotiating parties a duty to negotiate in good faith"); *TCL* at *56 (finding "mutual duty of the parties to negotiate in good faith."); *Unwired Planet* ¶ 160 (finding good faith "obligation applicable to the implementer").  The prospective licensee must equally negotiate in good faith, because an IPR owner has no ability to unilaterally "grant" a license that the implementer is not willing to accept.  Laithier Decl.¶¶ 15-17.  Thus, under French law, the IPR Licensing Declaration is similar to an "*accord de principe*" – a pre-contractual contract that obligates the parties to negotiate in good faith.  *Id*. ¶ 18; *Certain 3G Wireless Devices*, 2013 WL 3961230 at *232 ("Under French law, the type of obligation set forth in the ETSI undertaking is best described as *un accord de principe* (agreement in principle).").  The history of the ETSI IPR Policy's enactment, and industry practice pursuant to the Policy, also demonstrate the FRAND undertaking requires negotiation in good faith toward a license on FRAND terms and conditions.  Huber Decl. ¶¶ 52-75; Merritt Decl. ¶¶ 12-30.

The cases cited by ASUS also hold that the ETSI FRAND commitment does not require that each individual offer must be "FRAND," and consequently ASUS's motion relying solely on a theory that InterDigital made "discriminatory" offers to ASUS is without basis:

> An obligation focused only on making FRAND *offers* (my emphasis) is unrealistic since a process of fair negotiation will usually involve some compromise between the parties' rival offers. If the ETSI undertaking demands that offers made by a patentee must themselves consist of FRAND terms, then that would condemn patentees to always end up with negotiated rates below a FRAND rate. Therefore it makes much more sense to interpret the ETSI FRAND obligation as applicable primarily to the finally agreed terms rather than to the offers.

*Unwired Planet* § 159; *cf. Microsoft,* 2013 WL 2111217, at *3 (under policies of ITU and IEEE, "initial offers do not have to be on RAND terms").  Even the *TCL* case on which ASUS relies did not hold that making "non-FRAND" offers is a breach of the ETSI FRAND commitment:

In Ericsson's view, there is a range of offers which can satisfy the FRAND obligation. The FRAND commitment does not require each offer and counter-offer exchanged during the course of negotiations to be FRAND. . . *The Court concludes that it need not resolve the legal question whether the FRAND duty under ETSI requires the licensor to offer rates which are in fact FRAND*.

*TCL* at \*56.  Thus, even though the *TCL* court found that certain license offers made by Ericsson were "non-FRAND" in the context of other claims, the court expressly declined to hold that this constitutes a breach of contract under the ETSI FRAND commitment.  In fact, the court held that the ETSI FRAND commitment requires good faith negotiation, and found that "Ericsson negotiated in good faith and *did not commit a breach of contract* by virtue of its conduct." *Id*. ASUS's interpretation of the ETSI IPR Policy as requiring all "offers" to be FRAND is unsupported by case law and factually disputed; this motion for summary judgment of breach of contract should be denied on this ground alone.[4]

In addition, ASUS's French law expert takes the position that ███████████ ███████████████████████████████████ Opp. Ex. 2 (Stoffel-Munck Dep. 132:16-19).  Under ASUS's theory, then, ██████████████████████████████ ████████████████████ Yet the evidence demonstrates that ASUS is ███████ ████████████████████████████████████ █████████████████████████████████ Layne Farrar Decl. ¶¶ 5-7, 38-48; Putnam Decl. ¶¶ 54-58; McElvaine Decl. ¶¶ 6-14; *cf. Huawei v. ZTE*, ECJ C-170/13 (Ex. F2) (under European competition law, unwilling licensee who fails to make specific counteroffers and to post security for unpaid royalties cannot rely on FRAND as defense to injunctive action).  ████████ ████████████████████████████████████████████ ████████████████████ A reasonable jury could find that A█████████████████████████████████, and that ASUS's pursuit of this lawsuit is not a genuine effort to obtain a 4G license, but rather a stratagem to gain a monetary windfall by seeking a ███████████████ in past 3G

---

[4] Even if ASUS's interpretation that "non-FRAND offers" constitute a breach were correct, as set forth below, InterDigital strongly disputes that any offers were "non-FRAND."

