| | |
|---|---|
| Brian Nester (*pro hac vice*) | Richard A. Cederoth (*pro hac vice*) |
| bnester@sidley.com | rcederoth@sidley.com |
| Michael R. Franzinger (SBN 222155) | David C. Giardina (*pro hac vice*) |
| mfranzinger@sidley.com | dgiardina@sidley.com |
| Anna M. Weinberg (*pro hac vice*) | SIDLEY AUSTIN LLP |
| aweinberg@sidley.com | One South Dearborn Street |
| SIDLEY AUSTIN LLP | Chicago, Illinois 60603 |
| 1501 K Street, N.W. | Telephone (312) 853-7000 |
| Washington, D.C. 20005 | Facsimile: (312) 853-7036 |
| Telephone: (202) 736-8000 | |
| Facsimile: (202) 736-8711 | |

Mike Bettinger (SBN 122196)
mbettinger@sidley.com
SIDLEY AUSTIN LLP
555 California Street
Suite 2000
San Francisco, CA 94104
Telephone: (415) 772-1200
Facsimile: (415) 772-7400

Attorneys for Plaintiffs
ASUS COMPUTER INTERNATIONAL,
ASUSTEK COMPUTER INCORPORATED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ASUS COMPUTER INTERNATIONAL; and ASUSTEK COMPUTER INCORPORATED,<br><br>Plaintiffs,<br><br>vs.<br><br>INTERDIGITAL, INC.; INTERDIGITAL COMMUNICATIONS, INC.; INTERDIGITAL TECHNOLOGY CORPORATION; IPR LICENSING, INC. and INTERDIGITAL PATENT HOLDING, INC.,<br><br>Defendants. | Case No. 15-cv-01716-BLF<br><br>**ASUS'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date: October 11, 2018<br>Time: 9:00 a.m.<br>Location: Courtroom 3, 5th Floor<br>Judge: Hon. Beth Labson Freeman<br><br>**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................. 1

II.     ARGUMENT ........................................................................................................ 1

    A.    Undisputable Material Facts Establish ASUS Is Similarly Situated to Other Global Competitors under the Proper Legal Framework .................................. 2

        1.    Under *TCL*, Undisputed Facts Establish ASUS Is Similarly Situated to its Competitors ............................................................................... 2

        2.    IDC's Scattershot Attack on *TCL* as Inapposite Is Plainly Wrong. ....... 5

        3.    The Court Should Reject IDC's Argument That Factual Interpretation Issues Preclude Summary Judgement. ........................... 7

    B.    Based on IDC's ███████████████████, the Rates IDC Offers ASUS Are Discriminatory Vis-à-vis Those Similarly Situated under *TCL* ................. 9

    C.    IDC Does Not Substantiate Its Discriminatory ███████████ ............... 11

    D.    The Plethora of Other Issues IDC Raises Do Not Preclude Summary Judgment ........................................................................................................ 14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*1337523 Ontario, Inc. v. Golden St. Bancorp, Inc.*,
    163 F. Supp. 2d 1111 (N.D. Cal. 2001) ........................................................................5

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ......................................................................................................12

*Apple, Inc. v. Motorola Mobility, Inc.*,
    886 F. Supp. 2d 1061 (W.D. Wis. 2012) .................................................................7, 8

*Ariz. Dream Act Coal. v. Brewer*,
    855 F.3d 957 (9th Cir. 2017) ........................................................................................8

*Finjan Inc. v. Blue Coat Sys., LLC*,
    283 F. Supp. 3d 839 (N.D. Cal. 2017) ...................................................................3, 13

*Gianni Versace, S.p.A, v. Versace*,
    -- F. Supp. 3d --, 2018 WL 3548970 (N.D. Cal. 2018) ..............................................5

*In re Innovatio IP Ventures, LLC Patent Litig.*,
    2013 WL 427167 (N.D. Ill. Feb. 4, 2013) ....................................................................8

*Kenney v. Trinidad Corp.*,
    349 F.2d 832 (5th Cir. 1965) ........................................................................................8

*Microsoft Corp. v. Motorola, Inc.*,
    795 F.3d 1024 (9th Cir. 2015) ........................................................................7, 13, 14

*Moran v. Selig*,
    447 F.3d 748 (9th Cir. 2006) ........................................................................................8

*Nilsson v. City of Messa*,
    503 F.3d 947 (9th Cir. 2007) ......................................................................................12

*Realtek Semiconductor Corp. v. LSI Corp.*,
    946 F. Supp. 2d 998 (N.D. Cal. 2013) ...................................................................7, 15

*TCL Commc'n Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*,
    No. CV 15-2370 ................................................................................................... *passim*

*In re Vitamin C Antitrust Litig.*,
    810 F. Supp. 2d 522 (E.D. N.Y. 2011) ........................................................................8

**Other Authorities**

Fed. R. Civ. P. 56(c)(1)(B) ...................................................................................................14

Federal Rule of Civil Procedure 56 .........................................................................................8

