Brian Nester, (*pro hac vice*)
bnester@sidley.com
Michael R. Franzinger (SBN 222155)
mfranzinger@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711

Richard A. Cederoth (*pro hac vice*)
rcederoth@sidley.com
David C. Giardina (*pro hac vice*)
dgiardina@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone (312) 853-7000
Facsimile: (312) 853-7036

Michael J. Bettinger (SBN 122196)
mbettinger@sidley.com
SIDLEY AUSTIN LLP
555 California Street
Suite 2000
San Francisco, CA 94104
Telephone: (415) 772-1200
Facsimile: (415) 772-7400

Attorneys for Plaintiffs
ASUS COMPUTER INTERNATIONAL,
ASUSTEK COMPUTER INCORPORATED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ASUS COMPUTER INTERNATIONAL; and ASUSTEK COMPUTER INCORPORATED,<br><br>Plaintiffs,<br><br>vs.<br><br>INTERDIGITAL, INC.; INTERDIGITAL COMMUNICATIONS, INC.; INTERDIGITAL TECHNOLOGY CORPORATION; IPR LICENSING, INC. and INTERDIGITAL PATENT HOLDING, INC.,<br><br>Defendants. | Case No. 15-cv-01716 BLF<br><br>**ASUS'S OPPOSITION TO INTERDIGITAL'S MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF: APOSTOLOS K. "PAUL" KAKAES; FIONA M. SCOTT MORTON; AND GREGORY K. LEONARD**<br><br>Hearing Date: February 14, 2019<br>Time: 9:00 a.m.<br>Location: Courtroom 3, 5th Floor<br>Judge: Hon. Beth Labson Freeman<br><br>**UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     APPLICABLE LAW .............................................................................................3

III.    THE COURT SHOULD NOT EXCLUDE DR. KAKAES' OPINIONS ...............................4

        A.      Dr. Kakaes's Essentiality Opinions Are Useful Evidence................................5

                1.      Dr. Kakaes And Concur IP Appropriately Collaborated On The Census And Essentiality Analysis ........................................................................7

                2.      Their Methodology Is Appropriate ......................................................9

                3.      Their Methodology Is Consistent........................................................11

                4.      Their Analysis Is Sufficiently Disclosed .............................................12

                5.      Their Analysis Is Accurate Within Reasonable, Disclosed Error Bounds ...............................................................................................13

        B.      In Characterizing The Patent Portfolio Quality Analysis As Unsupported, InterDigital Overlooks Most Of The Support For That Analysis ....................14

IV.     THE COURT SHOULD NOT EXCLUDE DR. SCOTT MORTON'S OPINIONS .............16

        A.      Dr. Scott Morton's Opinions Regarding ASUS's Breach of Contract Claims Should Not Be Excluded.............................................................................16

        B.      Dr. Scott Morton's Opinions Related To ASUS's Sherman Act Claim Should Not Be Excluded .....................................................................................19

        C.      InterDigital's Miscellaneous Challenges Are Wholly Lacking In Support .....21

V.      THE COURT SHOULD NOT EXCLUDE DR. LEONARD'S OPINIONS ........................21

VI.     CONCLUSION..................................................................................................23

i

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Advanced Thermal Sciences Corp v. Applied Materials Inc.*
2009 WL10673194 (C.D. Cal. Oct. 28, 2009)....................................................................3, 4, 17

*Apple v. Motorola*
757 F.3d 1286 (Fed. Cir. 2004), overruled on other grounds, *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (en banc).............................................20

*Arista Networks, Inc. v. Cisco Sys. Inc.*
Case No. 5:16-cv-00923-BLF, Dkt. 334 (N.D. Cal. June 15, 2018) ............................20

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*
509 U.S. 579 (1993)........................................................................................3, 10, 13

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*
285 F.3d 609 (7th Cir. 2002) ..............................................................................3, 10

*Fidelity Nat'l Financial, Inc. v. Nat'l Union Fire Ins. Co.*
No. 09-CV-140-GPC-KSC, 2014 WL 1286392 (S.D. Cal. Mar. 28, 2014) ................................19

*Hangarter v. Provident Life & Accident Ins. Co.*
373 F.3d 998 (9th Cir. 2004) ..............................................................................4, 18, 21

*Huawei Techs. Co. v. Samsung Elecs. Co.*
No. 3:16-CV-02787-WHO, 2018 WL 4904895 (N.D. Cal. Sept. 25, 2018) ........................ passim

*Kaur v. City of Lodi*
No. 14-cv-0828 GEB AC, 2016 WL 98752 (E.D. Cal. Jan. 8, 2016)...........................................14

*Metaswitch Networks Ltd. v. Genband US LLC*
2016 WL 874775 (E.D. Tex. Mar. 7, 2016) .........................................................................22

*Microsoft Corp. v. Motorola, Inc.*
2013 WL 4008822 (W.D. Wash. Aug. 5, 2013) .......................................................... passim

*Moussouris v. Microsoft Corp.*
311 F. Supp. 3d 1223 (W.D. Wash. 2018)...............................................................................3

*Pac. Shores Props., Ltd. Liab. Co. v. City of Newport Beach*
730 F.3d 1142 (9th Cir. 2013) ............................................................................................20

*RSUI Indem. Co., Inc. v. Vision One, LLC*
No. C08-1386-RSL, 2009 WL 5125420 (W.D. Wash. Dec. 18, 2009).......................................17

*Southland Sod Farms v. Stover Seed Co.*
108 F.3d 1134 (9th Cir. 1997) .......................................................................................3, 10

ii

*TCL Comm'n Tech. Holdings Ltd. v. Telefonaktiebolaget LM Ericsson*
    SA CV 14-00341-JVS, 2016 WL 6921125 (C.D. Cal. May 4, 2016) ............................................6

*TCL Comm'n Tech. Holdings Ltd. v. Telefonaktiebolaget LM Ericsson*
    SA CV 14-00341-JVS, 2016 WL 6662727 (C.D. Cal. July 7, 2016)...........................................11

*TCL Comm'n Tech. Holdings Ltd. v. Telefonaktiebolaget LM Ericsson*
    SA CV 14-00341-JVS, 2018 WL 4488286 (C.D. Cal. Sept. 14, 2018) ............................... passim

**OTHER AUTHORITIES**

Fed. R. Civ. P. 26(b)(4)(B) ...........................................................................................................14

Fed. R. Civ. P. 26(a)(2)(B) ...........................................................................................................14

Fed. R. Evid. 703 .......................................................................................................................6, 9

Fed. R. Evid. 704(a) .............................................................................................................4, 16, 18

1     Plaintiffs ASUS Computer International and ASUSTeK Computer Incorporated (collectively,

2  "ASUS") hereby oppose the Motion to Exclude Opinions and Testimony (ECF Nos. 276, 277)

3  ("motion" or "Mot.") filed by Defendants InterDigital, Inc.; InterDigital Communications, Inc.;

4  InterDigital Technology Corporation; IPR Licensing, Inc.; and InterDigital Patent Holdings, Inc.

5  (collectively, "InterDigital"). For the reasons explained below, InterDigital's motion should be

6  denied.

7  **I.     INTRODUCTION**

8     ASUS's expert witnesses provide opinions based on their scientific and other specialized

9  expertise that will assist the trier of fact in determining material issues. In particular, their testimony

10 will shed light on the value attributable to InterDigital's patent portfolio in a fair, reasonable, and

11 nondiscriminatory ("FRAND") royalty calculation and the reasons InterDigital has not met its

12 FRAND commitments. In pursuing exclusion of portions of their proposed testimony, InterDigital's

13 motion sets forth an inaccurate caricature of ASUS's experts' opinions and overlooks relevant

14 precedent accepting similar expert approaches. A more fulsome description of their opinions and of

15 the corresponding law reveals why they should not be excluded from trial.