1  royalties paid under the 2008 PLA as well as treble damages on its antitrust claim.  This factual

2  dispute also precludes summary judgment.

3        **C.**      **The Factual Disputes Regarding the Meaning of "Fair, Reasonable, and Non-Discriminatory"**

4

5        Apart from the dispute about the nature of the obligation created by the ETSI FRAND

6  commitment, there is also a factual dispute about the meaning of the phrase "fair, reasonable, and

7  non-discriminatory." ████████████████████████████████████████

8  █████████████████████████████████████████████████████████████

9  ████  Mot. at 8, 15.  ASUS's account bears no resemblance to reality.  License agreements

10  result from individualized, bilateral negotiations between licensees and licensors, during which

11  each side makes good faith proposals and seeks to reach agreement taking into account the

12  specific business needs of each party.  Merritt Decl. ¶¶ 10-30; Huber Decl. ¶¶ 52-66.  As

13  demonstrated by the testimony of InterDigital's fact and expert witnesses, there are many

14  disputes between the parties about how to analyze whether terms are "fair, reasonable, and non-

15  discriminatory" and what result should obtain under the different analyses.[5]

16  ██ ████████████████████████████████████

17  ███████████████████████

18  ███████████████████████████████████████████

19  ████████████████████████████████████

20        The FRAND nondiscrimination requirement prohibits 'unfair discrimination,' but it

21  does not require uniform treatment across licensees, nor does it require the same terms for every manufacturer or competitor. Respondents base their argument that InterDigital's license offers are discriminatory on their calculation of the "effective

22  royalty rate" of the offers. A nondiscrimination analysis, however, requires an

23  *examination of the whole of each license agreement, and not just the effective royalty rate.*

24  *Certain Wireless Devices With 3G Capabilities*, 2013 WL 3961230, at *235 (citations omitted).[6]

25  Yet the sum total of ASUS's argument is that ████████████████████████████████

26  _____

27  [5]"Non-discriminatory" should be analyzed together with "fair and reasonable," as discrimination arguments should not lead to below reasonable royalties. Layne Farrar Decl. ¶ 17.

28  [6] While ASUS argues that ITC determinations are not binding on district courts for "patent issues," this finding goes to FRAND licensing issues, not "patent issues."  ASUS is also

(continued...)

1 ████████████████████████████████████████████████████████

2 InterDigital's experts should have the opportunity to explain to the jury why ███████

3 ████████████████████████████████████████████ Putnam

4 Decl. ¶¶ 9-52; Layne Farrar Decl. ¶¶ 8-36.

5   ASUS's argument is also factually unsupported. ████████████████

6 ████████████████████████████████████████████████████████

7 ████████████████████████████████████████████████████████

8 ████████████████████████████████████████████████████████

9 ████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████████

16 ████████████████████████████████████████

17   Further, ASUS recognizes that analysis of license agreements is a proper subject of

18 expert testimony. ████████████████████████████████████

19 ████████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████████

24 ████████████ ASUS chose not to submit declarations from its experts with its motion,

25 _____

  (...continued from previous page)

26 incorrect in claiming that the Commission "vacated" this portion of the ruling: the Commission decision expressed no position on the FRAND findings due to the outcome of its rulings on the

27 patent infringement claims.  At a minimum, the ALJs' decisions in the ITC cases should be considered as persuasive authority in light of the fact that they address InterDigital's licensing

28 program and rejected Respondents' breach of FRAND defenses after full trials on the merits.

1  presumably to make it appear as though there are no issues of fact as to whether and how

2  different license agreements can or cannot be properly compared.  That effort is unavailing, as

3  the evidence clearly demonstrates genuine issues of fact for trial on this question.

4

5

6

7          Mot. at 6, 17.  Running royalty agreements and lump sum agreements have very

8  different risk profiles and are not directly comparable.  *Lucent Techs., Inc. v. Gateway, Inc*., 580

9  F.3d 1301, 1326 (Fed. Cir. 2009) ("[s]ignificant differences exist between a running royalty

10  license and a lump-sum license"); Merritt Decl. ¶¶ 31-35; Putnam Decl. ¶¶ 12-38; Layne Farrar

11  Decl. ¶¶ 19-23; Padilla Decl. ¶ 10.

12

13

14

15

16

17

18

19

20

21

22                                                          The ETSI IPR Policy provides that

23  the license will be on FRAND "terms and conditions" (*see* IPR Policy § 6.1);

24

25

26

27

28



Dkt. 135-4.