**Table of Abbreviations**

| | |
|---|---|
| IDC | Defendants InterDigital, Inc., InterDigital Communications, Inc., InterDigital Technology Corporation, IPR Licensing, Inc., and InterDigital Patent Holdings, Inc. |
| ASUS | Plaintiffs ASUS Computer International and Asustek Computer Incorporated |
| IPR | Intellectual Property Right(s) |
| ETSI | European Telecommunications Standards Institute, a standards development organization |
| 3G | Third Generation (of cellular technology) |
| 4G | Fourth Generation (of cellular technology) |
| FRAND | Fair, Reasonable and Non-Discriminatory |
| FAC | First Amended Complaint |
| MFL | Most-Favored Licensee |
| SEP | Standards-Essential Patent |
| SSO | Standard-Setting Organization |
| FA | Final Award in IDC-ASUS arbitration, Dkt. No. 135-4 |
| Mot. | ASUS's Motion for Summary Judgment, Dkt. No. 231 |
| Resp. | Defendants' Opposition to ASUS's Motion for Summary Judgment, Dkt. No. 259 |
| Putnam Decl. | Declaration of Jonathan D. Putnam in Support of Defendants' Opposition to ASUS's Motion For Summary Judgment, Dkt No. 259-32 |
| Huber Decl. | Declaration of Dr. Bertram Huber in Support of Defendants' Opposition to ASUS's Motion For Summary Judgment, Dkt No. 259-34 |
| Merritt Decl. | Declaration of Dr. Bertram Huber in Support of Defendants' Opposition to ASUS's Motion For Summary Judgment, Dkt No. 259-82 |
| RM Ex. | Exhibits to the Declaration of Ranae McElvaine, filed with Resp. (Dkt Nos. 259-64 to 259-81) |
| WM Ex. | Exhibits to the Declaration of William Merritt, filed with Resp. (Dkt Nos. 259-83 to 259-86) |

Exhibits cited as "Ex. " are exhibits to the Declaration of Michael R. Franzinger, filed herewith.

Exhibits cited as "Mot. Ex." are exhibits to the Declaration of Michael R. Franzinger filed with ASUS's Motion for Summary Judgment, Dkt. Nos. 231-2 to 231-58.

I.  INTRODUCTION

Applying the law to the undisputed facts of this case demonstrates that IDC's ▮ ▮ breach the "non-discriminatory" prong of IDC's FRAND commitment to ETSI, of which ASUS is a third-party beneficiary. IDC does not dispute that it must make similar terms and conditions available to those "similarly situated." Application of *TCL*'s three-factor test to undisputed facts demonstrates that ASUS is "similarly situated" to competitors such as Samsung (and others). IDC does not dispute that it has not provided terms to ASUS that are similar to Samsung's (and other competitors). IDC does not dispute that it refuses to provide ASUS with licensing terms similar to Samsung's. Accordingly, the Court should summarily rule IDC has breached its non-discrimination obligation toward ASUS for 4G products.

What is more, IDC does not in any material way justify the ▮ ▮. Instead, IDC resorts to the others-do-it-too defense. But IDC does not get a free pass just because others may break the rules; anyway, IDC makes no effort to relate other ▮. More importantly, no Court has sanctioned ▮ for ETSI FRAND-encumbered patents. To the contrary, *TCL* holds under the ETSI policy that "*[s]ales volume alone does not justify giving lower rates to otherwise similar firms.*" TCL Commc'n Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson, No. CV 15-2370 JVS(DFMX), 2017 WL 6611635, at *33 (C.D. Cal. Dec. 21, 2017) (emphasis added). But that is precisely how ▮. Thus, IDC's ▮, in and of itself, a breach of its non-discrimination obligation.

IDC's opposition does not raise any disputed fact that is material. And it cannot defeat summary judgment by having witnesses contradict the law, advocating a hollowed-out version of FRAND. The undisputed facts are sufficient to establish that IDC does not comply with FRAND.

II.  ARGUMENT

Under the proper legal framework and undisputed material facts, ASUS is similarly situated to Apple, Samsung, Huawei, LG, and others. And, the undisputed material facts establish that IDC discriminates against ASUS vis-à-vis these similarly situated companies through (at least) ▮

████████. IDC litters its brief with irrelevant, conjured "issues of fact" and inaccurate legal arguments that cannot derail this straightforward, logical outcome.

### A. Undisputable Material Facts Establish ASUS Is Similarly Situated to Other Global Competitors under the Proper Legal Framework

IDC refuses to treat ASUS as similarly situated to Samsung, Apple, and its other larger licensees. Throughout negotiations, it has pinned ████████████████████. *E.g.* Mot. 6:16-23 (citing unrefuted admissions); Resp. 24:24-25:2. This approach was rejected in *TCL*. Instead, the proper framework for "similarly situated" set forth in *TCL* classifies firms based on the market they compete in by considering geographic scope, whether they need licenses for the same purpose, and if they have a threshold presence in the market. In that analysis, ASUS is similarly situated to "all well-established firms" on the global cellular market, including Samsung, Apple, and Huawei.

#### 1. Under *TCL*, Undisputed Facts Establish ASUS Is Similarly Situated to its Competitors

The parties do not dispute that the non-discrimination prong of ETSI's FRAND commitment requires providing similarly situated companies with similar terms and conditions..