16    ASUS's technical expert Dr. Kakaes is an electrical engineer with decades of experience in

17 the mobile telecommunications industry. He has carried out essentiality analyses in multiple

18 standards-related patent litigations. The reason for conducting an essentiality analysis is to get a

19 technically-grounded view of a standard-essential patent ("SEP") holder's share of the patent

20 families necessary to practice a given standard. The 3G and 4G standards include thousands of

21 declared essential families. Because it is not feasible to conduct a full patent infringement analysis

22 on each one, Dr. Kakaes designed a way to tackle the monumental project of determining which of

23 those thousands of declared families are actually essential. His results provide a more informed view

24 of the SEP holders' relative shares of patents necessary to practice the standard. Those shares can

25 then be used to apportion an overall cumulative royalty for a standard in a "top-down" calculation,

26 which Dr. Leonard used to calculate an economic assessment of a FRAND royalty.

27    Dr. Kakaes and other experts have used this method in multiple other proceedings, including

28

in *TCL* and *Huawei*. That he had assistance executing the analysis by a staff of engineers at Concur IP is hardly surprising, and no basis for criticism. Indeed, experts on both sides of this case have relied on support teams to carry out work. And the law is clear that an expert can properly rely on such an analysis that is within his scope of expertise, even if it was prepared without his involvement.

InterDigital's other criticisms fail. InterDigital faults Dr. Kakaes and Concur IP for not being in constant communication throughout the essentiality analysis, but never establishes any reason Concur IP should have been required to re-do thousands of hours of work it had already done just so it could talk to Dr. Kakaes while the work was in progress. Ex. 4, 92:2-7. InterDigital compares apples and oranges in purporting to find "inconsistencies" in Concur IP's results in several cases. It recycles complaints that a court has rejected as "not … legitimate grounds for attacking the reliability of the database" Concur IP assembled on essentiality. *Huawei Techs. Co. v. Samsung Elecs. Co.*, No. 3:16-CV-02787-WHO, 2018 WL 4904895, at *49 (N.D. Cal. Sept. 25, 2018). And it misperceives the nature and purpose of Dr. Kakaes's error rate analysis; disclosure of the error rate is encouraged (if not demanded) by *Daubert*, and the rate of disagreement recorded by Dr. Kakaes serves that function here.

With regard to portfolio quality, InterDigital attacks a strawman. It contends the opinions have inadequate basis, while glossing over most of the bases presented in Dr. Kakaes's report. His assessment of InterDigital's portfolio quality is based on more than the analysis of a few example patents. Dr. Kakaes's analysis is premised on the reasonable assumption that InterDigital perceived the patents it chose to assert as among the "best" in its portfolio. When even these handpicked stars fail, it stands to reason—as Dr. Kakaes points out—that the portfolio as a whole is not strong. Dr. Kakaes is entitled to present this reasoning, along with example patents, as support for a conclusion that InterDigital's portfolio is below average in quality. Indeed, the *TCL* opinion InterDigital cites as a basis for exclusion actually admits and relies upon the portfolio quality analysis Dr. Kakaes presented in that case. *See TCL Comm'n Tech. Holdings Ltd. v. Telefonaktiebolaget LM Ericsson*, No. SACV 14-341 JVS(DFMx), 2018 WL 4488286, at *24 (C.D. Cal. Sept. 14, 2018).

Lastly, in labeling Dr. Scott Morton's and Dr. Leonard's opinions inadmissible legal

1  conclusions, InterDigital applies an overbroad interpretation of that concept. Experts are not barred

2  from testifying on a subject merely because their testimony uses legal terms or embraces an

3  "ultimate issue." Dr. Scott Morton's and Dr. Leonard's opinions contrast with those of InterDigital's

4  experts, who cross the boundaries of proper expert testimony by incorporating what amounts to legal

5  briefing in their reports, as addressed in ASUS's *Daubert* motion. InterDigital applies a double

6  standard between its *Daubert* motion and its own expert reports. As detailed below, ASUS is the

7  only party that maintains a consistent line. InterDigital's motion should be denied on all counts.

8  **II.   APPLICABLE LAW**

9       The relevant law on expert opinions sets different boundaries on admissibility than

10  InterDigital's motion does. There are no per se rules against an expert's reliance on others, using

11  legal terminology, or touching on ultimate issues.

12       The Supreme Court has held that "[u]nlike an ordinary witness … an expert is permitted

13  wide latitude to offer opinions, including those that are not based on firsthand knowledge." *Daubert*

14  *v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993). Expert opinions are not excluded

15  merely because the opinions are based on data collected by others. *See Southland Sod Farms v.*

16  *Stover Seed Co.*, 108 F.3d 1134, 1141-42 (9th Cir. 1997). In *Southland Sod Farms*, the Ninth Circuit

17  expressly rejected the argument that an expert's "testimony is scientifically unreliable as a matter of

18  law because he did not personally do any of the work upon which his opinions are based[.]" *Id.* at

19  1141. Furthermore, in determining reliability, a court should attempt to "rule not on the correctness

20  of the expert's conclusions but on the soundness of the methodology." *Moussouris v. Microsoft*

21  *Corp.*, 311 F. Supp. 3d 1223, 1234 (W.D. Wash. 2018). Where an expert relies on work carried out

22  by others, the proper consideration is whether the expert has the necessary expertise to offer a

23  credible opinion about it. *See Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614-615 (7th

24  Cir. 2002) (excluding expert testimony that relied upon undisclosed expert analysis of another where

25  the testifying expert "lack[ed] the necessary expertise to determine whether the techniques were

26  appropriately chosen and applied").

27       What constitutes "legal opinion" is also narrower than InterDigital suggests. "The analysis of

28  complex facts, albeit within a legal framework, is a proper role for an expert." *Advanced Thermal*

3

*Sciences Corp v. Applied Materials Inc.*, No. SACV 07-1384-JVS (JWJx), 2009 WL10673194, at *1 (C.D. Cal. Oct. 28, 2009). "[A] witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible. Indeed, a witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004); *see also Microsoft Corp. v. Motorola, Inc.*, 2013 WL 4008822, at *12 (W.D. Wash. Aug. 5, 2013) ("[C]ourts may permit experts to use legal terminology in expressing their opinions, particularly where it would advance the jury's understanding of the case.") (citing *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1059 (9th Cir. 2008)).

Finally, the characterization of expert testimony as going to an "ultimate issue" has little to no bearing on its admissibility. "It is well established . . . that expert testimony concerning an ultimate issue is not per se improper." *Hangarter*, 373 F.3d at 1016 (quoting *Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1066 n.10 (9th Cir. 2002)); *see also* Fed. R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue."). "[A]n expert witness may always testify to facts and opinions that, if found, would allow the trier of fact to reach its own conclusion on an ultimate issue of fact." *Microsoft*, 2013 WL 4008822, at *12. "The touchstone of this inquiry is whether the expert's testimony on an ultimate issue of fact will be helpful to the jury." *Id.* "[I]n a more complicated case or a case dealing with a concept less familiar to ordinary jurors, expert testimony on an ultimate issue may be useful for guiding the trier of fact through a complicated morass of obscure terms and concepts." *Id.* (internal citations omitted).