### 3. ASUS's Reliance on the *Unwired Planet* Decision Raises Further Issues of Fact

In the *Unwired Planet* decision cited by ASUS (Mot. at 14-15), the judge defined a "hard-edged non-discrimination obligation" that "arises as a consequence of entering into particular transactions with particular licensees." *Unwired* ¶ 489.  This was distinguished from "general non-discrimination" which is interrelated with "fair and reasonable" and is assessed by analyzing the value of the patents to be licensed, not by comparing different licensees. *Id*. ¶ 177.

Mot. at 17.  However, *Unwired Planet* held that "the ETSI FRAND undertaking should ***not*** be interpreted so as to introduce th[is] kind of hard-edged non-discrimination obligation . . . without also including consideration of the distortion of competition."  *Unwired* ¶ 501.  Accordingly, the court rejected the claim of hard-edged discrimination because there was no evidence of distortion of competition.  *Id*. ¶ 521.  Under the *Unwired Planet* analysis, differences in license terms do not amount to discrimination unless they cause actual harm to competition.  ASUS acknowledges that its theory of discrimination depends on whether the result "would harm competition by increasing the costs for small firms."  Mot. at 15.

1    Here, there is substantial evidence demonstrating that competition has not been harmed, refuting any

2    possibility of discrimination, or at a minimum raising a disputed issue of fact.  Padilla Decl. ¶¶ 11-20;

3    Layne Farrar Decl. ¶¶ 49-51; Putnam Decl, ¶ 53.  ASUS's motion does not even attempt to establish

4    harm to competition.  Thus, ASUS cannot prevail on its own theory of discrimination.

5                    **4.      The Parties' Dispute as to When Licensees are "Similarly Situated"**
                              **Cannot Be Decided on Summary Judgment**
6

7            While ASUS argues that terms are non-discriminatory when similarly situated licensees

8    have similar terms,[7] as ASUS admits, there is significant dispute between the parties about the

9    appropriate analysis to be used for evaluating when licensees are similarly situated.  Mot. at 10

10   ("the parties' dispute [] focuses on how . . . 'similarly situated' should be interpreted.").  Because

11   legal standards using subjective adjectives such as "similar" are not a proper subject of summary

12   judgment, *see supra* § III.A, ASUS's motion should be denied on this basis alone.

13           ASUS cites inapposite documents and nonbinding case law that fail to support its

14   contention that non-discrimination was intended to "ensure a level playing field" in the manner

15   advocated by ASUS.  Mot. at 11-12.  ASUS cites extrinsic documents from 1988-1992, at a time

16   when ETSI was developing the 1993 Policy that was rescinded and that is not applicable here.

17   Huber Decl. ¶ 38.  Such documents do not shed light on the 1994 Policy at issue in this case.[8]  *Id*.

18   By contrast, evidence of the actual deliberations concerning the 1994 Policy demonstrates the

19   incorrectness of ASUS's view: the current policy emphasizes adequate and fair compensation for

20   IPR owners, as well as individual negotiations to reach FRAND terms.  *Id*. ¶¶ 47-66.  The 1994

21   Policy also eliminated the 1993 Policy's requirement of an MFL clause in licenses,

22

23   _____

24        [7] Other broader definitions of non-discriminatory may also be appropriate.  Huber Decl. ¶ 77
     (unfair discrimination as refusal to license its competitors); Layne Farrar Decl. ¶ 18 (same).

25        [8] The documents cited by ASUS are also irrelevant to ASUS's theory that "non-
     discriminatory" should be construed to protect small market-share manufacturers: there is a
26   quote about "fair and reasonable" terms that does not mention discrimination (Mot. at 12); a
     document about protecting non-ETSI members (as opposed to small market share vendors) from
27   discrimination (*id*.); and a quote about horizontal patent pool agreements that has no relationship
     to ETSI or standards-essential patents. (Mot. at 13).  Exhibits 33-39 to the Franzinger declaration
28   are also inadmissible hearsay, as they were not submitted as part of an expert's opinion.