Applying French law, *TCL* defined "similarly situated" for the ETSI FRAND commitment as applied to mobile device manufacturers. "Similarly situated" includes "all firms reasonably well-established in the world market." *TCL*, 2017 WL 6611635, at *30.[1] To identify "reasonably well-established firms," "[c]ertain factors obviously matter, such as the geographic scope of the firm, the licenses required by the firm, and a reasonable sales volume." *Id.* at *31. "This implies a necessarily wide spectrum, and correctly so for several reasons" based on ETSI and to ensure the "non-discrimination prong [is not] read out of the FRAND commitment." *Id.* IDC does not dispute any of the material facts establishing that ASUS is a "well-established global firm" like Apple, Samsung, LG, Huawei and several others.

##### a. Factor 1: Geographic Scope

Under *TCL*'s first factor (geography), ASUS is similarly situated to the aforementioned firms. *TCL* describes the "geographic scope" factor as distinguishing firms selling worldwide from

---

[1] Experts' disagreement with this legal definition (Resp. 21:23-25) does not create fact disputes.

1  "local kings" whose "sales largely occur in one country." *TCL,* 2017 WL 6611635, at *31-32. IDC
2  admits that ASUS sells its devices globally—"in dozens of countries worldwide." Resp. 1:27-28;
3  Mot. Ex. 3 (ASUS cellular device sales in 42 countries); *see* Putnam Decl. ¶¶ 5-8 (describing
4  ASUS's global reach). IDC instead argues that ASUS is distinguishable from "███████████
5  ████████████████████████████████████" Resp. 22:4-6. This ignores that
6  this factor is binary under *TCL*: either a company is a "local king" selling in only one country *or* a
7  niche market or it is a global firm selling across countries and continents. *TCL,* 2017 WL 6611635,
8  at *3. All companies with global reach are similarly situated, regardless of the extent of global
9  reach—and ASUS indisputably falls within that category. *Id.* at *32-33. Even if geographic *profile*
10 were relevant—which it is not—IDC's reliance on a conclusory, unsupported statement in its CEO's
11 affidavit cannot defeat summary judgment. *Id.* (citing Merritt Decl. ¶ 53 ("█████████████
12 ████████████████████████"). Conclusory affidavits are insufficient to ward off summary
13 judgement. *Finjan Inc. v. Blue Coat Sys., LLC*, 283 F. Supp. 3d 839, 850 (N.D. Cal. 2017).

            **b.**      **Factor 2: License Required**

15 Under *TCL*'s second factor, ASUS is also similarly situated to Samsung, Apple, LG, and
16 Huawei. *TCL* focuses on the standards sought to be licensed and the devices licensed. *TCL,* 2017
17 WL 6611635, at *33 (considering whether licenses were for "a blended global rate for a multi-mode
18 4G license [and licensees] all create phones of similar technical specifications"). Here, ASUS
19 requires and is seeking from IDC a license for the same technology and covering the same type of
20 devices as Apple's, Samsung's, Huawei's, LG's and others'. For example, IDC has ████████
21 ████████████████████████████████████████████████████████
22 ████████████████████████████████████████████████████████
23 ██████████████████████████████. *Compare* RM Ex. 15 ██████████████)
24 with Ex. 1 ¶¶ 205, 209, 212-217 (summarizing IDC license terms). Indeed, ASUS has repeatedly
25 sought "██████████████████████████████████████████████████
26 ████████████████████████████████████████████████████████
27 ██████████ Mot. Ex. 26 at 1-2 (emphasis added).
28 In stretching this factor outside the bounds set by *TCL*, IDC ignores that "similarly situated"

1  cannot be defined "by picking and choosing criteria with no relation to its SEPs or the FRAND

2  commitment." 2017 WL 6611635, at *30. IDC distinguishes Samsung's and Apple's licenses based

3  on those companies' product mixes (*i.e.*, differing features and pricing). Resp. 21:23-25 (citing

4  Putnam Decl. ¶ 9). But *TCL* rejected this same argument, ruling that Apple's and Samsung's the

5  brand recognition, proprietary operating systems, high-end market customer base, and other

6  intangibles do not warrant treating them differently than other well-established market players. 2017

7  WL 6611635, *33. IDC also argues that █████████████████████████ in its Samsung

8  license precludes ASUS from being considered similarly situated. Resp. 21:25-22:1. *TCL* did not

9  consider this a distinction relevant to the "similarly situated" analysis; *TCL* considered licensees

10 with both lump sum and running royalty structures. *See TCL*, 2017 WL 6611635, at *4, *42-43

11 (describing several licensees' lump sum and Huawei's running royalty); *id.* at *33 (not

12 distinguishing Apple or Samsung on basis of lump sum license structure).

13            c.      **Factor 3: Niche v. Reasonably Well-Established Licensee**

14         Under the final *TCL* factor, ASUS's sale volume distinguishes it from niche and small firms

15 and places it on the same footing as well-established global firms. *TCL* "views sales volume *only as*

16 *a filter* to separate out niche and small firms from the reasonably well-established global firms. 2017

17 WL 6611635, *33 (emphasis added). IDC admits that ASUS is a "[m]ultibillion dollar cell phone

18 manufacturer" rather than an SME. Resp. 20:6. IDC's expert explains that "[s]ince 2008, Asustek

19 has reported $11.7 billion in worldwide mobile device sales." Putnam Decl. ¶ 8; *see also* Ex. 1 ¶¶

20 39-46, 50 (████████████████████████████████████████). He also

21 admits that ███████████████████████████████████████████████

22 ████████████████—many of the same companies that *TCL* found were also similarly

23 situated to Apple, Samsung, LG, and Huawei. *Compare* Putnam Decl. ¶ 11, *with TCL*, 2017 WL

24 6611635, at *31-33, *56. IDC does not dispute any of these facts, which are all *TCL* requires for the

25 sales volume criterion. *Id.* at *33.