## III.   THE COURT SHOULD NOT EXCLUDE DR. KAKAES' OPINIONS

Dr. Kakaes offers opinions on a census and essentiality survey covering thousands of patents and applications declared essential to ETSI telecommunications standards. *See* IDC Br. Ex. 1, ¶¶ 6-9. These opinions are useful to obtain a more detailed determination of InterDigital's share of patents actually essential to the 3G and 4G standards. InterDigital's challenges to his proposed essentiality testimony are all rooted in the fact that he had assistance carrying out the legwork in these studies from Concur IP, an India-based firm experienced in this kind of survey from several SEP litigations. Dr. Kakaes is qualified to opine on these studies based on his experience in the field and specifically

4

with these types of studies. Moreover, he designed the census criteria and the essentiality protocol, confirmed the qualifications of Concur IP personnel, and conducted an error rate estimation. InterDigital had ample opportunity to explore the bases and reasons for his opinions through his report, its supporting exhibits and document production, and the depositions of Dr. Kakaes and the Concur IP principals (Nitin Agrawal and Sachin Sinha) heading the studies.

Dr. Kakaes's separate opinions on InterDigital's patent portfolio quality are also admissible, just as his opinions about Ericsson's portfolio were in *TCL*, where the court used them in the course of making its FRAND rate determination. *TCL*, 2018 WL 4488286, at *24.

### A.     Dr. Kakaes's Essentiality Opinions Are Useful Evidence

The purpose of Dr. Kakaes's essentiality analysis is to develop a technically-based understanding of what share of the value of a licenses to all patents essential to a standard should be apportioned to a particular patent owner in a top-down FRAND rate determination. One way to apportion the aggregate value is by simply counting the number of patents or patent families each patent owner declared as essential to the standard. But standard-setting organizations like ETSI (the relevant one for this case) do not particularly deter overinclusive disclosures of potentially essential patents. *See* IDC Br. Ex. 1, ¶¶ 103, 142-143, 162. To account for over-disclosure, which may not be uniform among participants, a more detailed way to conduct an essentiality analysis is to determine which patent families contain any claims that must be practiced to comply with a set standard. *Id.* ¶ 143.[1]

Relying on his knowledge and experience in the mobile industry, Dr. Kakaes devised a method for wading through the thousands of patent families declared essential to the 3G and 4G standards. Because of the vast time commitment involved in carrying out the review, he relied on a team of engineers from Concur IP to physically implement it. IDC Br. Ex. 1, ¶ 6. InterDigital, for its part, did not even attempt this task—and that is the motivation for its motion. Instead of conducting its own rebuttal essentiality analysis of the full set of declared essential families, InterDigital tries to enlist the Court's help in avoiding the issue altogether. ███████████████████████

---

[1] When analyzing Concur IP's data, Dr. Kakaes found in the end that InterDigital's share of essential patents was not inconsistent with its share of declared patents. IDC Br. Ex. 1, ¶¶ 171-179.

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ████████████████████ Ex. 2, ¶ 291.

This essentiality analysis is a vast project that must be conducted with some efficiency. Survey methods involving a team of people, like Concur IP, are a necessity. Courts have realized this necessity and have been willing to admit expert testimony utilizing such a method. For instance, in *TCL* the court acknowledged some of the imperfections of the method but recognized the value of using a broad-based survey. *TCL*, 2018 WL 4488286, at *9, *15-*18.[2] Similarly, InterDigital's challenges to Dr. Kakaes's essentiality study are nearly a carbon copy of Samsung's motion to strike the analysis of Dr. Jackson and Concur IP in *Huawei*, which the court unequivocally denied. *Huawei*, 2018 WL 4904895, at *48-49. As the court noted: "[T]he database is not an 'opinion,' it is data from which [the testifying expert] forms his opinions. The Federal Rules explicitly allow an expert to 'base an opinion on facts or data in the case that the expert has been made aware of or personally observed.' Fed. R. Evid. 703 …" *Id.* at *48.

Moreover, aspects of InterDigital's description of Dr. Kakaes and Concur IP's essentiality work are factually wrong. For example, InterDigital claims the patent census was done for another case, Mot. at 6, but all three deponents testified to the contrary. Mr. Sinha stated that the 2017 update to Concur IP's data (which was used by Dr. Kakaes) included a new census. IDC Br. Ex. 6, 81:18-20. Dr. Kakaes explained that he provided the categorization required to carry out the census in late 2017. Ex. 3, 211:16-213:3. Mr. Agrawal, who personally carried out the census, testified that he always receives the categorization from the particular expert working on the matter, which is why he implemented Dr. Kakaes's November 2017 categorization across the entire census. Ex. 7, 7:11-8:1. The categorization is the substantive part of the census, and the remainder is just an objective process of downloading data from ETSI. *Id.* at 11:15-12:7, 25:14-26:5; 26:21-27:2.

---

[2] The court also denied at least one motion to exclude Dr. Kakaes's essentiality analysis in that case. *See TCL Comm'n Tech. Holdings Ltd. v. Telefonaktiebolaget LM Ericsson*, SA CV 14-00341-JVS (DFMx), Order Re: Motion to Preclude, 2016 WL 6921125, at *2-3 (C.D. Cal. May 4, 2016) (denying motion to strike Dr. Kakaes's essentiality study).

On the subject of patent portfolio quality, Dr. Kakaes' opinions are not as InterDigital describes. While he did in-depth case studies on five patents, that was not the sum total of his analysis. He also—importantly—looked at what happened with the patents InterDigital chose to assert in litigation. *See* IDC Br. Ex. 1, ¶¶ 192-202. Logically, one would infer these were the "best" patents InterDigital believed it had—yet InterDigital lost on infringement, repeatedly. *See id.* The fact that even InterDigital's own selected patents proved not to be infringed by implementers' products provides insight into the quality of InterDigital's portfolio and supports Dr. Kakaes's conclusion.

Ultimately, InterDigital's criticisms of Dr. Kakaes are matters for cross-examination, not admissibility. The Court should therefore deny InterDigital's *Daubert* motion.

## 1. Dr. Kakaes And Concur IP Appropriately Collaborated On The Census And Essentiality Analysis

InterDigital's motion sets forth an incomplete and distorted view of the analysis Dr. Kakaes and Concur IP performed. The task they undertook was massive: to assess the fraction of essential 3G and 4G patent families that belongs to InterDigital. In doing so, they employed established methods that have been approved by other courts. *See TCL*, 2018 WL 4488286, at *16-18, *24; *Huawei*, 2018 WL 4904895, at *48-49. Dr. Kakaes's method in the *TCL* case was as follows: first exclude patent families that lack claims for user equipment (because the relevant products were user equipment, not network equipment); divide the remaining patents into 2G, 3G, and 4G; and sort by patent holder for calculation of essentiality shares. *TCL*, 2018 WL 4488286, at *16. The court accepted the subset Dr. Kakaes analyzed as an adequate representation of the whole. *Id.* Dr. Ding, who was working with Concur IP implementing Dr. Kakaes' method, conducted an error check which estimated a 9.5% rate of disagreement with Concur IP's essentiality findings. *Id.* The court accepted this error rate, finding that "[t]he error rate regarding whether patents were essential went in both directions, and thus the small number of errors largely balanced each other out over the course of the study." *Id.*

The reason the essentiality analysis task is so large is the sheer number of patents involved. In the relevant time frame, ETSI participants have declared 5,310 patent families essential to 3G and