1   demonstrating the intent by ETSI members not to diminish freedom of contract in order to

2   mandate leveling of licensing terms across licensees.  Huber Decl. ¶ 46.

3       ASUS's characterization of EU's policies toward SMEs (small-and-medium-sized

4   enterprises) as demonstrating an intention to favor implementers with low market shares is

5   without basis.  The EU has a very specific definition of SME: enterprises with under €50 million

6   in revenue per year.[9]  Multibillion dollar cell phone manufacturers like ASUS are not SMEs.

7   However, at the time of the ETSI IPR Policy's adoption in 1994, a small licensor like

8   InterDigital that had under €50 million in revenue *did* qualify as an SME.  Merritt Decl. ¶ 9.

9   Given the structure of the industry, any policy considerations meant to assist SMEs would be

10  expected to favor licensors, not manufacturers. Huber Decl. ¶¶ 47-48.  While ASUS cites *TCL*

11  for the proposition that ETSI meant to protect SMEs (Mot. at 11), its quote is out of context.

12  While the court referenced TCL's reliance on documents about SMEs (*TCL* at *7), it ultimately

13  found that "TCL overstates the nature of the concern for small and medium sized firm[s]"

14  because those documents actually addressed how arbitration would affect SMEs, and "an

15  arbitration scheme was never adopted."  *TCL* at *30 & n.29.

16      ASUS also cites the *TCL* decision as finding that one should not "exclud[e] from the analysis

17  the largest firms in the market."  Mot. at 14.  Yet ASUS ignores that when performing its FRAND

18  assessment, the *TCL* court added a step of discarding the "top two" and "bottom two" rates resulting

19  from its analysis, and thus it actually *did* exclude outliers from consideration.  *TCL* at *51.  Further, the

20  *TCL* court held that "[i]n determining which firms are similarly situated", "[c]ertain factors obviously

21  matter, such as the geographic scope of the firm, the licenses required by the firm, and a reasonable

22  *sales volume*."  *Id*. at *31.  The court also found that vendors with different geographical sales

23  coverage were not similarly situated.  *Id*. at *32.  And ASUS also fails to show that it is in the same

24  position as TCL, such that ASUS would be "similarly situated" to the same licensees with respect to

25  InterDigital as TCL was with respect to Ericsson.  In general, however, the *TCL* case is inapposite in

26  numerous ways: (i) it was decided after a 10-day trial in which 27 witnesses gave testimony, and thus

27

28      [9] http://ec.europa.eu/growth/smes/business-friendly-environment/sme-definition_en.

1   strongly demonstrates the inappropriateness of summary judgment; (ii) it is a district court decision that

2   is not binding on this Court, and that addressed the issue of non-discrimination as a question of first

3   impression; (iii) it is currently on appeal to the Federal Circuit; (iv) the licensor in that case had a

4   history of ███████████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████ and (v) as noted above, the *TCL*

6   court expressly declined to reach the only issue raised in ASUS's motion: whether an allegedly "non-

7   FRAND" offer is a breach of contract under the ETSI FRAND commitment.

8          The other cases ASUS cites are equally inapposite to its claim that "non-discriminatory"

9   precludes ██████████████████████████ ASUS cites *Microsoft v. Motorola* for

10  the proposition that the "commercial relationship between the licensor and licensee is irrelevant"

11  – but that discussion was in the context of the fifth *Georgia-Pacific* factor for assessing patent

12  damages, and did not address comparison ***among licensees***.  Mot. at 11.  Similarly, the *Innovatio*

13  case relating to the IEEE Wi-Fi standard did not address the ETSI IPR Policy, and its discussion

14  of the licensee's "position in the market" related to the type of products sold (components vs.

15  end products), ██████████████████████████.  *Id*.  Although ASUS claims that "European

16  competition law" is relevant, (*id*. at 13), it cites no European Commission decisions ██████████

17  ████████████   Instead, ASUS cites a recent EC white paper about patents and standards that

18  merely says "rightholders cannot discriminate between implementers that are 'similarly

19  situated.'"[10]  *Id*.  However, the white paper also says "[g]iven that FRAND is not one-size-fits-

20  all, solutions can differ from sector to sector and depending on the business models in question,"

21  and notes that "[p]arties to a SEP licensing agreement, negotiating in good faith, are in the best

22  position to determine the FRAND terms most appropriate to their specific situation."  Ex. H23.