26         IDC uses ██████ to stratify the global cellular market players into far narrower classes of

27 "similarly situated." *See* Mot. Ex. 17, p.12. IDC simply is arguing against the law set out in *TCL*. In

28 fact, *TCL* explicitly admonishes against this granular fracturing of the market for reasons that apply

1  with equal force here. Market volumes are an unreliable metric in the volatile, dynamic cellular
2  market and "excluding from the analysis the largest firms in the market would have the effect of
3  insulating them, and further contributing to their dominant positions, by imposing a barrier in the
4  form of a higher rate for those not at the top if the market." *TCL*, 2017 WL 6611635, at *30-31. IDC
5  has no response to these arguments, which were made in ASUS's motion. *See* Mot. 20:27-
6  21:23. IDC's ███████████████████████████████: use "sales volume alone" to provide
7  "lower rates to otherwise similar firms." 2017 WL 6611635, at *33.

8        Thus, IDC raises no disputable material facts relevant to finding that ASUS is similarly
9  situated to, *inter alia*, Apple, Samsung, LG, Huawei, and others under *TCL*'s legal framework.[2]

10        **2. IDC's Scattershot Attack on *TCL* as Inapposite Is Plainly Wrong.**

11        Tacitly admitting that it discriminates under *TCL*'s framework, IDC launches a scattershot
12  attack on the *TCL* decision and tries to recast the legal issues decided in *TCL* as factual ones. None
13  of its arguments warrants denial of ASUS's motion.

14        First, *TCL* is persuasive authority from a court in the same circuit, rather than inapposite law
15  that should be disregarded as IDC claims. *See* Resp. 20:25-21:3 (Lacking any authority). *TCL*
16  addresses the same contractual FRAND language in the same context (ETSI declarations) for the
17  same cellular standards at issue here. *TCL* applies French law; it relies on the same ETSI source
18  documents cited in the parties' briefing here;[3] and it had before it virtually the same expert testimony
19  from the two ETSI experts in this case (Dr. Bekkers and Dr. Huber). *TCL*, 2017 WL 6611635, at *6-
20  8, *30-33, *54-56. "[G]iven the similarity of circumstances presented," this Court has considered
21  such decisions from sister districts persuasive. *See Gianni Versace, S.p.A, v. Versace*, -- F. Supp. 3d
22  --, 2018 WL 3548970, *3 (N.D. Cal. 2018) (relying on other district court decisions on whether the
23  same trademark was similar as persuasive).

24        Neither does *TCL*'s issuance after a *bench* trial warrant disregard of *TCL* on summary

---

[2] In arguing that ███████████ should not be considered similarly situated to ASUS because *TCL* disregarded the "top two" rates, IDC cites only the court's evaluation of the appropriate royalty rate *after* it already determined who is similarly situated. Resp. at 20:16-19; *TCL*, 2017 WL 6611635, at *33 (Samsung and Apple similarly situated), *50-51 ("Setting a FRAND Rate").

[3] This also refutes IDC's arguments that the ETSI documents are inadmissible hearsay. ASUS cites the ETSI documents "not for the truth of [the] statements but for the fact they were made." *1337523 Ontario, Inc. v. Golden St. Bancorp, Inc.*, 163 F. Supp. 2d 1111, 1121 (N.D. Cal. 2001).

5

1  judgment, as IDC posits. Resp. 20:26-21:1, 11:17-19. IDC argues that the procedural posture of *TCL*
2  indicates that "similarly situated" is a factual issue that must be tried. IDC ignores that the court
3  analyzed "similarly situated" as a legal issue. The *TCL* court summarized its "similarly situated"
4  analysis in its "conclusions of law" as one of the "legal principles which guide its factual analysis,"
5  stating that "[f]or purposes of non-discrimination component of FRAND, one must look at similarly
6  situated firms. Here, those firms are: Apple, Samsung, LG, HTC, and ZTE." *TCL*, 2017 WL
7  6611635, at *54-56.

8      IDC also urges the Court to ignore *TCL* because it is pending appeal. Resp. 21:3. And, on
9  appeal, the SEP holder in that case does not dispute the definition or framework of "similarly
10 situated" set forth by the district court—in fact, it argues the court applied the geographic factor too
11 *narrowly* by failing to include certain smaller local firms as "similarly situated." Ex. 3 at 64-66.
12     IDC next ███████████████████████████████. Resp. 22:19-25. ██████ "Sales
13 volume alone does not justify giving lower rates to otherwise similar firms." 2017 WL 6611635,
14 *33. *TCL* explicitly states that it is improper to treat well-established global competitors differently
15 merely based their market share. *TCL*, 2017 WL 6611635, at *33. ████████████████████
16 ████████████████████████ Mot. 16:6-18:5.