9,621 patent families essential to 4G. IDC Br. Ex. 1, ¶ 150; ¶ 153. Dr. Kakaes explains in his expert report in detail each step taken to conduct the patent census and essentiality study. IDC Br. Ex. 1, ¶ 127-141 (census); 142-146 (essentiality); Ex. 8 [Kakaes Report Errata] (correcting description of treatment of expiration dates); Ex. 3, 15:6-20:12, 109:6-119:10. In brief, a team of professionals from Concur IP with engineering degrees and experience in analyzing standard-essential patents in the mobile communication industry carried out the most labor-intensive steps. Dr. Kakaes had worked with Concur IP in the past, so he knew of the firm's proficiency and capability to carry out the type of analysis he requested. It so happened that the Concur IP personnel had already completed much of the essentiality analysis of the patents that Dr. Kakaes requested, so rather than duplicate all that work, they reused certain data they already had. Dr. Kakaes offered regularly scheduled weekly teleconferences and further discussion as needed with the Concur IP team as they updated their survey—all of which had been carried out according to his designed method IDC Br. Ex. 1, ¶ 128; *see also* Ex. 3, 76:19-77:12. Given the volume of patents at issue and the limited time frame of the litigation, it was imperative for Dr. Kakaes to work with Concur IP in this manner and it was a reasonable, reliable and realistic way to develop the necessary data for Dr. Kakaes to formulate his opinion. IDC Br. Ex. 1, ¶ 128.

Dr. Kakaes's methodology employed steps to identify and exclude expired patents, focus the analysis on user equipment ("UE") patent claims because ASUS's relevant products are UEs, and review patent families with an issued English or Chinese language patent to determine which patent families contained at least one patent claim reasonably expected to be essential. IDC Br. Ex. 1, ¶ 144. Many of the families had already been analyzed, thus Dr. Kakaes instructed the Concur IP team to conduct an incremental essentiality analysis of the families that had not already been analyzed. IDC Br. Ex. 1, ¶ 145.

Once the Concur IP team concluded their analysis, Dr. Kakaes conducted an independent review of a random sample of families in order to determine how often his decisions on essentiality would have differed from Concur IP's. IDC Br. Ex. 1, ¶ 146. Dr. Kakaes ensured that his random sample included at least one issued non-expired US or EP patent as well as at least one UE claim. IDC Br. Ex. 1, ¶ 181. Additionally, Dr. Kakaes used a sample size calculator to determine the

1   confidence interval for each error rate. IDC Br. Ex. 1, ¶ 187. This analysis confirmed that the

2   statistic was meaningful. IDC Br. Ex. 1, ¶ 187. Thus, the basis and reasons for the census and

3   essentiality analysis have been provided.

4           **2.**       **Their Methodology Is Appropriate**

5        That Concur IP assisted with the patent review does not, as InterDigital suggests, make Dr.

6   Kakaes's opinions inadmissible. As the court noted in *Huawei* when facing essentially the same

7   issue, Concur IP's "database is not an 'opinion,' it is data from which Dr. Jackson [the testifying

8   expert] forms his opinions. The Federal Rules explicitly allow an expert to 'base an opinion on facts

9   or data in the case that the expert has been made aware of or personally observed.' Fed. R. Evid. 703

10  …" *Huawei*, 2018 WL 4904895, at *48. In a mirror image of the present case, the court rejected

11  Samsung's arguments that "the bulk of the work was done by Concur IP without Dr. Jackson's direct

12  involvement, and much of the data was extracted from the work of Dr. Apostolos Kakaes in

13  unrelated litigation ..." *Id.* Simply swap the experts, and the result is InterDigital's argument here,

14  which fails for the same reasons.

15       Experts commonly rely on support personnel in their own field to carry out steps of their

16  analysis. For example, ████████████████████████████████████████████

17  ████████████████████████ which included 11 individuals who signed the Protective Order

18  undertaking in this case. Ex. 6. Dr. Kakaes appropriately relied on the patent census and survey of

19  Concur IP. Dr. Kakaes designed the methodology used by Concur IP; he opted to use Concur IP

20  based on his previous experience observing the quality of the firm's work on the same type of

21  analysis; he verified Concur IP conducted the analysis according to his methodology; and he

22  conducted an error analysis to quantify the level of precision of the survey. IDC Br. Ex. 7, 71:1-4,

23  73:14-16; IDC Br. Ex. 1, ¶ 128. As Dr. Kakaes explains in his expert report, he had previously

24  worked with the Concur IP team, specifically with the team led by Mr. Agrawal for the census and

25  Mr. Sinha for the essentiality analysis, and was confident that the work produced would be of high

26  quality. IDC Br. Ex. 1, ¶¶ 128, 144-145.

27       InterDigital's effort to preclude Dr. Kakaes's reliance on Concur IP's work is unsupported by

28  law. *See* Mot. at 9. The Supreme Court held that "[u]nlike an ordinary witness … an expert is

1   permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge."

2   *Daubert*, 509 U.S. at 592. As shown, the Supreme Court requires less than what Dr. Kakaes actually

3   did; Dr. Kakaes not only offers an opinion applying his own relevant expertise to Concur IP's

4   findings, but actually developed the methodology used by the Concur IP team in analyzing the

5   thousands of patents. Additionally, according to the Ninth Circuit, expert opinions are not excluded

6   for the sole fact that the opinions are based on data collected by others. *See Southland Sod Farms*,

7   108 F.3d at 1141 (rejecting argument that expert's testimony should be excluded "because he did not

8   personally do any of the work upon which his opinions are based"). The five district cases

9   InterDigital claims are to the contrary cannot override *Southland Sod Farms*. *See* Mot. at 9-10. In

10  addition to being subordinate authority, three of them are from outside this Circuit, and the other two

11  are only cited for the proposition that an expert cannot serve as a "mouthpiece" for others. *Id.*

12  InterDigital's use of the conclusory epithet "mouthpiece" cannot substitute for an actual substantive

13  analysis of Dr. Kakaes's opinions, and these two cases do not advance that analysis.

14       Dr. Kakaes plainly has "the necessary expertise to determine whether the techniques were

15  appropriately chosen and applied." *Dura Auto*, 285 F.3d at 614-15. Dr. Kakaes even developed the

16  method by which the data underlying his opinion was generated, which is more than *Dura Auto* or

17  *Southland Sod Farms* require. *See* Ex. 3, 76:20-77:2. Dr. Kakaes explained during his deposition that

18  the protocol used for the essentiality analysis update conducted by the Concur IP team in 2017 was

19  the same protocol that ███████████████████████████████████████████████

20  ████████████████████████████ *Id.* Although not necessary in the Ninth Circuit, Dr. Kakaes's

21  direct involvement in developing the methodology also distinguishes this case from *Karum Holdings*

22  *LLC v. Lowe's Cos.*, one of the district cases InterDigital cites, where an expert's testimony on a

23  model he did not build was excluded. No. 15 C 380, 2017 U.S. Dist. LEXIS 192269, at *15-16 (N.D.

24  Ill. Nov. 21, 2017).

25       InterDigital's argument that some of the work was performed for a different case is also

26  immaterial. It would have been redundant and a waste of resources to have Concur IP redo the entire

27  essentiality analysis, which took "more than seven or eight thousand hours" for the 2014-15 portion

28  and "between two to three thousand hours" for the 2017 update. Ex. 4, 91:16-92:7.

The present situation is distinct from the situation identified in ASUS's *Daubert* motion where Dr. Layne-Farrar, an economist, relies on third-party essentiality studies. ECF Nos. 279, 278-3. This differs fr      the present issue because Dr. Kakaes, a technical expert, is relying on technical information gathered by Concur IP per Dr. Kakaes' developed method and supervision. Furthermore, unlike the present instance where ASUS made the leads of the Concur IP team available for deposition, InterDigital did not (and presumably had no way to) make the authors of Dr. Layne-Farrar's cited essentiality studies available for deposition. *Id.*, 9:6-8; *see TCL Comm'n Tech. Holdings Ltd. v. Telefonaktiebolaget LM Ericsson*, No. SACV 14-00341 JVS (DFMx), 2016 WL 6662727, at *4-5 (C.D. Cal. July 7, 2016) (requiring TCL to make the Concur IP principals available for deposition).