23         InterDigital's witnesses dispute that all global cell phone vendors must be considered as

24  "similarly situated" solely by virtue of the fact that they sell products based on the same cellular

25  standards.  Layne Farrar Decl. ¶¶ 24-26; Putnam Decl. ¶¶ 9-22.  In the circumstances of this

26  case, ASUS is very differently situated ████████████████████████████████████████████r

27  ─────────────────────────────

28  [10] The white paper also "is not intended to represent a statement of the law" and "does not
    bind the Commission as regards the application of EU rules on competition."  Ex. H23.

1   ████████████████████████████████████████ Putnam Decl. ¶¶ 9-22;

2   *see also* Merritt Decl. ¶ 53.   ████████████████████████████████████

3   ████████████████████████████████████████████████████████

4   ███████   *See infra* § III.C.5.  Further, under the *TCL* case ASUS relies on, geographic coverage

5   is a basis on which licensees may not be similarly situated (*TCL* at *32), and here, ███████

6   ████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████

10  ████████████████████████████████████████ plainly precludes

11  summary judgment, as resolution of this issue is properly in the province of the factfinder.

12       ███   ██████████████████████████████████

13       ASUS admits that licenses need not have identical terms to be non-discriminatory, but

14  rather can have "similar" terms.   Mot. at 10.  That is necessarily the case because there will

15  always be variation among licenses that are negotiated on an individualized, arm's length basis.

16  Merritt Decl. ¶¶ 20-30.  Given the subjective and imprecise nature of the range of terms that can

17  be characterized as "similar" even when licensees are considered to be "similarly situated," this

18  issue is inappropriate for decision on summary judgment.  *See supra* § III.A.

19       ASUS argues that ███████████████████████████████████████

20  ████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████

22  ████████████████████████████████████████ The *TCL* court

23  concluded that "there is no single rate that is necessarily FRAND, and different rates offered to

24  different licensees may well be FRAND given the economics of the specific license." *TCL* at

25  *55.  The court further cited the testimony of Dr. Huber that "the drafters did not intend

26  'nondiscriminatory' to ensure the exact same treatment or identical license terms for all licensees

27  . . . ." *Id.* ████████████████████████████████████████

28  ████████████████████████████████████████████████████████

1  █████████████████████████████████████████████████████████████

2  ████████████████████████████████████  At a minimum, there is a disputed issue of fact.

3  ████████████████████████████████████  even before the 1994 ETSI IPR Policy was

4  adopted, and nothing in the Policy reflects an intent to change this practice.  Huber Decl. ¶¶ 81-

5  89.  Instead, ETSI members understood that the 1994 Policy provided for individually negotiated

6  agreements using ordinary licensing practices, ████████████████  *Id.* ¶¶ 52-62, 89.

7  As explained by Mr. Merritt, who has been involved in cellular licensing since the mid-1990s,

8  █████████████████████████████████████████████████████████████

9  ████████████████████████  Recently, the Japan Patent Office published a FRAND licensing

10  guide that likewise notes the common practice of ██████████████[11]

11         Decisions by arbitrators and courts reflect that the ████████████████████

12  █████████████████████████████████████████████████████████████

13  ███████████████████████████████████████████████████████

14  ███████████████████████████████████████████████████

15  ███████████████████████████████████████████████████████

16  ███████████████████████████████████████████████████████

17  █████████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████  In multiple

19  ITC decisions where respondents challenged InterDigital's license offers as "non-FRAND," the

20  administrative law judges rejected those arguments. *Certain 3G Wireless Devices*, 2013 WL

21  3961230, at *235; *Certain Wireless Devices With 3G and/or 4G Capabilities*, 2014 WL

22  2965327, at *81 ("The evidence presented does not support the Respondents' position that

23  InterDigital has violated a FRAND obligation . . ."); *Certain 3G Mobile Handsets*, 2015 WL

24  6561709, at *23 ("[t]he [FRAND] obligation that InterDigital has taken has been fulfilled").  *Id.*

25  ¶ 48.  ████████████████████████████████████████████████████

26  ██████████████████████████████████████████████████

27  _____

28     [11] http://www.meti.go.jp/press/2018/06/20180605003/20180605003-2.pdf at p. 47.