17     Nor does *Unwired Planet* help IDC. That court took an even broader view than *TCL* of who
18 is "similarly situated": it found that discrimination based on *any* licensee-specific characteristics
19 (including size or volume) would violate FRAND. Mot. Ex. 30, ¶ 175. The court determined non-
20 discrimination "has the result that all licensees who need the same kind of license will be charged
21 the same kind of rate" regardless of whether they are "major players" or "new entrants"; "a
22 benchmark FRAND rate should be derived which is applicable to all licensees seeking the same kind
23 of licence." *Id.* ¶¶ 175, 481, 503. IDC's use of ████████████████████████████████
24 better financial terms contravenes *Unwired Planet* just as it does *TCL*.

25     At bottom, IDC's legal position is that ████████████████████████████████
26 ██████. *See, e.g.*, Mot. Ex. 9, 129:1-131:11 (████████████████████████████████
27 ████████████████████████); Ex. 2 at 15-17 (No. 22).[4] As *TCL* admonished, "permitting
28

6
ASUS'S SUMMARY JUDGMENT REPLY
CASE NO. 5:15-cv-01716-BLF

[IDC] to define similarly situated very narrowly by picking and choosing criteria with no relation to its SEPs or the FRAND commitment would effectively allow [IDC] to read the non-discrimination prong out of the FRAND commitment." *Id.*; Mot. 20:27-22:2.

### 3. The Court Should Reject IDC's Argument That Factual Interpretation Issues Preclude Summary Judgement.

IDC purports to raise genuine disputes over the "interpretation" of the ETSI FRAND commitment and the meaning of "similarly situated." Yet IDC does not offer its own interpretation of these terms or concepts, but only denies *TCL*'s interpretations, relying on the testimony of IDC-aligned witnesses. IDC's avoidance of any affirmative position shows that these purported disputes are not genuine. Furthermore, IDC's "interpretation" issues are really legal disputes, and the courts have not looked favorably on the positions IDC espouses. Finally, to the extent any of the interpretation issues could be characterized as factual, they fail to create any genuine dispute that could affect the outcome, because IDC does not even attempt to identify a way in which it met its nondiscrimination obligation, as explained above.

The crux of IDC's argument on "interpretation of the ETSI licensing declaration" (Resp. 12:11-14:2) is that it has no obligation whatsoever to make FRAND offers. That is contrary to law. *TCL* finds that a licensor must make a FRAND offer. *See TCL*, 2017 WL 6611635, at *1 ("The Court must determine whether Ericsson met its FRAND obligation, and then whether Ericsson's final offers before litigation, Offer A and Offer B, satisfy FRAND."); *see also Apple, Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061, 1087 (W.D. Wis. 2012) ("Apple must prove that Motorola's initial offer of a 2.25% royalty rate and attempts to negotiate were unfair, unreasonable or discriminatory . . . ."). *Microsoft* holds that a RAND commitment to "negotiate licenses with other parties on a non-discriminatory basis on reasonable terms and conditions" can be breached by non-RAND offers. *Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1031, 1045 (9th Cir. 2015).

Dr. Laithier's opinions attempting to cabin the remedial powers of the Court are unreliable and/or irrelevant. It is settled law that U.S. courts can issue relief for breach of FRAND commitments. *See, e.g., TCL*, 2017 WL 6611635; *Apple*, 886 F. Supp. 2d 1061; *Microsoft*, 64 F. Supp. 2d 1023 (W.D. Wash. 2012); *Realtek Semiconductor Corp. v. LSI Corp.*, 946 F. Supp. 2d 998,

1005-1008 (N.D. Cal. 2013); *Research In Motion*, 644 F. Supp. 2d 788 (N.D. Tex. 2008); *In re Innovatio IP Ventures, LLC Patent Litig.*, 2013 WL 427167 (N.D. Ill. Feb. 4, 2013). Dr. Laithier's deposition revealed that he does not think a court could ever set a FRAND rate. Ex. 11 at 61:25-63:3, 64:17-65:3. His opinion cannot be reconciled with FRAND precedent, including cases applying French law such as *TCL* and *Apple*. Moreover, "[d]isputes among experts regarding foreign law do not create issues of fact." *In re Vitamin C Antitrust Litig.*, 810 F. Supp. 2d 522, 540 (E.D. N.Y. 2011) (citation omitted). Nor can Dr. Laithier's contention that contract interpretation is a question of fact under French law alter proper Court procedure; contractual choice of substantive law does not override Federal Rule of Civil Procedure 56 or determine which issues must be tried to a jury. *See, e.g.*, *Kenney v. Trinidad Corp.*, 349 F.2d 832, 837 (5th Cir. 1965) ("Under usually accepted choice of laws rules, procedural matters are governed by federal procedural law.").