To summarize, the weight of precedent—including the most on-point precedent, *TCL* and *Huawei*—strongly favors denial of InterDigital's motion.

### 3.    Their Methodology Is Consistent

InterDigital has not established that Dr. Kakaes's analysis leads to inconsistent results. What it has done instead is to try to construct a false parallelism between different sets of results that represent different facets of the analysis. ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████ ██████████████████████████████████ ████████████████████████████ The third column is based on patent families rather than individual patents (*see* IDC Br. Ex. 1, ¶ 9), such that a different family member could (for example) lead to a "Yes" result where columns 1 and 2 are a "No." Moreover, the passage of time before the column 3 analysis means new patent family members and essentiality declarations could have issued, which could also affect the results.

InterDigital failed to investigate these and other reasons for the apparent discrepancies. It has not shown *any* actual inconsistencies, much less a rate of variation out of line with Dr. Kakaes's own

11

derived error rate for Concur IP's analysis. In no way is ASUS or Dr. Kakaes claiming the method is perfect; Dr. Kakaes recognizes there will be some rate of variation between different individuals' analysis of patents, hence his reason for deriving an error rate to account for variations in the bulk analysis of the patents. In *TCL*, an error (or disagreement) rate of 9.5% did not lead the court to distrust Concur IP's survey or Dr. Ding's calculations from it, and similar considerations should not do so here. *TCL*, 2018 WL 4488286, at *16-17.

### 4. Their Analysis Is Sufficiently Disclosed

Despite the extensive disclosures of methodology, error checking, and Concur IP's patent-by-patent spreadsheet of results, InterDigital digs further to assert that Concur IP should have inserted comments in the spreadsheet for a greater number of patents. Mot. at 11-12. On this basis, even as it acknowledges the existence of 8,105 such comments in the spreadsheet, InterDigital contends that all of Dr. Kakaes's "opinions on census and likely essentiality, as well as his 'error checking,'" should be excluded. *Id.* The overreach here is plain. None of the prior cases evaluating Concur IP's surveys or experts' reliance on them found fault with Concur IP's provision of bases and reasons for its decisions. Samsung's challenge to Concur IP's data "extracted from the work of Dr. Apostolos Kakaes in unrelated litigation" was rejected. *Huawei*, 2018 WL 4904895, at *48. The *TCL* court found Concur IP's data sufficiently reliable to make use of it in the court's FRAND determination. 2018 WL 4488286, at *17-18.

Moreover, in focusing on instances where there is no comment, InterDigital overlooks Mr. Sinha's testimony that a comment "was provided for at least one patent in each family." Ex. 4, 108:8-24. InterDigital did not pursue any further explanation at his deposition, for example as to when and why this was deemed sufficient. *See also* IDC Br. Ex. 7, 118:19-119:10.

The sole case InterDigital cites on this issue, *Wilderness Development, LLC v. Hash*, is easily distinguishable. In that case, the expert reviewed no discovery materials and merely offered generalities about stress on trees from harvesting, citing no facts from any materials reviewed that supported his opinions. No. CV 08-54 M-JCL, 2009 WL 564224, at *1, *5 (D. Mont. Mar. 5, 2009). It provides no basis for departing from much more on-point precedent allowing experts to rely on Concur IP's census and essentiality studies.

5.      **Their Analysis Is Accurate Within Reasonable, Disclosed Error Bounds**

Because *Daubert* states that courts should ordinarily consider the "potential rate of error" in a scientific analysis, 509 U.S. at 594, Dr. Kakaes derived and disclosed an error rate for the essentiality survey. Determining essentiality necessarily involves some degree of individual judgment. Therefore, the error rate is simply a measure of the extent of divergence between Dr. Kakaes's determinations and Concur IP's. To estimate this, Dr. Kakaes performed his own detailed review of a random sample of the patent families Concur IP surveyed, noting how often his determination differed from theirs. Dr. Ding did the same thing in *TCL*, where the court cited his declaration in noting that Concur IP's error rate was "only 9.5%." 2018 WL 4488286, at *16. The *TCL* court also cited a rate of disagreement between Dr. Kakaes's and Concur IP's results in that case. *Id.* at *18. The takeaway from *TCL* is that disclosure of the rate of disagreements between the surveyors and the lead expert is warranted and welcome.

In criticizing Dr. Kakaes for not changing the survey results in the small sample when he had a disagreement, Mot. at 12 n.7,  *TCL*, 2018 WL 4488286, at *16. InterDigital is mistaken as to the rationale of Dr. Kakaes's error rate determination. The point was not to selectively reverse Concur IP's decisions on essentiality of individual patent families. If it were, this would have amounted to Dr. Kakaes performing the analysis over again himself, defeating the purpose of having Concur IP do it. The actual point of the error check was to develop a confidence boundary on the share of patents determined in the essentiality survey. Once that number is derived, the error check's purpose has been fully served. Taking the further step InterDigital claims is necessary—i.e., changing the results on these families—would have been contrary to that purpose. It would have split the data into two classes: a small subset of the patent families that reflected Dr. Kakaes' decisions, and a remaining comprehensive set that reflected the Concur IP team's decisions. *See* IDC Br. Ex. 7, 73:14-74:5. Far from making the method better, this would in fact have introduced inconsistency. Instead, Dr. Kakaes presented a method that was uniform, with an understanding of the bounds on its accuracy.

Having explained how he performed the error check, Dr. Kakaes is not obligated to provide every granule of the drafting that went into it. *See* Mot. at 12-13 & n.7; *see also* IDC Br. Ex. 7,

13

1    158:10-159:16. The rules are clear that InterDigital is not entitled to receive expert drafts. *See* Fed.

2    R. Civ. P. 26(b)(4)(B). Moreover, InterDigital's apparent disagreement that Dr. Kakaes's proffered

3    bases and reasons justify his error rate conclusions is no basis for withholding the essentiality survey

4    evidence from the jury. *Kaur v. City of Lodi*, No. 14-cv-0828 GEB AC, 2016 WL 98752, at *2 (E.D.

5    Cal. Jan. 8, 2016) ("the point of Rule 26(a)(2)(B) is not to for defendants to provide plaintiffs with

6    opinions that plaintiffs can fully agree with, nor opinions that plaintiffs will agree are fully supported

7    by the proffered underlying bases and reasons").

8    **B.      In Characterizing The Patent Portfolio Quality Analysis As Unsupported,**

9    **InterDigital Overlooks Most Of The Support For That Analysis**

10   InterDigital's argument on Dr. Kakaes's patent portfolio quality assessment misses the bigger

11   picture. Nowhere does it acknowledge, for example, the obvious reason why InterDigital's

12   previously litigated patents are representative of low quality throughout the portfolio. InterDigital

13   would presumably have selected its "best" patents to assert in litigation, yet—in the numerous

14   examples Dr. Kakaes cites—could not show infringement even of these handpicked patents. Dr.

15   Kakaes reasonably inferred from InterDigital's woeful track record with its own selected patents that

16   its other patents may fare badly as well. IDC Br. Ex. 1, ¶ 281.