1 ███████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ██████████████████████████████████████ *Id.*

5      Industry patent pools for standardized technologies also frequently ████████████

6 ████████████████████████████████████████████████

7 ███████████████████████████████████████ In *Microsoft v. Motorola*, the

court used patent pools as a reference for determining RAND rates.  The court relied on the "Via

Licensing 802.11 pool [which] has rates that vary from $0.05 to $0.55 per unit, depending on

volume."  *Id.* at *88.  The court did not consider the 11x variation in rates spread over seven volume

tiers to be discriminatory, and instead found that the pool license structure had "characteristics that

are indicative of a RAND royalty rate."  *Id.*  The evidence of industry practice ██████████████

13 ████████████████████████████████████████████

14 ██████████████████████████████████████████

15 ████████████████████████████████████████████

16 ████████████████████████████████████████████

17 ████████████████████████████████████████████

18 ████████████████████████████████████████

19 ████████████████████████████████████████████

20 ████████████████████ ████████████████████████████

21 █████████████████████████████████████████

22 ██████████████████████████████████████████████

23 ████████████████████████████████████████████

24 ████████████████████████████████████████████████

25

26 ──────────────────────
    12 ████████████████████████████████████████████████████

27 ██████████████████████████████████████████████████████████

28 ███████████████████████████████████████████████████

1  █████████████████████████████████████████

2  █████████████████████████████████

3      █████████████████████████████████████

4  █████████████████████████████████████████

5  ██████████████████████████

6         Non-discrimination should not require fixed per-unit royalties because fixed fees
   and royalties that decline with output have desirable efficiency properties by
7  providing incentives for licensees to produce more to take advantage of lower fees.

8  R. Gilbert, "Deal or No Deal," 77 Antitrust L.J. 855, 875 (2011).  ██████████████

9  ████████████████████████████████████████

10 ███████████████████████████████████████████

11 (i) welfare enhancement enabling innovators to recoup their recurring R&D investments; (ii)

12 reduction of transaction costs; (iii)  reduction of patent license monitoring and enforcement

13 costs; (iv) enhancing wide dissemination of standards via market maker effects; and (v) aligning

14 SDO members' incentives to increase adoption and expand output, benefiting consumers.  Layne

15 Farrar Decl.¶¶ 27-32.

16       ASUS incorrectly claims that it was discriminated against because ████████████

17 ███████████████████████████████████████████

18 ███████████████████████████████████

19 ████████████████████████████████████████

20 ███████████████████████████████████████

21 ██████████████████████████████████████

22 ████████████████████████████████████████

23 ██████████████████████████████████████

24 ████████████████████████████████████████

25 ████████████████████████████████████████

26 █████████████████████████████████████

27 ███████   Clearly, there are a myriad of factual disputes between the parties about the range of royalty

28 terms that are consistent with FRAND, precluding summary judgment here.

1    Dated: September 13, 2018              Respectfully submitted,

2                                          WILSON SONSINI GOODRICH & ROSATI
                                           Professional Corporation
3

4                                          By:  /s/ David S. Steuer
                                                      David S. Steuer
5

6                                          David S. Steuer
                                           Michael B. Levin
7                                          Maura L. Rees
                                           Matthew R. Reed
8                                          WILSON SONSINI GOODRICH &
                                           ROSATI
9                                          650 Page Mill Road
                                           Palo Alto, California 94304-1050
10                                         Telephone: (650) 493-9300
                                           Facsimile: (650) 493-6811
11

12                                         Lucy Yen
                                           WILSON SONSINI GOODRICH & ROSATI
13                                         1301 Avenue of the Americas, 40th Floor
                                           New York, NY 10019-6022
14                                         Telephone:  (212) 999-5800
                                           Facsimile:   (212) 999-5899
15

16                                         *Counsel for Defendants InterDigital
                                           Communications, Inc., InterDigital Technology
17                                         Corporation, IPR Licensing, Inc., and InterDigital
                                           Holdings, Inc.*
18

19

20

21

22

23

24

25

26

27

28