IDC also argues that the interpretation of "similarly situated" is a factual dispute. Resp. 10:23-11:11, 19:10-12. Yet courts routinely determine whether "similarly situated" is met (in various legal contexts) on summary judgment. *See, e.g.*, *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 966-67 (9th Cir. 2017) (affirming summary judgment finding persons "similarly situated" under Equal Protection Clause); *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006) (granting summary judgment for failure to demonstrate "similarly situated" in a Title VII claim). IDC's assertion that "similarly situated" in the FRAND context is an issue of fact, rather than law, is also belied by case law and ▓▓▓▓ during discovery. *See, e.g.*, *TCL*, 2017 WL 6611635, at *56 (addressing "similarly situated" under "Conclusions of Law"); Ex. 4 at 119:15-24, 124:15-125:19, 129:23-130:7, 225:5-20, 225:21-226:15, 228:24-229:9 (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓). IDC offers no interpretation of "similarly situated" of its own to rival that of ASUS or the *TCL* court. *See* Resp. 19:5-22:11. And, in any event, IDC's effort to raise "similarly situated" disputes is academic, because judging whether licensees are similarly situated is ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

Thus, IDC's purported interpretation disputes do not alter the proper legal framework, which establishes ASUS is similarly situated to well-established market participants who have or are

8
ASUS'S SUMMARY JUDGMENT REPLY
CASE NO. 5:15-cv-01716-BLF

1  seeking 3G and 4G licenses from IDC. *See* § I.A.1, *supra*.

2  **B.    Based on IDC's ███████████████, the Rates IDC Offers ASUS Are Discriminatory Vis-à-vis Those Similarly Situated under** *TCL*

4  IDC does not grant ASUS the ███████ it grants ASUS's competitors that are

5  similarly situated. Again, IDC agrees that the non-discrimination prong of its FRAND commitment

6  requires that it provide similarly situated firms similar licensing terms. Mot. 10:6-14 (collecting

7  cites); *see generally* Resp. The undisputed facts demonstrate that ████████████████

8  ████████████████████████████████████████████████

9  ████████████ Indeed, ████████████████████████

10 ████████████████████████████████████████████████

11 ████████████████████████████████████████

12 ████████████████████████████ Mot. Ex. 19.

13 Below are the ████████████████████████████████████████ as

14 set out by IDC:

[redacted table]

20 *See* Mot. 16:6-16 (providing citations). As can be seen, and is undisputed, ██████████

21 ████████████████████████████████████████████████

22 ████████████████████████████████████████████████

23 ████. Resp. 25:17-23; *see also* Ex. 8,139:1-11; Ex. 9,24:10-12.

24 By contrast, below ████████████████████████████████

25 ████████████████████████████████████████████████

---

[5] ASUS maintains this offer is inadmissible. But, for purposes of completeness, this entry reflects the lump sum and running royalty terms IDC offered on April 12, 2018. RM Ex. 15 at 2, 5.

| License (Model) | | | | | | |
|---|---|---|---|---|---|---|
| ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | ███ |

*See* Mot. 6:1-6, 17:3-13 (providing citations); Mot. Ex. 14 at Ex. 23. A comparison of these tables demonstrate that ███████████████████████████████████████████ ███████████████████████████████████████████ Mot. 16:6-16, 17:3-18:5. IDC ignores ███████████ ███████████████████████████████████████████ ████████████████████████. Even with ██████████[7] ███████████████████████████████████ according to IDC's internal model, which is indisputably higher than the corresponding terms ███████████████████████████████ ███████ Mot. 16 n.3 & 17:3-13; Mot. Ex. 41, p.2. In fact, ███████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ██████ Mot.16 n.3 & 17:3-13. (████████████████████████████████████████ ███████████████████████████████████████████ *See* Ex. 1 at Ex. 13.2; *see also* Mot. Ex. 41, p. 13 (███████████████████████████████). ███████ Regardless of whether a license is ████████████████ ███████████████████████████████████████████ ███████████████████████████████. Mot. Ex. 15, 19:11-20, 21:9-24, 32:33-33:8; *see* Ex. 6 at 1 █████████████████████████████████████ ███████████████████████████████████████████ ██████████████████████████), 3 (███████████████).

---

[7] IDC calculated this discount and ASUS contends the discounts was significantly less than 50%. But for purposes of summary judgement, ASUS uses the figure provided by IDC.

1   IDC takes issue with ASUS's use of IDC's internal licensing models because ASUS's tables
2   sets out ▮▮▮▮
3   these models. Resp. 16:12-15. The other terms are unnecessary to demonstrate ▮▮▮▮
4   ▮▮▮▮
5   ▮▮ in its internal licensing models for ▮▮▮▮
6   ▮▮ Mot. 17:3-13; Resp. 16:8-13. As IDC concedes, it uses *these* internal models ▮▮
7   ▮▮▮▮
8   ▮▮▮▮. Mot. 5:14-16 (citing Mot. Ex. 15 at 89:6-13;
9   Mot. Ex. 18 at 96:22-97:7). Yet, IDC attempts to deflect attention from these models by claiming
10  ▮▮▮▮ Resp. 16:13-14.
11  Leaving no stone unturned, IDC also asserts its models ▮▮▮▮ Resp.
12  16:14-15. IDC agreed to produce its most final models. Ex. 7 at 1; RM Ex. 18. Regardless, IDC's
13  expert ▮▮▮▮ as provided in the table, and his
14  ▮▮▮▮ IDC's models. *See* Mot. Ex. 14 at Report Ex. 23; Putnam Decl. Table 3.