17   When addressing the example patents on which Dr. Kakaes presented an in-depth analysis,

18   InterDigital omits crucial information. Similar to his discussion of past InterDigital litigation, █

19   ████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████

21   ██████████████████████████████████████████████████

22   ██████████████████████████████████ Thus, Dr. Kakaes finds these patents a useful

23   indicator, coupled with other factors, in his assessment of portfolio quality. *Id.*, ¶ 281.

24   InterDigital also gives short shrift to Dr. Kakaes's process of selecting examples to illustrate

25   his point. In proceeding with ████████████████████████████████████

26   ████████████████████████████████████████████████████████

27   ███████████████ *Id.*, ¶ 205. █████████████████████████

28   ████████████████████████████████████████████████████████

---

14

1   ████████████████████████ *Id.*, ¶ 206. The bases for selecting these patents

2   is disclosed; if InterDigital seeks to criticize it, that is a matter of weight, not admissibility.

3   Furthermore, Dr. Kakaes' conclusion "that InterDigital's patent portfolio is "likely to be of below

4   average quality"" is not based solely on five patents, as InterDigital claims. Mot. at 7:27-8:2. Dr.

5   Kakaes simply looks at ██████████████████ in order to provide specific

6   examples of his broader opinions.

7        All of these conclusions, moreover, are made in the context of Dr. Kakaes's longstanding

8   experience in the field. *See, e.g.*, Ex. 3 at 190:10-16 ("to the extent that the invention was

9   fundamental to 4G, I would have noticed it.… Fundamental inventions stick out in an expert's mind,

10  and none of them stuck out in my mind."); *id.* at 196:23-197:7 ("I've seen lots of patents that belong

11  to a variety of assignees, including InterDigital, over the years…. I have not seen any InterDigital

12  patents that I would characterize as being in the upper 50th percentile in terms of quality relative to

13  other patents I have seen. And that's, again, confirmed by the evidence I provided in my report.").

14  InterDigital's claim of "failures" in this analysis is simply a laundry list of things InterDigital

15  apparently believes are relevant to patent portfolio quality. Its subjective disagreement is (again) a

16  matter for cross-examination, not admissibility. And when InterDigital tried to cross-examine Dr.

17  Kakaes on these points, he defended the bases of his analysis effectively. For example, in his

18  deposition he explained that InterDitigal had such negligible success in trying to prove infringement

19  at the ITC that "there was no need to develop anybody else's record and compare it to the zero out

20  of, roughly, 12 patents that were litigated by InterDigital at the International Trade Commission."

21  Ex. 3 at 181:1-5.

22        Finally, InterDigital relies on a post-trial factual finding—not an admissibility ruling—from

23  *TCL*, while again failing to provide the full picture. Dr. Kakaes's opinions on the quality of

24  Ericsson's portfolio were admitted into evidence at the *TCL* trial; the finder of fact in the present

25  case should have the chance to evaluate Dr. Kakaes's portfolio strength evidence just like the *TCL*

26  court did. Moreover, upon performing that evaluation, the court did not reject Dr. Kakaes's evidence

27  (as InterDigital implies); instead, the court expressly relied on it. *TCL*, 2018 WL 4488286, at *24

28  ("However, the Court does find some value in the technical analysis, particularly to show that

1  Ericsson's patent portfolio is certainly not as strong or essential as it has claimed. The Court uses

2  this finding in part to assist it in determining the final FRAND rate."). While the court did not find

3  the portfolio quality evidence useful in a direct economic calculation of FRAND "final numbers" (a

4  purpose for which it is not used in the present case), it did find Dr. Kakaes's technical evaluation of

5  patent portfolio strength to be admissible, relevant, and useful. *Id. TCL* thus does not support, but

6  rather undermines, InterDigital's motion on Dr. Kakaes's portfolio quality analysis.

7  **IV.  THE COURT SHOULD NOT EXCLUDE DR. SCOTT MORTON'S OPINIONS**

8  InterDigital's motion seeks to exclude expert testimony that purportedly covers "ultimate

9  issues" (Mot. at 1-3, 16-18), but that is not a basis to exclude testimony. *See* Fed. R. Evid. 704(a)

10  ("An opinion is not objectionable just because it embraces an ultimate issue."); *see also id.*,

11  Advisory Committee Notes ("the so-called 'ultimate issue' rule is specifically abolished by the

12  instant rule"). InterDigital's criticism of the testimony as "usurping the province of the jury" is

13  specifically called out as "empty rhetoric" in Rule 704(a)'s Advisory Committee Notes.

14  InterDigital's attempt to salvage this argument by characterizing Dr. Scott Morton's opinions

15  as "legal conclusions" misapplies the distinctions between proper and improper expert testimony,

16  while disregarding its own experts' transgression of the line between the two.

17  **A.  Dr. Scott Morton's Opinions Regarding ASUS's Breach of Contract Claims**

18  **Should Not Be Excluded**

19  *First*, what InterDigital characterizes as Dr. Scott Morton's opinions regarding the

20  interpretation of "Fair and Reasonable" and "Non-Discriminatory" are not improper legal

21  conclusions. *See* Mot. at 16.[3] ███████████████████████████████████

22  ███████████████████████████████████ *See, e.g.*, Ex. 1, ¶¶ 84-85,

23  90, 100, 116, 275-277, 280, 313, and 401; Ex. 2, ¶¶ 105, 332, and Ex. 2, "FRAND Appendix" ¶¶ 6-

24  9, 11-27. In one representative example, Dr. Layne-Farrar argues that ███████████████

25  ███████████████████████████████████████████████████

26  ███████████████  Ex. 1, ¶ 90. InterDigital's expert Dr. Putnam opines ██████████

27

28  [3] While InterDigital here cites paragraphs 89-90 of the Scott Morton Report, Mot. at 16, it does not
ask the Court to exclude these two paragraphs. Mot. at 21.

1   ████████████████████████████████████████████████████████████

2   ███████████████ Ex. 2, "FRAND Appendix" ¶¶ 11-27. ASUS has not moved to exclude these

3   sections of Dr. Layne-Farrar's and Dr. Putnam's reports as legal opinion, but if InterDigital's

4   argument were correct, it would exclude ████████████████████████████████ as well.[4]

5       Dr. Scott Morton, as an economist experienced in SSO and FRAND issues, is permitted to

6   testify on what is understood in her field—the economic understanding of "fair and reasonable" and

7   "nondiscriminatory." Similar testimony was allowed in an analogous context in *Microsoft*: "so as

8   long as [the expert] makes clear that his testimony is based on his knowledge of what was

9   understood in the legal community, and hence by [the SEP holder], . . . , his testimony is relevant

10  and proper.". *Microsoft*, 2013 WL 4008822, at *17; *RSUI Indem. Co., Inc. v. Vision One, LLC*, No.

11  C08-1386-RSL, 2009 WL 5125420 at *2 (W.D. Wash. Dec. 18, 2009) (finding "experts' opinions,

12  based on their wealth of experience, is helpful to the Court" involving conformance to industry

13  standards.).