15  **C.   IDC Does Not Substantiate Its Discriminatory ▮▮▮▮.**
16  Not only does IDC fail to dispute a material fact under *TCL*'s analysis (other than to contend
17  all licensees are dissimilar), which by itself justifies summary judgement; IDC also offers no
18  economic justification for its ▮▮▮▮. It is uncontested that ▮▮
19  ▮▮▮▮
20  ▮▮▮▮. Indeed, although it makes a
21  host of excuses for ▮▮▮▮
22  ▮▮▮▮
23  ▮▮. This motion seeks a ruling that IDC's ▮▮▮▮
24  ▮▮▮▮ are discriminatory. IDC's lack of economic
25  justification for its particular ▮▮▮▮ is not a "red herring" (Resp. at 24:21) but a
26  second, alternative basis for summary judgement.
27  IDC is silent in response to ASUS's attack on its ▮▮▮▮
28  ▮▮▮▮ as discriminatory. Mot. 22:10-23:14; Resp. 25:3-13.

1  IDC does not dispute that the record is devoid of any evidence or explanation of ▮▮▮▮
2  ▮▮▮▮▮▮. *See* Mot. 22:5-23:26. At most, IDC parrots Dr. Layne-Farrar's
3  hypothetical justifications ▮▮▮▮ *in general.* Resp. 25:8-15. But IDC does not respond
4  to ASUS's point that these justifications are untethered to any quantitative analysis or to FRAND.
5  *See id.*; Mot. 23:14-26. IDC musters no evidence purporting to show how its ▮▮▮▮
6  ▮▮▮▮ complies with its FRAND obligations. Thus, even if ▮▮▮▮
7  ▮▮▮▮ was not *per se* discriminatory, IDC presents no evidence to support a conclusion
8  that ▮▮▮▮ are consistent with its FRAND obligations.
9  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (requiring "specific facts showing that
10 there is a genuine issue for trial").
11         Lacking quantitative support, IDC falls back on allegations that others implement ▮▮▮▮
12 ▮▮▮▮ and that IDC received judicial approval of its ▮▮▮▮. As an initial matter, these
13 arguments cannot refute that application of the undisputed facts to *TCL*'s legal framework renders
14 IDC's ▮▮▮▮ discriminatory as to ASUS. *See supra* § A. What is more, IDC fails to
15 identify any court that has approved IDC's (or any other) ▮▮▮▮ under the ETSI FRAND
16 commitment.
17         That other licensors may implement ▮▮▮▮ is not a justification of ▮▮▮▮
18 ▮▮▮▮ at all, much less of IDC's. Many drivers run red lights, but that does not make it legal. IDC
19 insists that ▮▮▮▮ is an acceptable industry licensing practice that pre-dates and post-
20 dates ETSI. Resp. 23:3-23:10. But where is IDC's specific evidence of such ▮▮▮▮
21 IDC's only backing is a pair of conclusory, unsupported affidavits from its CEO, Bill Merritt, and its
22 expert, Dr. Huber. A "conclusory, self-serving affidavit, lacking detailed facts and any supporting
23 evidence, is insufficient to create a genuine issue of material fact." *Nilsson v. City of Messa*, 503
24 F.3d 947, 952 n.2 (9th Cir. 2007) (citation omitted). Mr. Merritt ▮▮▮▮
25 ▮▮▮▮ Merritt Decl., ¶ 43. Dr. Huber's cited testimony consists of (1) a
26 general reference to his "own experience for decades in the industry" and (2) an unsupported
27 assertion that "▮▮▮▮ were already a constituent part of the industry at the time when the
28 ETSI IPR Policy was adopted . . . and even more importantly, this industry practice has remained

1  consistent during the decades ever since, and it remains intact today." Huber Decl. ¶ 81, 89; *see*
2  Resp. 23:5-6. This type of naked affidavit cannot create factual disputes to defeat summary
3  judgment. *Finjan*, 283 F. Supp. 3d at 850. Moreover, Dr. Huber admitted at deposition that ▓▓
4  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.
5  Mot. Ex. 6 at 164:17-165:7. Putting aside the conclusory nature of IDC's proffered support, IDC
6  does not even attempt to demonstrate that "industry practice" relates in any way to ▓▓▓▓▓▓
7  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ And, of course, IDC would have to contravene *TCL*'s interpretation
8  of the ETSI FRAND obligation to do so.
9      IDC argues patent pools give ▓▓▓▓▓▓▓▓ too. But IDC's references to pools are again
10 no more than inapposite generalizations. And IDC identifies no instance—in court or a governmental
11 agency—where a pool's ▓▓▓▓▓▓▓▓ were found to be FRAND-compliant. Further, IDC relies
12 on pools that relate to other SSOs (ITU or IEEE). *See* Resp. at 24:5-10; *Microsoft*, 2013 WL
13 2111217, at *1, *88. IDC itself argues elsewhere a pool that has "no relationship to ETSI or
14 standard-essential patents" is irrelevant to the dispute here. Resp. 19 n.8.
15     Finally, IDC claims that arbitrations and ITC investigations found IDC's ▓▓▓▓▓▓
16 consistent with ETSI's FRAND obligation. But IDC cannot show a single discussion, let alone an
17 authorization, of IDC's ▓▓▓▓▓▓▓▓▓▓ in any court, arbitration, or regulatory agency
18 proceeding, because that does not exist. IDC and Mr. Merritt ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
19 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
20 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. *See* Resp. 23:18-25; Ex. 4, 142:9-19. And
21 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
22 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. *See* Resp. 23:12-15, WM
23 Ex. 1 at 2; Dkt. No. 234 at 16:12-22. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
24 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Ex. 4, at 141:19-24. Likewise, IDC's claim that ▓▓
25 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
26 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. *See* Ex. 9 at 71:23-73:1.  IDC's claim that ▓▓
27 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *See*
28 *id.* 23:15-28; Ex. 4 at 141:25-142:7. IDC would doubtless have produced the ▓▓▓▓▓▓▓▓ in