14      *Second*, Dr. Scott Morton's opinion that ████████████████████████████████████

15  ███████████████████████████████████████████████████ is not an

16  excludable "legal conclusion." *See* Mot. at 16, citing IDC Br. Ex. 2 at ¶¶ 23, 218, 219. In seeking to

17  exclude these three paragraphs, InterDigital apparently aims to preclude Dr. Scott Morton from

18  stating the conclusion of her preceding analysis. ██████████████████████████████

19  ██████████████████████████████████████████████████████████████████

20  ██████████████████████████████████████████████████████████████████

21  ██████████████████████████████████████████████████████████████████████

22  ██████████████████████████████ IDC Br. Ex. 2, ¶¶ 211-217 (factual analysis),

23  218 (conclusion). Dr. Scott Morton's testimony is based on an appropriate analysis of complex facts

24  within the legal framework of FRAND. *See Advanced Thermal Sciences Corp v. Applied Materials*

25  *Inc.*, 2009 WL10673194 at *1 (C.D. Cal. Oct. 28, 2009) ("The analysis of complex facts, albeit

---

4   ASUS's *Daubert* motion does target some proposed testimony as legal opinion, but it reserves this
26  challenge for instances where InterDigital's experts engage in the equivalent of legal briefing, citing
27  and purporting to apply case law and arbitral orders. *See* ASUS Mot. at 5-7 and 17-19 (seeking
    exclusion of InterDigital expert opinions on Final Arbitration Award); *id.* at 9-13 (seeking exclusion
28  of opinions on the substance and impact of ITC determinations on FRAND).

1    within a legal framework, is a proper role for an expert."). InterDigital seeks to eliminate the

2    "punchline" of the discussion, but "expert testimony concerning an ultimate issue is not per se

3    improper." *Hangarter*, 373 F.3d at 1016; *see also* Fed. R. Evid. 704(a) ("An opinion is not

4    objectionable just because it embraces an ultimate issue."). In evaluating the admissibility of this

5    proposed testimony, the Court is simply tasked with deciding "whether the expert's testimony on an

6    ultimate issue of fact will be helpful to the jury." *Microsoft*, 2013 WL 4008822, at *12. For Dr. Scott

7    Morton to state the point of her discussion of ████████████████ would, at a minimum, help

8    a jury unfamiliar with FRAND licensing to understand why her analysis matters to the case. *See id.*

9    ("[I]n a more complicated case or a case dealing with a concept less familiar to ordinary jurors,

10   expert testimony on an ultimate issue may be useful for guiding the trier of fact through a

11   complicated morass of obscure terms and concepts.").

12        *Microsoft* provides an applicable example on this issue. In that case, the court permitted

13   expert testimony that a SEP holder's licensing offers were made in "good faith," noting that the case

14   (like this one) was "complicated" and that "the jury [would] be asked to hear, among other things,

15   evidence regarding offer letters of patent portfolios, industry royalty rates and ranges determined by

16   analysis of those patent portfolios, and the legal framework surrounding RAND licensing both

17   domestic and abroad." *Microsoft*, 2013 WL 4008822, at *19. All of those same issues are present in

18   the case at bar. The *Microsoft* court found that expert opinions which (like Dr. Scott Morton's)

19   "piece[d] together the evidence heard by the jury into an opinion on the issue" would "assist the trier

20   of fact in reaching its own decision" and were therefore admissible. *Id.*

21        *Third*, InterDigital raises the same flawed arguments against Dr. Scott Morton's conclusions

22   that ████████████████████████████████████████████████████████

23   ████████████      *See* Mot. at 17, citing IDC Br. Ex. 2 ¶¶ 185, 190 and IDC Br. Ex. 3 ¶ 11. As

24   discussed above, in this complex case, Dr. Scott Morton's testimony analyzing ████████████

25   ████████████████████████████████████████████████████████

26   ████████████████████████████      "will assist the trier of fact in reaching its own decision"

27   whether terms InterDigital offered to ASUS were non-discriminatory. *Microsoft*, 2013 WL 4008822,

28   at *19. Her articulation of the conclusion that ████████████████████████ would help orient a

1    jury as to its significance. *Fidelity Nat'l Financial, Inc. v. Nat'l Union Fire Ins. Co.*, No. 09-CV-

2    140-GPC-KSC, 2014 WL 1286392, at *8 (S.D. Cal. Mar. 28, 2014) (distinguishing between

3    impermissible testimony that "invades the court's authority by discoursing broadly over the entire

4    range of the applicable law and the permissible, helpful expert testimony that directs the jury's

5    understanding of the legal standards upon which their verdict must be based") (internal quotation

6    marks, emphasis, and bracketing omitted).

7         *Fourth*, InterDigital challenges Dr. Scott Morton's opinion that █████████████

8    ████████████████████████████████████████ and is thus a legal conclusion

9    on an ultimate issue. Mot. at 17 (citing IDC Br. Ex. 2, ¶ 19). But this case is generally about FRAND

10   related claims; ███████████████████████████████████████

11   █████████████████████████████████████████████████████████

12   ██████████████████████████

13        InterDigital's argument for excluding this testimony finds no basis in law (and InterDigital

14   cites none). In the sole paragraph of her report addressed by this argument, paragraph 19, Dr. Scott

15   Morton ████████████████████████████████████████████████████

16   ██████  There is nothing inherently "legal" or improperly "ultimate" in stating that conclusion. The

17   Court in *Huawei* found that an expert's report that provided factual context and relayed the expert's

18   conclusion that the SEP holder acted as a willing licensor and the potential licensee did not "will

19   prove helpful to the jury in determining the ultimate issue of whether either party breached its

20   FRAND obligations." *Huawei*, 2018 WL 4904895, at *47. Similarly here, Dr. Scott Morton's

21   █████████████████████████████████████████████████████████

22   ████████████  will be helpful to the jury in determining the ultimate issue of breach of FRAND.

23   **B.     Dr. Scott Morton's Opinions Related To ASUS's Sherman Act Claim Should Not**

24   **Be Excluded**

25        Dr. Scott Morton's proposed testimony "concerning alleged acquisition, maintenance, and

26   abuse of monopoly power in the Cellular Technology Markets" and that InterDigital has engaged in

27   patent holdup are not inadmissible "legal conclusions." *See* Mot. at 17-18 (citing IDC Br. Ex. 2 at ¶¶

28   24, 111, 114, 174). InterDigital cites no case law excluding these types of opinions, but rather rests

1  on a conclusory assertion that they "comprise legal opinions" and "relate to ultimate issues for the

2  jury." Mot. at 18. These are inadequate grounds for exclusion. As discussed above, it is appropriate

3  for the experts to state the conclusions of their analysis, identifying why those conclusions matter.

4  Further, "monopoly power" and "patent hold-up" are not everyday concepts a jury can apply without

5  expert assistance. *See Apple v. Motorola*, 757 F.3d 1286, 1333 (Fed. Cir. 2004) (Rader, C.J.,

6  dissenting in part) (commenting that "hold up" in the context of SEP licensing is a "complex factual

7  question[]" that is observed by "market analysts"), overruled on other grounds, *Williamson v. Citrix*

8  *Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (en banc).

9          InterDigital misapplies the law in arguing that Dr. Scott Morton's testimony on "whether

10  InterDigital's alleged conduct caused any injury (to ASUS or competition generally) lacks

11  foundation and usurps the role of the jury, as it concerns a factual question on an ultimate issue." *See*

12  Mot. at 18 (citing ¶¶ 25, 238). This characterization supports admissibility, not exclusion. *Microsoft*,

13  2013 WL 4008822, at *11 ("An expert witness may testify about ultimate issues of fact, but not

14  ultimate issues of law."), citing Fed. R. Evid. 704(a). Further, InterDigital's two cited "causation"

15  cases are irrelevant to the question of expert opinion admissibility, and merely relate to the division

16  of issues between judge and jury. *See* Mot. at 18, citing *In re W. Liquid Asphalt Cases*, 487 F.2d 191,

17  199 (9th Cir. 1973) and *Pac. Shores Props., Ltd. Liab. Co. v. City of Newport Beach*, 730 F.3d 1142,

18  1168 (9th Cir. 2013).