1   discovery if it ███████████████. *See* Fed. R. Civ. P. 56(c)(1)(B) (IDC "cannot produce

2   admissible evidence to support the fact"). Mr. Merritt's testimony about ████████████ is no

3   substitute for the real thing. *See* Resp. 23:15-18 (citing Merritt Decl. ¶ 49). Further, IDC's expert

4   ████████████████████████████████████████████████████████████████████████████

5   ████████████████████ *See* Putnam Decl. ¶ 38.

**D.  The Plethora of Other Issues IDC Raises Do Not Preclude Summary Judgment**

The remainder of IDC's response is devoted to other issues not relevant to ASUS's motion. These issues have no effect on, and should not be allowed to obscure, the undisputed material facts and sound legal bases that warrant granting summary judgment.

For example, IDC attempts to add extra elements to the cause of action for breach. IDC contends that ASUS must prove patent essentiality, but cites no authority that requires such proof. Resp. 12, n.3 (citing case law on what it takes to prove essentiality, but not on whether a FRAND contract plaintiff must prove it). Contrary to IDC's take on the law, a court can find a patent owner violated its FRAND obligation without adjudicating the infringement or essentiality of individual patents. *See Microsoft,* 795 F.3d at 1040-47 (affirming district court's determination of a RAND rate and jury's verdict of breach without any adjudication whether the declared patents were actually essential). Regardless, IDC has ████████████████████████████████████████████. Mot. 3:22-4:1 (citing, *e.g.*, Mot. Ex. 8, at 6-8; Mot. Ex. 9 at 99:6-23).

Likewise, IDC's argument that ASUS must prove it "is not an unwilling licensee" as an element of the breach of contract claim is not supported by any applicable law or IDC's own pleadings. *See* Dkt. No. 112, 16:11-13 (listing "unwilling licensee" status as a *defense* for IDC). IDC betrays its lack of support when it relies solely (and wrongly) on ASUS's French law expert, Dr. Stoffel-Munck, for this proposition. Resp. 14. This is no support at all, because IDC is employing a different meaning of "unwilling licensee" than Dr. Stoffel-Munck. He specified in the next paragraph and the next two answers that he was referring to a potential licensee that has "refused to benefit" from the FRAND right. Ex. 10 at 132:9-134:1. That description cannot reasonably be applied to an entity that affirmatively asks the Court to set the terms of a FRAND license (and that continues to pay IDC (excessive) royalties for all licensed products). ASUS is such an entity;

1  through this action, it is legally bound to enter a license with IDC. *See* Dkt. No. 107 (FAC) at 33:16-
2  19 (requesting that "IDC specifically perform its contractual obligation to grant [ASUS] a license on
3  [FRAND] terms" and that the Court "set[] the proper FRAND terms and conditions for IDC's
4  cellular…portfolio."); *id.* at 33:18-19; *see also Realtek*, 946 F. Supp. 2d at 1007 (implementer's
5  admission that it is willing to accept a RAND license defeated "unwilling licensee" arguments).

6  Further, IDC introduces a pejorative discussion of ASUS's negotiations strewn with
7  inaccuracies and omissions, Resp. at 6:10-9:19, but never relies on any of it as a basis for opposing
8  summary judgment. IDC does not dispute the only material fact from the negotiations that *is relevant*
9  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ at issue in this motion: ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
10 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
11 ▇▇▇▇▇. *See* Mot. 15:26-18:9. Even IDC's ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ does not place
12 ASUS on similar footing with its larger competitors. *Id.* at 16 n.3.

13 IDC also diverts several pages of its brief to a non-existent argument about ▇▇▇▇▇▇▇▇.
14 Resp. 15:16-17:3. Contrary to IDC's assertion that "▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
15 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇," ASUS's Motion focuses on the ▇▇▇▇▇▇▇,
16 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Mot. Ex. 15 at
17 19:11-20; Ex. 6 at 1, 3. IDC's other ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ only further
18 discriminate against ASUS, but the Court need not adjudicate ▇▇▇▇▇▇▇▇ to grant this Motion.

19 Finally, IDC emphasizes that ETSI envisioned that FRAND licenses would be negotiated at
20 arm's length between the licensee and patent holder. Resp. 5:3-5. ASUS does not dispute this point.
21 But it is inapposite to ASUS's Motion. ETSI's discussion of arm's-length negotiations does not
22 negate the FRAND obligation or suggest that a license necessarily becomes FRAND just because it
23 was entered into at arm's length.

24
25 DATED: September 27, 2018

26            By: */s/ Michael R. Franzinger*
             Michael R. Franzinger
27              *Attorney for Plaintiffs*
             ASUS COMPUTER INTERNATIONAL, and
28              ASUSTEK COMPUTER INCORPORATED