19          InterDigital seeks to exclude Dr. Scott Morton's testimony that "antitrust enforcement is an

20  appropriate remedy for InterDigital's anticompetitive behavior[.]" *See* Mot. at 18, citing IDC Br. Ex.

21  2 at ¶ 26) and relying on *Arista Networks, Inc. v. Cisco Sys. Inc.*, Case No. 5:16-cv-00923-BLF, Dkt.

22  334 at 9 (N.D. Cal. June 15, 2018). In *Arista*, the Court found that the expert's testimony of "what

23  conduct the antitrust laws should or should not allow" was improper. Here, Dr. Scott Morton does

24  not opine on whether antitrust laws should prohibit InterDigital's conduct. Rather, she opines that

25  ██████████████████████████████████████████ This is a different question,

26  akin to the analysis of "antitrust injury" commonly addressed by economic experts. *See* IDC Br. Ex.

27  2 ¶ 239 (identifying harm to competition, not only to competitors); *see also, e.g.*, Ex. 2, ¶ 13, and Ex.

28  9, ¶¶ 2.2-2.21, 6.63-6.67 ████████████████████ *see also id.*, ¶¶ 2.3

1   & 3.2(d) █████████████████████████████████████████

2   ███████████████████████████████████████████████████

3   ████████████

4   **C.    InterDigital's Miscellaneous Challenges Are Wholly Lacking In Support**

5   At the end of its Motion, InterDigital requests relief encompassing paragraphs of Dr. Scott

6   Morton's expert report for which it identifies absolutely no basis for exclusion. *See* Mot. at 21.

7   While InterDigital lists paragraphs 119, 201, 20-22, 24, 100-112, 116, 170-71, 173, 192, 204-08, and

8   210 of Dr. Scott Morton's Corrected Report and paragraphs 8 and 16 of her Supplemental Report in

9   its list of paragraphs to be excluded, none of these paragraphs are discussed in the body of its

10  Motion, nor does InterDigital link them in any way to any of its arguments. For this additional

11  reason, InterDigital's motion as to these paragraphs of Dr. Scott Morton's reports is baseless and

12  should be denied.

13  **V.    THE COURT SHOULD NOT EXCLUDE DR. LEONARD'S OPINIONS**

14  InterDigital relies on a single case, *Microsoft*, for its arguments to exclude Dr. Leonard's

15  testimony, claiming that Dr. Leonard opines on █████████████████████████████████

16  █████████████████   *See* Mot. at 18-20. The *Microsoft* court held that testimony on "the

17  interpretation of the RAND obligation vis-à-vis the rights and obligations of the SEP holder and

18  implementer" is prohibited. *Microsoft*, 2013 WL 4008822, at *14. Here, none of Dr. Leonard's

19  testimony that InterDigital seeks to exclude purports to define "the rights and obligations of the SEP

20  holder and implementer" under the RAND obligation.

21  Instead, Dr. Leonard opines on the "conceptual economic matter" that the FRAND royalty

22  for an SEP is capped by the "inherent economic value that the patented technology generates." IDC

23  Br. Ex. 4, ¶ 37. Dr. Leonard's opinion provides an economic rationale for having a FRAND

24  requirement at all, rather than permitting an SEP holder to appropriate the value of standardization.

25  This puts FRAND into context, and thereby will "aid the jury in understanding the facts in evidence"

26  and ultimately in reaching its own conclusion regarding whether InterDigital breached its FRAND

27  obligations. *Hangarter*, 373 F.3d at 1017. Contrary to InterDigital's assertion, the *Microsoft* court

28  did not exclude "similar testimony" of Dr. Leonard. *See* Mot. at 19, citing *Microsoft*, 2013 WL

1    4008822, at *22. In *Microsoft*, the court excluded his testimony as to: whether RAND required an

2    SEP owner to treat differently situated licensees similarly, whether "good faith" means an offer is

3    "meant to be the start of a negotiation through which the parties can reach a RAND license[,]" and

4    whether a party had "established a reliable basis for calculating its damages[.]" *Microsoft*, 2013 WL

5    4008822, at *21-22. None of these statements even resembles the economic rationale for FRAND

6    presented by Dr. Leonard.

7         InterDigital next claims that Dr. Leonard offered ███████████████████████████

8    ████████████████████████ Mot. at 19, citing IDC Br. Ex. 4 at ¶¶ 46, 49. Not so, Dr.

9    Leonard, as an economist, is permitted to opine that a FRAND royalty rate should be "economically

10   feasible" for standard-implementers. *See Metaswitch Networks Ltd. v. Genband US LLC*, 2016 WL

11   874775 at *2 (E.D. Tex. Mar. 7, 2016) (finding that the expert's opinion related to the SEP holder's

12   FRAND obligations was permissible as his analysis "necessarily requires him to analyze the scope

13   and nature of the alleged FRAND commitment and to give his opinions about its economic effect").[5]

14        InterDigital contends that Dr. Leonard's opinions that ███████████████████████

15   ███████████████████████ are legal conclusions, but that is not the case. Mot. at 19-20,

16   citing IDC Br. Ex. 4 at ¶¶ 219, 234, 236; IDC Br. Ex. 5 at ¶ 4. To the contrary, Dr. Leonard's

17   opinions merely "piece[] together" his ██████████████████████████████████████

18   ████████ and shows the significance of his analysis. *See Microsoft*, 2013 WL 4008822, at *19.

19   Thus, Dr. Leonard's testimony is properly within the scope of testimony that is permissible, and

20   moreover, helpful to the jury. *Id.*; *Huawei*, 2018 WL 4904895, at *47.

21        InterDigital is again incorrect to apply the "legal conclusion" label to Dr. Leonard's

22   testimony ████████████████████████████████████████ *See* Mot. at 20 (citing

23   IDC Br. Ex. 4, ¶¶ 119, 124). Dr. Leonard's statement that ████████████████████████

24   ████████████████████████████████████ is an economic statement with a

25   _____

[5] ████████████████████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████████████████

28   ████████████████████████████████████████████

1   foundation in economic reasoning regarding the bargaining positions of licensors and licensees. IDC

2   Br. Ex. 4, ¶ 119. The preceding paragraphs of Dr. Leonard's report explain that the likelihood of an

3   SEP holder being granted an injunction has decreased recently, meaning that ███████████████████

4   ████████████████████████████████████████████████████████████████████ Thus, Dr.

5   Leonard's testimony is merely a logical conclusion to the injunction observation. Similarly, Dr.

6   Leonard's opinion that ██████████████████████████████████████████████████████████████

7   ██████████████████████████████████████ is proper expert testimony as it is the logical

8   conclusion of economic reasoning about relative power in negotiations.

9          As with Dr. Scott Morton's testimony, InterDigital again seeks to exclude paragraphs neither

10   discussed nor cited in the body of its Motion. Mot. at 21 (listing ¶¶ 35, 112-13, 226 of the Corrected

11   Expert Report of Dr. Leonard and ¶¶ 11 and 12 of the Second Supplemental Expert Rebuttal Report

12   of Dr. Leonard). InterDigital's Motion as to these paragraphs should also be denied as baseless.

13   **VI.    CONCLUSION**

14          For the reasons addressed herein, ASUS respectfully requests that the Court deny

15   InterDigital's motion to exclude expert testimony.

16

17

18          Dated: December 5, 2018

19                                          By: */s/ Michael R. Franzinger*
                                            Michael R. Franzinger

20
                                            *Attorney for Plaintiffs*
21                                          ASUS COMPUTER INTERNATIONAL, and,
                                            ASUSTEK COMPUTER INCORPORATED
22

23

24

25

26

27

28